1  KELLY M. KLAUS (State Bar No. 161091)
   kelly.klaus@mto.com
2  VIRGINIA GRACE DAVIS (State Bar No. 336732)
   grace.davisfisher@mto.com
3  **MUNGER, TOLLES & OLSON LLP**
   560 Mission Street, 27th Floor
4  San Francisco, California 94105-2907
   Telephone:   (415) 512-4000
5  Facsimile:   (415) 512-4077

6
   BETHANY W. KRISTOVICH (State Bar No. 241891)
7  bethany.kristovich@mto.com
   BENJAMIN G. BAROKH (State Bar No. 318629)
8  benjamin.barokh@mto.com
   **MUNGER, TOLLES & OLSON LLP**
9  350 South Grand Avenue, 50th Floor
   Los Angeles, California 90071-3426
10 Telephone:   (213) 683-9100
   Facsimile:   (213) 687-3702
11
   Attorneys for Defendant
12
                UNITED STATES DISTRICT COURT
13
               CENTRAL DISTRICT OF CALIFORNIA
14
                      WESTERN DIVISION
15

16 CONOR WOULFE and PETER              Case No. 22-cv-00459-SVW-AGR
17 MICHAEL ROSZA,
                                       **DECLARATION OF KELLY M.**
18          Plaintiffs,                **KLAUS IN SUPPORT OF**
                                       **DEFENDANT'S *EX PARTE***
19     vs.                             **APPLICATION TO STRIKE**
                                       **SECOND AMENDED COMPLAINT**
20                                     **[DKT. NO. 36] FOR VIOLATION**
   UNIVERSAL CITY STUDIOS LLC,         **OF CIV. L.R. 15-1 AND FOR**
21                                     **SANCTIONS**
22          Defendant.
                                       Judge:   Hon. Stephen V. Wilson
23
24                                     Filed Concurrently:  *Ex Parte*
25                                     Application; [Proposed] Order
26
27
28
                                          Case No. 22-cv-00459-SVW-AGR

I, Kelly M. Klaus, hereby declare:

1.     I am admitted to practice before all of the Federal and State courts in the State of California, including the United States District Court for the Central District of California.  I am a partner in the law firm of Munger, Tolles & Olson LLP, counsel for Defendant Universal City Studios LLC ("Universal" or "Defendant") in the above-captioned matter.  I submit this declaration in support of Defendant's *Ex Parte* Application to Strike Second Amended Complaint and for Sanctions.  The contents of this declaration are based on my personal knowledge.  If called as a witness, I could and would testify competently to the matters set forth in this declaration.

2.     On May 4, 2022, Plaintiffs filed an *Ex Parte* Application for Leave to File Second Amended Complaint.  Dkt. No. 28.  Pursuant to Local Rule 15-1, Plaintiffs attached to their application a Proposed Second Amended Complaint ("Proposed SAC") that, in redline format, showed all the changes they intended to make to their FAC.  Dkt. No. 28-3; *see* Civ. L.R. 15-1 ("Any proposed amended pleading must be filed as an attachment to the related motion").

3.     On May 26, 2022, the Court granted Plaintiffs' application and authorized Plaintiffs to file the Proposed SAC.  Dkt. No. 35.

4.     On June 1, 2022, one of my colleagues on this matter, Grace Davis Fisher, reached out to Plaintiffs' counsel by email to ask why Plaintiffs had not yet filed the Proposed SAC and to request Plaintiffs' agreement to a briefing schedule for Universal's renewed Motions to Strike and Dismiss that pleading.  Ms. Davis Fisher's email specifically referenced and quoted the language from Local Rule 15-1 that required Plaintiffs, upon the Court's Order, to "promptly thereafter file the pleading approved by the Court as a separate document in the Court's CM/ECF System."  Civ. L.R. 15-1.  (A true and correct copy of that email, and all other emails relating to the instant application, is attached hereto as Exhibit 1.  Ms. Davis Fisher's June 1 email is the bottom email in that chain.)

5.     Later that same day, June 1, Matthew Pequignot, one of the two lawyers representing Plaintiffs, responded that he had been recovering from an illness and catching up on work, "but, yes, we do intend to file a clean copy soon." Mr. Pequignot also said that he or his co-counsel, Cody LeJeune, would "circle back soon about the briefing schedule."  Ex. 1.

6.     As of Friday, June 3, after we had not heard anything further from Plaintiffs' counsel or seen the filing of the Proposed SAC, another of my colleagues, Benjamin Barokh, reached out to Plaintiffs' counsel.  Mr. Pequignot's response to this email stated that the members of his family had been experiencing significant health issues, as had a member of his staff, but that we would hear an answer on the briefing schedule by the following Monday, and that "[w]e should also have the SAC filed by then."  (We have redacted from the email chain attached at Exhibit 1 Mr. Pequignot's statements about the health issues affecting other parties out of respect for their privacy.)  Mr. Barokh's reply sent the same day made clear that we understood and were respectful of the health issues and wished all concerned well.  Ex. 1.

7.     Near the end of the day on Monday, June 6, we still had not received a response regarding the briefing schedule or seen the filing of the Proposed SAC.  Mr. Barokh again reached out to Plaintiffs' counsel.

8.     Shortly after midnight on June 7, we received an ECF notification that Plaintiffs had filed a Second Amended Complaint.  This was 12 days after the Court's order granting leave to file the Proposed SAC.  At 1:38 a.m. Pacific Time on June 7, Mr. Pequignot sent an email stating he had been told by his co-counsel, Mr. LeJeune, that the dates in the stipulation "seem fine."  Ex. 1.

9.     When we downloaded the SAC through the ECF system, we quickly discovered that Plaintiffs had not filed the Proposed SAC, but a significantly different and revised SAC ("Filed SAC").  The Filed SAC added dozens of new allegations and two new claims that were not in the Proposed SAC the Court had

approved.  Dkt. Nos. 28-3, 35, 36.  A true and correct copy of a redline showing the changes that the Filed SAC makes to the Proposed SAC is attached hereto as Exhibit 2.  (The formatting of Exhibit 2 has a large number of blank spaces because we only had a redlined PDF version of the Proposed SAC against which to compare changes to the Filed SAC.)

10.     Later in the morning of June 7, I emailed Plaintiffs' counsel to notify them of the violation of Local Rule 15-1.  I asked Plaintiffs' counsel to remedy the violation by withdrawing the Filed SAC and filing the clean version of the Proposed SAC, as Rule 15-1 requires.  I said that if Plaintiffs would not comply with the Rule, we would have no choice but to seek *ex parte* relief.  Ex. 1.

11.     Plaintiffs' counsel sent back a lengthy reply that expressed "disappoint[ment]" at what he claimed was my suggestion he had been "dishonest" about his family and staff member's health situation; that purported to justify Plaintiffs' filing of the Filed SAC rather than the Proposed SAC; and that asked Universal to stipulate to a briefing schedule we had worked out for our motions directed to the Proposed SAC.  Plaintiffs' counsel also indicated that Plaintiffs would oppose this *ex parte* application and possibly file their own *ex parte* application seeking leave to authorize the filing of the Filed SAC.  Ex. 1.

12.     I responded by email.  I stated I had never suggested or even believed Plaintiffs' counsel had been untruthful about the health issues, but that those issues were not the point.  I again requested that Plaintiffs obviate the need for this application by filing the Proposed SAC in compliance with Rule 15-1.  Ex. 1.

13.     On June 8, 2022, at 3:23 p.m. Pacific Time, Plaintiffs' counsel responded to my email, indicating that they "disagree that Plaintiffs violated any rule" and again refusing to file the Proposed SAC in compliance with Local Rule 15-1.  Ex. 1.

14.     At this point, Universal does not know which complaint it should be responding to.  Local Rule 15-3 would appear to make the Proposed SAC the

-3-

DECLARATION OF KELLY M. KLAUS IN SUPPORT OF *EX PARTE* APPLICATION TO STRIKE SECOND AMENDED COMPLAINT AND FOR SANCTIONS

operative complaint, and to deem it served as of May 26, in which case Universal's response date would be tomorrow, June 9. (As noted above, we had an agreement with Plaintiffs' counsel we could have until June 30 to respond to the Proposed SAC.) Now that Plaintiffs have filed the Filed SAC, we do not know if Universal's time to respond to that complaint started running yesterday, June 7. If Universal were to seek the relief requested in this application by way of a noticed motion, there is a risk that Universal's response time may have run by the time that motion was resolved. Universal therefore is presenting this matter by way of an *ex parte* application.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that I executed this declaration this eighth day of June 2022 at San Francisco, California.

*/s/ Kelly M. Klaus[1]*
Kelly M. Klaus

---

[1] This document is electronically signed and filed by Benjamin G. Barokh on behalf of Kelly M. Klaus with Mr. Klaus' authorization.

# EXHIBIT 1

| From: | Klaus, Kelly |
|---|---|
| To: | Matthew Pequignot; Barokh, Benjamin; Davis Fisher, Grace; Cody LeJeune |
| Cc: | Kristovich, Bethany |
| Subject: | RE: Woulfe v. Universal City Studios LLC, No. 2:22-cv-00459-SVW-AGR |
| Date: | Wednesday, June 8, 2022 5:10:37 PM |

Hi Matt:

I appreciate you getting back to me, but I am sorry that Plaintiffs still will not remedy the indisputable violation of Local Rule 15-1.  We will be filing our ex parte application via the ECF system, and we will let the Court know that Plaintiffs intend to oppose it.

Pursuant to Judge Wilson's Standing Order, please be advised that opposing papers must be filed not later than 3:00 p.m. on the first business day succeeding the day the ex parte application was served.

Regards,
Kelly

---

**From:** Matthew Pequignot <mpequignot@pmiplaw.com>
**Sent:** Wednesday, June 08, 2022 3:23 PM
**To:** Klaus, Kelly <Kelly.Klaus@mto.com>; Barokh, Benjamin <Benjamin.Barokh@mto.com>; Davis Fisher, Grace <Grace.DavisFisher@mto.com>; Cody LeJeune <cody@lejeunelawfirm.com>
**Cc:** Kristovich, Bethany <Bethany.Kristovich@mto.com>
**Subject:** Re: Woulfe v. Universal City Studios LLC, No. 2:22-cv-00459-SVW-AGR

Kelly –

As you're aware, I live in Hawaii which is 3 hours earlier, so 10am (I presume PST) would have been 7am for me. I am also working on a genuine emergency matter just requested by a Canadian client this morning for a deadline set by statute and international treaty (in other words, it is not extendible for any reason, absent Congressional amendment of the relevant statute, and international action.). Though you've seen my preliminary thoughts on this matter, given these circumstances, it was essentially impossible for me to consult with my clients (that live in different areas of the country and may or may not be available today) to get you a concrete answer by a "deadline" you set well after business hours last evening (nearly 10PM PST, despite obviously being aware of the issue that morning).

Moreover, I will parrot your relatively recent email to me (pertaining to my clients' *ex parte* application, which actually was an emergency, given the anti-SLAPP rules): I don't see how your desire to file a motion to strike is an emergency (warranting an *ex parte* application) under the

circumstances. Among other issues:

- Though you may have been preparing a motion to dismiss based on the SAC attached to the *ex parte* application, all of that content remains in the SAC as filed. You've also had knowledge of Plaintiffs' claims, including the lion's share of their particular detail, since at least March 4th.

- Many of the additional words in the SAC are simply clarifying details already alleged; are making more explicit what was (at least) already implicit; or are addressing Defendant's arguments and purported evidence improperly raised in Defendant's prior motions.

- June 30th is a generous enlargement of time under any circumstance, and especially under these.

- There is no scheduling order issued in this case yet, thus a deadline for amending the pleadings has not even been set (and therefore could not have been missed).

- There is no credible claim of prejudice that Universal can advance in support of opposing Plaintiffs' SAC filing.

Although you complain that you have been working on a motion directed to the SAC attached to the *ex parte* application (which is unfounded as I've already explained), we were forced to prepare nearly a full opposition to your dual-motions (while dealing with illnesses and their attendant issues) which was only necessitated by Universal's refusal to consent to the SAC, which was wasteful and burdensome to us, and not well-taken particularly in view of the "extreme liberality" standard for amending pleadings in the 9th Circuit, so that cases can be decided on their merits and not based on technicalities. DCD Programs, Ltd., v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987). If you file your own *ex parte* application on this issue, the issue could repeat itself, and this time also again due to Universal's actions, and not Plaintiffs.

Although we disagree that Plaintiffs violated any rule, as you well know, your client can consent to the amendment of any pleading. See FRCP Rule 15(a)(2). Therefore, I will ask (without conceding that any allegation of Universal is correct) that Universal signify its consent by simply briefing the SAC as filed using normal motion procedure. If the issue is only that you need more time (as your email seems to suggest), please let me know how much more time you need, and if your request is reasonable, I'm sure we can accommodate you. We've already agreed to an earlier generous extension (agreed to, even before you raised these issues), but since the stipulation is not yet on file, it is a simple matter to change dates.

Conversely, if you intend to proceed with your *ex parte* application, please advise us immediately. If that is the case, be reminded that Plaintiffs will likely file their own precautionary *ex parte* application to preserve their rights. Therefore, please also indicate if Universal will oppose Plaintiffs' own *ex parte* application. Again, we are available for a telephone call to discuss the issue of Plaintiffs' application as needed.

All of that said, at the current juncture, our current posture is that Plaintiffs will oppose Universal's motion (if brought), even though we have not yet had the opportunity to consult our clients.

We could all spend our time more productively focusing on the merits of this case. Therefore, I am hopeful that we can reach an agreement that gives Universal the time it perceives that it needs to oppose the SAC using normal motion practice (thereby avoiding wasteful *ex parte* practice).

Sincerely,

Matt Pequignot

Matthew A. Pequignot
Pequignot + Myers
t. 202.328.1200
f. 202.328.2219
www.pmiplaw.com

This transmission contains confidential and/or legally privileged information from PEQUIGNOT + MYERS intended only for the use of the individual(s) to which it is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, copying or distribution of this information or the taking of any action in reliance on the contents of this transmission is strictly prohibited. If you have received this transmission in error, please notify us immediately.

---

**From:** "Klaus, Kelly" <Kelly.Klaus@mto.com>
**Date:** Tuesday, June 7, 2022 at 6:43 PM
**To:** Matthew Pequignot <mpequignot@pmiplaw.com>, "Barokh, Benjamin" <Benjamin.Barokh@mto.com>, "Davis Fisher, Grace" <Grace.DavisFisher@mto.com>, Cody LeJeune <cody@lejeunelawfirm.com>
**Cc:** "Kristovich, Bethany" <Bethany.Kristovich@mto.com>
**Subject:** RE: Woulfe v. Universal City Studios LLC, No. 2:22-cv-00459-SVW-AGR

Matt —

I did not in any way suggest or state that you had been dishonest regarding the significant health issues you and your family have endured over the last few weeks. I believed you when you told us your family was experiencing those difficulties, and I believe you now. I am very sorry for everything you, your wife, and your children have had to go through. And as I said in my email below, I am glad to know that things have gotten better for your family.

Respectfully, however, the issue is not whether you were being honest about your family's significant health problems.  The issue is that plaintiffs clearly violated Local Rule 15-1 by filing a *different* SAC than the "*the pleading approved by the Court*."  The new SAC includes dozens of new factual allegations, spanning multiple pages, and two entirely new claims for relief.  Plaintiffs did not inform us they intended to do this.  And plaintiffs did not seek, much less receive, Court approval to do this.  Local Rule 15-1 is clear and unambiguous, and plaintiffs violated it.  The point is beyond dispute, and your email conspicuously does not deny the violation.  Courts have stricken complaints where plaintiffs have done exactly what plaintiffs have done.  *See, e.g., Lin v. Chicago Title Ins. Co.*, 2010 WL 11549337, at *1–2 (C.D. Cal. Sept. 2, 2010), *aff'd*, 501 F. App'x 655 (9th Cir. 2012) (striking an amended complaint because it added 5 paragraphs and 3 pages to the proposed amended complaint and concluding that the plaintiff's actions were "in violation of the Local Rules, the Federal Rules of Civil Procedure, and this Court's order" granting leave to amend); *see also* Local Rule 83-7 (providing for sanctions for violations of the Local Rules).

Since the Court granted leave to amend on May 27, we have been preparing a response based on the SAC plaintiffs attached to their ex parte application.  It was on the basis of that SAC that we asked, and you agreed, we could have until June 30 for our response.  We have not been preparing a response to a new complaint that adds many pages of new allegations and new claims for relief.

You say plaintiffs' new allegations and claims are intended to address the motions to strike and dismiss the first amended complaint (FAC).  The Rules provide a mechanism for plaintiffs to seek that relief, namely, a motion to amend.  We are in the situation where we have a motion on file and the SAC the Court approved because plaintiffs did not wait to see our motion and then move to amend in response to that.  Plaintiffs instead went in ex parte and asked for leave to file an SAC that plaintiffs attached to their ex parte application.  The Court granted your request, but Court did not say that plaintiffs could amend their pleading to respond to the brief that we had

already filed.  Under the Court's Order and Local Rule 15-1, plaintiffs were required to file the SAC they submitted with their application.  If plaintiffs want to amend once again, they should file the SAC that complies with the Local Rules and then meet and confer with us and, if we cannot reach agreement, file a motion to amend.

I reiterate our request that plaintiffs withdraw the new SAC and file the pleading attached to your ex parte application as the Local Rule requires. Please let us know by 10 am tomorrow if plaintiffs will comply with Rule 15-1 and honor their agreement to stipulate that we may have until June 30 to respond to that SAC.  If plaintiffs will not do that, we will proceed with our ex parte application.

Thanks,
Kelly

---

**From:** Matthew Pequignot <mpequignot@pmiplaw.com>
**Sent:** Tuesday, June 07, 2022 2:05 PM
**To:** Klaus, Kelly <Kelly.Klaus@mto.com>; Barokh, Benjamin <Benjamin.Barokh@mto.com>; Davis Fisher, Grace <Grace.DavisFisher@mto.com>; Cody LeJeune <cody@lejeunelawfirm.com>
**Cc:** Kristovich, Bethany <Bethany.Kristovich@mto.com>
**Subject:** Re: Woulfe v. Universal City Studios LLC, No. 2:22-cv-00459-SVW-AGR

Hi Kelly —

We have prepared proposed revisions to the stipulation which are mostly formal in nature, but which otherwise essentially agree to your proposed answer/response deadline enlargement and briefing schedule. Cody should be sending that to you shortly. In other words, we are agreeing that Universal will have until June 30, 2022 to respond to the SAC.

I'm otherwise frankly disappointed at the suggestion that I would be dishonest about either ███ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ █████████████████ The suggestion that I would be dishonest is particularly surprising given that we have tried to be amicable and accommodating in virtually all respects when Universal asks for reasonable accommodation. At this point, for example, I think we have accommodated every request of Universal.

Conversely, Universal has refused even the most basic of requests – burdening everyone as a result – our request for Universal's consent that Plaintiffs would file an amended complaint to avoid motion practice as contemplated by LR 7-3. Prior to that, Plaintiffs had avoided serving the original complaint for the express purpose of not burdening Universal, when Plaintiffs knew that an FAC was forthcoming (after compliance with the notice provisions of the CLRA was complete). In other words, under the spirit of the rule, a new amended complaint should have been allowed a matter of right, with no leave required. But Universal opposed anyway.

When Universal would not agree to an SAC, that decision forced Plaintiffs to rush to file an *ex parte* application seeking leave, which was basically a race to the courthouse necessitated by Universal's refusal to consent (viewed at least in the context of the anti-slapp procedural rules). Unfortunately, it was only after we filed the *ex parte* application for leave that we gained the benefit of Universal's motion which, itself, violated LR 7-3. That is, the motion raised many issues never discussed in the required pre-motion meet and confer, in addition to also raising many issues of fact, which Universal expressly represented that it would not do. These new issues raised by Universal, in turn, counseled that Plaintiffs address them.

Of course, at this juncture, we expect that Universal would have complained either way. If Plaintiffs didn't address all of the arguments in Universal's motions, Universal would have claimed that we sat on our hands and gave up the right. And now where we have addressed them, Universal also objects.

All of the above said, given the liberal pleading standards and background facts here - the fact that Plaintiffs' SAC merely addresses issues raised in Defendant's motion and the fact that Plaintiffs are agreeing to provide Universal with a liberal enlargement of time to respond (despite nearly all the legal issues being the same) - we respectfully request that you not file the proposed *ex parte* application. Alternatively, we suggest that you address the SAC in normal motion practice, with any Universal motion being due on or before June 30th. Alternatively, if Universal will not so agree, please take this as notice that Plaintiffs may file – as a precaution – their own *ex parte* application explaining the above facts and requesting approval of the SAC. To be clear, we don't think this should be required under the circumstances, but Universal's current posture is (possibly) forcing this precautionary extra step. Indeed, any extra burden which has been incurred by any party during the last couple of months has been necessitated by Universal, and not Plaintiffs, which we believe will be readily apparent if forced to address the issue. If you would like a call to discuss Plaintiffs' proposed *ex parte* application (which, again, we think should be unnecessary), please let us know.

Sincerely,

Matt Pequignot

Matthew A. Pequignot
Pequignot + Myers
t. 202.328.1200
f. 202.328.2219
www.pmiplaw.com

This transmission contains confidential and/or legally privileged information from PEQUIGNOT +
MYERS intended only for the use of the individual(s) to which it is addressed. If you are not the
intended recipient, you are hereby notified that any disclosure, copying or distribution of this
information or the taking of any action in reliance on the contents of this transmission is strictly
prohibited. If you have received this transmission in error, please notify us immediately.

---

**From:** "Klaus, Kelly" <Kelly.Klaus@mto.com>
**Date:** Tuesday, June 7, 2022 at 8:44 AM
**To:** Matthew Pequignot <mpequignot@pmiplaw.com>, "Barokh, Benjamin"
<Benjamin.Barokh@mto.com>, "Davis Fisher, Grace" <Grace.DavisFisher@mto.com>, Cody
LeJeune <cody@lejeunelawfirm.com>
**Cc:** "Kristovich, Bethany" <Bethany.Kristovich@mto.com>
**Subject:** RE: Woulfe v. Universal City Studios LLC, No. 2:22-cv-00459-SVW-AGR

Hi Matt –

Glad you and your family are feeling better.  I need to raise a serious issue with
you.  We have reviewed the second amended complaint (SAC) that you filed
very early this morning.  It is not the version of the SAC you asked for leave to
file or that the Court approved when it granted your application.  You have
added numerous additional material and two new causes of action.

This is a flat-out violation of Local Rule 15-1, which provides:

> L.R. 15-1 Separate Document. Any proposed amended pleading must be filed
> as an attachment to the related motion or stipulation. In addition, unless
> exempted from electronic filing by L.R. 5-4.2(a)(1), <u>a party who obtains leave of
> Court to file an amended pleading must promptly thereafter file the pleading
> approved by the Court as a separate document in the Court's CM/ECF System</u>.

Plaintiffs failed to file the SAC promptly.  Based on your representations to us,
we thought this was because you were dealing with health issues, which we
could understand and of course accommodate.  But it now appears plaintiffs
used the time to rewrite the SAC, including adding new claims.  It is hard to
conceive of a more flagrant violation of the Local Rule.

I do not know if you and Cody had read the Local Rule when you prepared and filed a rewritten version of the SAC.  Regardless, you are charged with knowing and complying with the Local Rules.

Our preference would be to resolve this matter without Court intervention.  By this email, I request that you immediately file a notice of withdrawal of the SAC that you filed this morning, and that you immediately file a corrected SAC, which is a clean version of the redlined SAC you filed with your ex parte application.  In addition, we need to get the stipulated briefing schedule on file with the Court today.  Under Local Rule 15-3, the prior SAC was deemed served on May 27, and we need to extend our response deadline as agreed.  Therefore, I also request that you immediately approve and authorize us to file the stipulation and proposed order we sent you last week.

We need your immediate response to these requests.  If plaintiffs will not agree, or we do not hear from you, we will have no choice but to file an ex parte application asking the Court to strike the SAC, extend our response time to the SAC filed with your ex parte application, and award sanctions for the costs we will have incurred in dealing with your violation of Local Rule 15-1.  I really hope that will not be necessary.

Thanks,
Kelly

---

**From:** Matthew Pequignot <mpequignot@pmilaw.com>
**Sent:** Tuesday, June 07, 2022 1:38 AM
**To:** Barokh, Benjamin <Benjamin.Barokh@mto.com>; Davis Fisher, Grace <Grace.DavisFisher@mto.com>; Cody LeJeune <cody@lejeunelawfirm.com>
**Cc:** Klaus, Kelly <Kelly.Klaus@mto.com>; Kristovich, Bethany <Bethany.Kristovich@mto.com>
**Subject:** Re: Woulfe v. Universal City Studios LLC, No. 2:22-cv-00459-SVW-AGR

Hi Ben –

Apologies. I'm told by Cody that the dates seem fine.

One of us will confirm in the morning.

Thanks!

Matthew A. Pequignot
Pequignot + Myers
t. 202.328.1200
f. 202.328.2219
www.pmiplaw.com

This transmission contains confidential and/or legally privileged information from PEQUIGNOT + MYERS intended only for the use of the individual(s) to which it is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, copying or distribution of this information or the taking of any action in reliance on the contents of this transmission is strictly prohibited. If you have received this transmission in error, please notify us immediately.

**From:** "Barokh, Benjamin" <Benjamin.Barokh@mto.com>
**Date:** Monday, June 6, 2022 at 5:04 PM
**To:** Matthew Pequignot <mpequignot@pmiplaw.com>, "Davis Fisher, Grace" <Grace.DavisFisher@mto.com>, Cody LeJeune <cody@lejeunelawfirm.com>
**Cc:** "Klaus, Kelly" <Kelly.Klaus@mto.com>, "Kristovich, Bethany" <Bethany.Kristovich@mto.com>
**Subject:** RE: Woulfe v. Universal City Studios LLC, No. 2:22-cv-00459-SVW-AGR

Hi Matt –

Just checking in to see if you've had a chance to review the stipulation. We'd like to get it on file tomorrow.

Thanks,
Ben

**From:** Barokh, Benjamin
**Sent:** Friday, June 3, 2022 3:40 PM
**To:** Matthew Pequignot <mpequignot@pmiplaw.com>; Davis Fisher, Grace <Grace.DavisFisher@mto.com>; Cody LeJeune <cody@lejeunelawfirm.com>
**Cc:** Klaus, Kelly <Kelly.Klaus@mto.com>; Kristovich, Bethany <Bethany.Kristovich@mto.com>
**Subject:** RE: Woulfe v. Universal City Studios LLC, No. 2:22-cv-00459-SVW-AGR

Thanks, Matt. I hope you, your family, and staff feel better. Have a nice weekend.

**From:** Matthew Pequignot <mpequignot@pmiplaw.com>

**Sent:** Friday, June 3, 2022 3:37 PM
**To:** Barokh, Benjamin <Benjamin.Barokh@mto.com>; Davis Fisher, Grace <Grace.DavisFisher@mto.com>; Cody LeJeune <cody@lejeunelawfirm.com>
**Cc:** Klaus, Kelly <Kelly.Klaus@mto.com>; Kristovich, Bethany <Bethany.Kristovich@mto.com>
**Subject:** Re: Woulfe v. Universal City Studios LLC, No. 2:22-cv-00459-SVW-AGR

Hi Ben —

Thanks for preparing this. I've only skimmed it briefly (I've been dealing with another court deadline, among other matters), but if the dates parallel our earlier agreement, I'm sure we will have no problem finalizing mutually acceptable dates. That said, Cody is out for the day I think, and I'm still playing an awful game of catch-up with other matters. Apart from my own covid experience ███████ ████████████████████████████████████████████████████████ ███████████████████████████████

All of that said, we'll get you an answer on dates by Monday (which I need to run by Cody). We should also have the SAC filed by then.

Thanks for your patience and have a good weekend.

Matt

Matthew A. Pequignot
Pequignot + Myers
t. 202.328.1200
f. 202.328.2219
www.pmiplaw.com

This transmission contains confidential and/or legally privileged information from PEQUIGNOT + MYERS intended only for the use of the individual(s) to which it is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, copying or distribution of this information or the taking of any action in reliance on the contents of this transmission is strictly prohibited. If you have received this transmission in error, please notify us immediately.

---

**From:** "Barokh, Benjamin" <Benjamin.Barokh@mto.com>
**Date:** Friday, June 3, 2022 at 7:35 AM
**To:** Matthew Pequignot <mpequignot@pmiplaw.com>, "Davis Fisher, Grace" <Grace.DavisFisher@mto.com>, Cody LeJeune <cody@lejeunelawfirm.com>
**Cc:** "Klaus, Kelly" <Kelly.Klaus@mto.com>, "Kristovich, Bethany" <Bethany.Kristovich@mto.com>
**Subject:** RE: Woulfe v. Universal City Studios LLC, No. 2:22-cv-00459-SVW-AGR

Hi Matt, attached are a stipulation and proposed order addressing the briefing schedule for our motions to strike and dismiss the SAC. We suggested opposition and reply dates that parallel the dates in our first stipulation, so that each of us has the same amount of time as we would have had with respect to the FAC. Will you please let me know if we have your authorization to sign and file?

Thanks,
Ben

---

**From:** Matthew Pequignot <mpequignot@pmiplaw.com>
**Sent:** Wednesday, June 1, 2022 5:34 PM
**To:** Davis Fisher, Grace <Grace.DavisFisher@mto.com>; Cody LeJeune <cody@lejeunelawfirm.com>
**Cc:** Klaus, Kelly <Kelly.Klaus@mto.com>; Kristovich, Bethany <Bethany.Kristovich@mto.com>; Barokh, Benjamin <Benjamin.Barokh@mto.com>
**Subject:** Re: Woulfe v. Universal City Studios LLC, No. 2:22-cv-00459-SVW-AGR

Hi Grace –

Thanks for your email. I've been recovering/playing catch-up after a covid infection, but, yes, we do intend to file a clean copy soon. One of us will also circle back soon about the briefing schedule.

Thanks - Matt

Matthew A. Pequignot
Pequignot + Myers
t. 202.328.1200
f. 202.328.2219
www.pmiplaw.com

This transmission contains confidential and/or legally privileged information from PEQUIGNOT + MYERS intended only for the use of the individual(s) to which it is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, copying or distribution of this information or the taking of any action in reliance on the contents of this transmission is strictly prohibited. If you have received this transmission in error, please notify us immediately.

---

**From:** "Davis Fisher, Grace" <Grace.DavisFisher@mto.com>
**Date:** Wednesday, June 1, 2022 at 2:07 PM
**To:** Matthew Pequignot <mpequignot@pmiplaw.com>, Cody LeJeune <cody@lejeunelawfirm.com>
**Cc:** "Klaus, Kelly" <Kelly.Klaus@mto.com>, "Kristovich, Bethany" <Bethany.Kristovich@mto.com>, "Barokh, Benjamin" <Benjamin.Barokh@mto.com>
**Subject:** Woulfe v. Universal City Studios LLC, No. 2:22-cv-00459-SVW-AGR

Hi Matt and Cody,

Hope you both had a great holiday weekend.  We are reaching out because we assume that you will be filing a clean version of Plaintiffs' Second Amended Complaint in light of the Court's recent order on your ex parte application.  *See* L.R. 15-1 ("[A] party who obtains leave of Court to file an amended pleading must promptly thereafter file the pleading approved by the Court as a separate document in the Court's CM/ECF System.")  Do you have a sense of when you plan to file the Second Amended Complaint?  We'd also like to discuss a briefing schedule for our anticipated Motion to Strike and to Dismiss the Second Amended Complaint when you are available.

Thanks,

**Grace Davis Fisher (she, her, hers)** | **Munger, Tolles & Olson LLP**
560 Mission Street | San Francisco, CA 94105
Tel:  415.512.4083. | Grace.DavisFisher@mto.com | www.mto.com

***NOTICE***
*This message is confidential and may contain information that is privileged, attorney work product or otherwise exempt from disclosure under applicable law.  It is not intended for transmission to, or receipt by, any unauthorized person.  If you have received this message in error, do not read it.  Please delete it without copying it, and notify the sender by separate e-mail so that our address record can be corrected. Thank you.*

# EXHIBIT 2

CODY R. LEJEUNE (CSB No. 249242)
cody@lejeunelawfirm.com
**LEJEUNE LAW, P.C.**
445 S. Figueroa St.
Suite 3100
Los Angeles, CA 90071
Telephone: (985) 713-4964


MATTHEW A. PEQUIGNOT (admitted pro hac vice)
mpequignot@mpiplaw.com
**PEQUIGNOT + MYERS**
2585 Ala Namahana Pkwy, #1007
Kilauea, HI 96754
Telephone:  202-328-1200


Attorneys for Plaintiffs
CONOR WOULFE, an individual, and PETER
MICHAEL ROSZA, an individual

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CONOR WOULFE, an individual, and PETER MICHAEL ROSZA, an individual,<br><br>        Plaintiff,<br><br>    v.<br><br>UNIVERSAL CITY STUDIOS LLC, d.b.a., UNIVERSAL PICTURES, a California limited liability company; and DOES 1-20, inclusive,<br><br>        Defendant, | CASE NO.:  2:22-cv-00459-SVW-AGR<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>CASE NO.:  2:22-cv-00459-SVW-AGR<br><br>**SECOND    AMENDED    CLASS ACTION COMPLAINT** |

**DEMAND FOR JURY TRIAL**

2:22-cv-00459-SVW-AGR

Plaintiffs Conor Woulfe and Peter Michael Rosza ("Plaintiffs") bring this class action complaint against Defendant Universal City Studios LLC, doing-business-as Universal Pictures ("Defendant"), individually and on behalf of all others similarly situated, and allege upon personal knowledge as to Plaintiffs' acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiffs' attorneys.

### NATURE OF THE ACTION

1.      This is a consumer protection class action arising out of Defendant's false, deceptive, and misleading advertising of the 2019 movie *Yesterday*.

2.      Defendant is an American film production and distribution company that advertises, sells, broadcasts, licenses, and distributes feature films, including a movie released in the year 2019 entitled *Yesterday*.

3.      Among other deceptions, Defendant's nationwide advertising and promotion of the movie *Yesterday, and key word linking of Ana De Armas' name to the movie on digital movie platforms, represented and currently* represents to prospective movie viewers that the world famous actress Ana De Armas has a substantial character role in the film.

4.      Defendant's movie *Yesterday*, however, fails to include any appearance of Ana De Armas whatsoever. Accordingly, Defendant's advertising and promotion of the movie *Yesterday* is false, misleading, deceitful, unfair, fraudulent, and deceptive.

5.      Plaintiffs bring this action individually and on behalf of all other similarly situated consumers to halt the dissemination of Defendant's false, ~~deceptive, and~~ misleading, deceitful, unfair, fraudulent, and deceptive representations, to correct the false, ~~deceptive,~~ and misleading perception Defendant's representations have

1

2:22-cv-00459-SVW-AGR

created in the minds of

2

consumers, and to obtain redress for those who have purchased, rented, licensed, or otherwise paid for attending showings of the movie *Yesterday*.

3

2:22-cv-00459-SVW-AGR

**PARTIES**

6.      Plaintiff Peter Michael Rosza ("Plaintiff Rosza") is a forty-four year-old citizen of the State of California, and, at all times relevant to this action, resided in San Diego County, California.

7.      On or about October 31, 2021, Plaintiff Rosza watched Defendant's advertisement of the movie *Yesterday*, in the form of a movie trailer accessed and viewed using Amazon.com's internet movie streaming service. The movie trailer which Plaintiff Rosza viewed was false, misleading, deceitful, unfair, fraudulent, and deceptive. Among other false representations, the trailer promoted Ana De Armas as an actress that would appear in the film. Plaintiff Rosza viewed the movie trailer at his home in San Diego County, California. Persuaded by the movie trailer to view the film *Yesterday* because of its false representations, Plaintiff Rosza rented the movie. Upon watching the rented movie, Plaintiff Rosza discovered that, among other deceptions, Ana De Armas does not appear in the film. Plaintiff Rosza is a frequent movie consumer with experience watching movie trailer advertisements. Prior to his experience with the *Yesterday* trailer and movie, Plaintiff Rosza had never seen a movie trailer that featured an actor or actress that didn't also appear in the film being advertised. For these and other reasons, Plaintiff Rosza interpreted the movie trailer for *Yesterday* as representing that Ana De Armas would appear in the actual movie.

8.      Relying on the Defendant's false, ~~deceptive, and~~ misleading, deceitful, unfair, fraudulent, and deceptive representations, Plaintiff Rosza purchased rights to view the movie *Yesterday* for approximately $3.99. By paying to view the falsely advertised movie, Plaintiff suffered injury-in-fact and lost money.

<u>4</u>

9.     Plaintiff Conor Woulfe ("Plaintiff Woulfe") is a thirty-eight year-old citizen of the State of Maryland, and, at all times relevant to this action, resided in Howard County, Maryland.

10.    On or about July 12, 2021, Plaintiff Woulfe watched Defendant's advertisement of the movie *Yesterday*, in the form of a movie trailer accessed and viewed using Amazon.com's internet movie streaming service. The movie trailer which Plaintiff Woulfe viewed was false, misleading, deceitful, unfair, fraudulent, and deceptive. Among other false representations, the trailer promoted Ana De Armas as an actress that would appear in the film. Plaintiff

2:22-cv-00459-SVW-AGR

Woulfe viewed the movie trailer at his home in Howard County, Maryland. Persuaded by the movie trailer to view the film *Yesterday* because of its false representations, Plaintiff Woulfe rented the movie. Upon watching the rented movie, Plaintiff Woulfe discovered that, among other deceptions, Ana De Armas does not appear in the film. Plaintiff Woulfe is a frequent movie consumer with experience watching movie trailer advertisements. Prior to his experience with the *Yesterday* trailer and movie, Plaintiff Woulfe had never seen a movie trailer that featured an actor or actress that didn't also appear in the film being advertised. For these and other reasons, Plaintiff Woulfe interpreted the movie trailer for *Yesterday* as representing that Ana De Armas would appear in the actual movie.

11.    Relying on the Defendant's false, ~~deceptive, and~~ misleading, deceitful, unfair, fraudulent, and deceptive representations, Plaintiff Woulfe purchased rights to view the movie *Yesterday* for approximately $3.99. By paying to view the falsely advertised movie, Plaintiff suffered injury-in-fact and lost money.

12.    But for Defendant's false and~~/or~~ misleading representations and ~~deceptions~~unfair, fraudulent, and/or deceptive conduct promoting the movie, Plaintiffs would not have paid to view the movie *Yesterday*.

6

2:22-cv-00459-SVW-AGR

13.   Defendant is a limited liability company with a principal place of business at 100 Universal City Plaza, Universal City, California 91608.

14.   ~~14.~~ Defendant is owned by Comcast Corporation ("Comcast"), by way of Comcast's ownership of NBCUniversal. As a related and jointly controlled entity, which acts in concert with Defendant, digital video store VUDU is also owned by NBCUniversal by way of NBCUniversal's 75% ownership of Fandango Media ("Fandango"). VUDU sells and rents Defendant's movies for play in consumer's homes, and Fandango sells tickets for movie theater showings of Defendant's motion pictures.

~~15~~ VUDU and Fandango each promote and sell Defendant's movies in concert with and under the direction and control of Defendant and for Defendant's financial benefit. In some cases, for example, Fandango sold movie tickets for *Yesterday* on Defendant's website www.universalpictures.com. Additonally, Defendant utilizes a website www.uphe.com which it uses to sell DVD copies of movies directly to consumers, including the movie *Yesterday.*

15.   Defendant acquired rights to the movie *Yesterday* from production company, Working Title Films Limited. In other words, the movie *Yesterday* is the creation of a third- party other than Defendant. Defendant thereafter marketed, advertised, screened, promoted, distributed, licensed, rented, and sold the movie to hundreds of thousands, if not millions, of consumers in California and Maryland, knowingly utilizing false advertising to do so. Likewise, and more specifically, Defendant's false, deceptive, unfair, fraudulent, and misleading advertisements were shown and distributed in California and Maryland.

7

## JURISDICTION AND VENUE

16.   ~~16.~~ The Court has original jurisdiction under 28 U.S.C. § 1332(d)(2) ("Class Action Fairness Act" or "CAFA") because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are

2:22-cv-00459-SVW-AGR

in excess of 100 class members, and some of the members of the class are citizens of states different from Defendant, thus satisfying the minimal diversity requirement.

17.   ~~17.~~ This Court has personal jurisdiction over Defendant because Defendant conducts business in California. Defendant marketed, advertised, screened, promoted, distributed, licensed, rented, and sold the movie *Yesterday* in and from California, rendering exercise of jurisdiction by California courts permissible.

18.   ~~18.~~ Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district. Venue also is proper under 18 U.S.C. § 1965(a) because Defendant transacts substantial business in this district.

## FACTUAL ALLEGATIONS

**Introductory Background**

19.   As the original format for motion pictures (or movies), some movies are filmed using cameras that record movie scenes on physical film reels, typically in 35mm or 70mm formats. After such a movie is completed (e.g., post editing, color correction, etc.), the physical film is duplicated onto additional film reels (often two reels, for longer length movies), and the physical film reels are delivered in protective cannisters to movie theaters around the country for play on film projectors at the respective theaters. Movie consumers (persons that pay to watch or buy movies) which view such a conventional

9

2:22-cv-00459-SVW-AGR

format movie today thereafter buy tickets which are issued in physical form at a theater or digitally online. Moreover, often digital tickets are formatted for physical printing onto paper so that the digital purchase could be proven at the movie theater entrance (by turning in the printed digital ticket). In other words, for movies which are recorded on conventional film, movie consumers purchase tickets for the right to view (and hear) the display of a

10

2:22-cv-00459-SVW-AGR

movie which is accomplished by operating a physical film projector playing one or more physical film reels. At a modern movie theater, luxury seating and food and beverages are often supplied with the play of the movie, and a technician actively monitors the play of the movie to adjust the volume or to correct projection (or similar) issues during movie play.

20.   Although conventional film reels are still used today, it is more common now for movies to be recorded with digital cameras. Like film reels, however, a digitally shot film is recorded using a camera that writes the imagery and sound onto a digital file recorded onto a physical digital recording medium. Also like a film-shot movie, once the digital movie is edited and otherwise completed, the movie is copied in physical form, and the physical movie copies are loaded into protective plastic cases (e.g., often with cables and adaptors) – collectively termed Digital Cinema Packages ("DCPs") – which are then shipped to movie theaters around the country for display at movie theaters with digital film projection capabilities. At such theaters, movie consumers are once again paying to view and hear the operation of the physical DCPs which play the movies as tangible sight and sound. When paying to view the movie, like with a film-shot movie, the consumers buy physical or digital tickets. Alternatively, for some movies, the contents of physical digital film packages are transmitted by satellite to movie theaters which then store the movies on physical storage platforms for display to consumers as tangible imagery and sound. Often license keys are required, sold by the movie distributor, which "open" access to the satellite transmitted movie for display to movie patrons.

21.   In addition to shipping physical movie copies (as sales or rentals or leases) to movie theaters, motion pictures are often also reproduced by movie studios (e.g.,

<u>11</u>

Defendant Universal) onto Digital Video Discs ("DVDs"), which are typically comprised of layers of aluminum and reflective gold, covered in a polycarbonate plastic.

12

2:22-cv-00459-SVW-AGR

The metal and plastic disc is packaged in a plastic case, often with additional cardboard packaging, and the entire physical DVD package (often shrink-wrapped) is then sold to movie consumers either in brick and mortar stores or through electronic commerce channels. ~~Indeed,~~, such as directly from Defendant at www.uphe.com. When a movie consumer purchases a DVD, the movie consumer receives ownership rights not only in the DVD itself, but also receives the irrevocable right to re-sell or even rent the movie content (including the imagery and sound) to other consumers, under the First Sale doctrine. In other words, a purchaser of a DVD effectively receives fee simple title to the movie content itself. Defendant Universal has sold at least tens of thousands of DVD copies of the movie *Yesterday* to consumers, with one e-commerce channel alone revealing more than 30,000 sales. These sales are in addition to Defendant Universal's DVD sales and/or ~~rentals of rights~~sales to view the operation of a physical film or digital motion picture package at a movie theater.

22. In yet another commercialization channel for movie studios, it is now common for movie studios to sell or rent movies to consumers by transmitting the movies directly to consumer homes. For example, many televisions are now sold with movie play platforms such as Amazon Prime or VUDU preinstalled. Alternatively, as another example, plug-in devices (which include such platforms) are sold to consumers for plugging into physical slots in a television (e.g., into an HDMI port). Using such movie play platforms, a consumer can review trailer advertisements on their own television to find an appealing movie to watch. Once an appealing movie is identified, the consumer typically has the option to rent or purchase the movie. Regardless of which option is selected, once the "offer" of the movie presented by the movie play platform (i.e., on behalf of the movie distributor, in this case Defendant Universal) is accepted, and after the consumer pays for the rental or purchase, the movie data files are transmitted from the physical storage device where the original motion picture (or copy

13

thereof) is being stored ~~to~~on the consumer's television (or externally connected device )

= at least for a period of time – so that the tangible movie imagery (displayed as visible

light) and sound can be played for the consumer in the consumer's home. In the most

<u>14</u>

typical scenario, such as is the case with the trailer for the movie *Yesterday*, the opportunity to purchase or rent the movie is displayed alongside the trailer - on the same screen – so that the consumer can make an immediate decision to purchase or rent the movie (or not), without consulting other sources. In cases in which the movie is sold to a consumer or is purchased by a consumer, the consumer is able to re-watch the movie effectively in perpetuity and is even able to transfer the movie to different physical devices. For example, if a movie is purchased from a digital movie store on a television in a home in California, the movie can nevertheless be transmitted (in other words moved) to a different physical device (e.g., a television, tablet, mobile phone, USB dongle, etc.) so that the movie can be watched at a different location, such as at a second home, or in a hotel, or on an airplane. As an example, digital movie seller VUDU's legacy set-top boxes (so-called VUDU boxes) are physical boxes connectable to a television and onto which purchased movies could be downloaded. The box containing the purchased movies could be moved to other physical locations and attached to different physical viewing devices. Moreover, VUDU provided express written warranties with VUDU boxes which guaranteed that VUDU would replace any purchased movies which were lost. According to one version of such warranty as an example, "If you have to return or replace your VUDU Equipment, or if content is lost due to a failure of the hard drive in the VUDU Equipment, VUDU will, to the best of its ability and within the rights granted by our content licensors, replace all purchased (but not rented) movies or other content that you acquired (but not rented) entertainment content that you acquired from VUDU." With respect to its later set-top boxes, VUDU began including its VUDU digital movie store pre-loaded onto other physical and moveable



2:22-cv-00459-SVW-AGR

36

devices, such as Blue-ray players, televisions (e.g., Amazon Fire TV Edition smart TVs), and portable movie storage and player devices such as those offered under the brand Roku. Indeed, according to VUDU, "Vudu is also the official movie and TV store on Roku, the world's leading streaming device and Smart TV OS platform." Other digital movies stores, such as Prime Video offered by Amazon.com, offer the same or similar features and options, with many moveable physical movie storage and delivery device offerings, including for example Amazon Fire Tablets. Likewise, a movie can be downloaded from a digital movie store such as Prime Video, onto a tablet for example, and then brought onto an airplane (in other words "moved") to be watched with no access to the internet.

23.     By way of example specific to this case, a screen shot of NBCUniversal's VUDU movie platform offering the *Yesterday* movie for sale and for rent is reproduced below:



 16

2:22-cv-00459-SVW-AGR

24.    The screenshot above is a true and accurate copy of VUDU's offer of sale or rent of the movie *Yesterday* (last accessed May 2, 2022).

25.    As shown in the above screenshot, VUDU offers a selectable "button" for acccessing the *Yesterday* movie trailer advertisement, which falsely advertises the *Yesterday* movie, on the same page and preceding the opportunities to purchase or rent the

17

movie. This is because digital movie stores, such as VUDU, which is co-owned with Defendant by NBCUniversal, intend for the trailer to be relied upon by consumers when making movie rental or purchase decisions. Because Defendant is co-owned with VUDU, VUDU acts in concert with and under the direction of Defendant for the promotion of the movie *Yesterday*, and Defendant and/or its parent entities profit(s) from *Yesterday's* movie sales and rentals consummated on the VUDU movie platform.

26.     As shown in the screenshot, the VUDU platform, which is co-owned with Defendant, also affirmatively represents that Ana De Armas is in the movie *Yesterday*, by listing her name and including her photograph as a cast member, even though she is not.

27.     Some movie platforms, such as VUDU's, also allow consumers to conduct key word search for movies. For example, if a consumer likes Ana De Armas as an actress, the consumer can type her name into a search field in the VUDU platform, and the platform will display the movies in which Ana De Armas purportedly appears.

28.     The screenshot below is a true and accurate copy of a screen print from VUDU's movie play platform displaying the results of a search performed using the actress Ana De Armas' name (last accessed May 2, 2022):

<u>18</u>

<u>2:22-cv-00459-SVW-AGR</u>



29.   As can be seen in the screenshot above (displaying the search results), the VUDU platform lists Ana De Armas as an actress that appears in the movie *Yesterday*, even though she does not. In other words, the search results of a VUDU search for Ana De Armas affirmatively, falsely represent that Ana De Armas is in the movie *Yesterday*.

30.   ~~When~~ On a platform such as this, when consumers are induced to pay for *Yesterday* movie rentals or purchases on the VUDU movie platform because they believe Ana De Armas appears in the movie, because she is listed as an actress in the movie, and because the trailer represents that she is in the movie, both Defendant and co-owned VUDU (and therefore Defendant's parent entity or entities) profit from this deception.

31.   Similar to VUDU, the Amazon Prime movie play platform also displays the *Yesterday* movie trailer on the same page as opportunities to purchase or rent the movie. This is so that consumers can be enticed by the trailer to make immediate movie rental and purchase decisions. Also similar to VUDU, Defendant shares in the profits made

19

by

20

2:22-cv-00459-SVW-AGR

Amazon Prime when the movie *Yesterday* is rented or purchased by a consumer. Additionally, when the movie Yesterday is rented on Amazon Prime, the agreement offered by the platform on behalf of Defendant and accepted by the consumer under false pretenses, makes the movie accessible to the consumer for 30 days.

**The Actress Ana De Armas**

32.   32. Ana De Armas (hereinafter Ms. De Armas) is a talented, successful, and famous actress, that has starred in such movies as *Blade Runner 2049*, *War Dogs*, and *Knives Out*.

33.   33. Demonstrating her demand in the film industry, Ms. De Armas was chosen to be a female lead in the movie *No Time to Die*, co-starring Daniel Craig. *No Time to Die* debuted on or about October 8, 2021 and is the latest film in the James Bond franchise. *No Time to Die* is an important movie for its studio because it is the last James Bond film expected to feature Actor Daniel Craig.

34.   34. Ms. De Armas was also recently selected to star in the upcoming film *Blonde*, playing the role of deceased movie star Marilyn Monroe. She was also selected to star in the recently released movie *Deep Water*, co-starring her former boyfriend Ben Affleck (hereinafter Mr. Affleck).

35.   35. Ms. De Armas' 2015 movie *Knock Knock*, co-starring Keanu Reeves, was identified by Netflix as one of its most popular movies. Indeed, *Knock Knock* achieved the status of the "most-watched" movie on Netflix's streaming service during 2020.

36.   36. Ms. De Armas currently has approximately 5.9 6.8 million followers on Instagram.

37.   37. In 2020, Ms. De Armas was the Golden Globe Nominee for Best Actress

21

2:22-cv-00459-SVW-AGR

in a Comedy or Musical for her performance in the movie *Knives Out*.

22

38.   38. Ms. De Armas is famous throughout America and the world because of her successful movie and other media appearances.

***Yesterday*** **and its Trailer**

39.   39. The movie *Yesterday* started filming in April 2018, premiered at the Tribeca Film Festival on May 4, 2019, and was released in the United States on June 28, 2019 by Universal Pictures. *Yesterday* is a film about a failed musician Jack Malik, who hits his head during a black-out only to wake-up to discover that that the world's knowledge of The Beatles has been erased. Taking advantage of this opportunity, the protagonist Malik adopts The Beatles' songs as his own, quickly becoming world famous.

40.   40. Ms. De Armas was originally cast to co-star in the film *Yesterday* as a character named Roxanne. Accordingly, scenes featuring Ms. De Armas as the character Roxanne were shot for inclusion in the original version of the movie. In the original version of the movie, the character, Roxanne, was written as a known actress that meets the protagonist Malik during a late night talk show appearance. During the talk show appearance, the host first suggests that Malik write a song about Roxanne. Immediately revising his song writing request, the talk show host subsequently tells Malik to write a song about "something." Malik – in reply – plays the The Beatles' song *Something* seated next to and gazing at Roxanne. As the scene appears in the movie trailer for *Yesterday*, a romantic attraction is immediately sparked between the two characters. Roxanne, in the scene, appears charmed by Malik's perceived song writing talent and they ultimately embrace. The film's female lead Ellie, played by the relative unknown actress Lily James, witnesses the meeting on television from home. In the scene as it appears in the *Yesterday* movie trailer, Ellie is visibly upset that she might lose Malik to Roxanne. Dialogue in the trailer also suggests that Ellie is concerned that Malik is distracted by his

23

newfound fame

24

45

and glamor of actress Roxanne. Ellie, herself, does not portray a famous or glamorous character in the film, but is simply Malik's longtime, hometown friend.

41.    ~~41.~~ According to the director Danny Boyle, Ms. De Armas' portrayal of Roxanne in the original film cut was "brilliant" and Ms. De Armas was "radiant" in the role. More specifically, according to the film's director:

> "When you watched [the scene with Ms. De Armas] alone, it was fantastic[.]"

> "[S]he was brilliant in it. I mean really radiant."

> "[I]t's some of our favorite scenes from the film[.]" (sic)

42.    ~~42.~~ Director Boyle expressed similar flattering views pertaining to character Jack Malik's response to the request to play "something" in the same scene featuring Ms. De Armas. According to Boyle:

> "Actually, we cut one of my favorite jokes from the film, which my son thought of. Because James Corden used to say, 'Why don't you write something right now? I hear you can write things really quickly, write something right now.' And so he wrote 'Something.' [Jack] actually sang the song 'Something,' and I was so delighted by that joke."

43.    ~~43.~~ The principal actors in the movie Yesterday were largely unknown before the film was released. For example, the actor which played protagonist Malik, Himesh Patel, had never acted or starred in a film prior to *Yesterday*. Similarly, the actress who played Ellie, Lily James, was a relatively unknown name to the casual movie watcher.

44.    ~~44.~~ Consequently, because none of the *Yesterday* film leads were famous, Defendant could not rely on their fame to promote the movie to entice viewership.

25

45.   ~~45.~~ In contrast to the film's lead actors, Ms. De Armas is and was a known movie star. Moreover, according to the director of the film, she was "radiant" and "brilliant" in the movie scenes originally shot for the film.

46.   ~~46.~~ Unable to rely on fame of the actors playing Jack Malik or Ellie to maximize ticket and movie sales and rentals, Defendant consequently used Ms. De Armas's fame, radiance and brilliance to promote the film by including her scenes in the movie trailers advertising *Yesterday*. Ms. De Armas, in contrast to the actors playing Jack Malik or Ellie, is famous and is a viewership draw by herself.  Moreover, the Ms. De Armas scene which Defendant included in the trailer was described by director Boyle as fantastic. Accordingly, the inclusion of such a fantastic scene would be expected to entice viewership and thereby boost movie sales and rentals.

47.   ~~47.~~ Although Defendant included the scenes with Ms. De Armas in the movie trailer advertisements, for the purposes of promoting *Yesterday* and enticing film sales and rentals, Ms. De Armas is not and was never in the publicly released version of the movie. Therefore, any consumer that purchased theater tickets or rented or purchased the film *Yesterday* online did not see Ms. De Armas in the film.

48.   ~~48.~~ Adding to its deceptiveness, the trailer for *Yesterday* also included the "something"-song-joke, which director Boyle described as one of his "favorites" and which he explained "delighted" him. In that scene, the character Malik plays The Beatles' song "Something" as a punchline to the comedic set-up of the scene. Notably the song "Something" is also demonstrably famous. From the Beatles' 1969 album *Abbey Road,* "Something" was written by George Harrison and topped the Billboard Hot 100 in the United States, as well as charts in Australia, Canada, New Zealand and West Germany. Still popular today, one upload of the song alone has achieved over 72 million views on YouTube. Although in the movie trailer which advertises and promotes *Yesterday*,

<u>26</u>

27

2:22-cv-00459-SVW-AGR

scene with the "something"-song-joke, in which Malik plays The Beatles' song "Something", is not in the publicly released version of the film.

49.   ~~49.~~ Defendants' false representations that an actress, song, and other scene elements would appear in the film *Yesterday*, when they did not, collectively comprise a false, deceptive, deceitful, fraudulent, unfair, and misleading movie trailer advertisement. ~~By~~It is believed to be unprecedented, for example, for a movie trailer to feature an actor or actress which does not actually appear in the movie being advertised. Certain versions of the trailer for *Yesterday* also call the trailer a "preview" thereby expressly representing textually that the trailer is showing scenes that will be in the actual movie. For these and other reasons, by including Ana De Armas and the omitted scenes in the trailer, consumers perceive her and their inclusion as an affirmative representation that Ms. De Armas and the omitted scenes will appear in the full length movie. Demonstrating their commercial purpose, one or more versions of the *Yesterday* trailer also include the words "Coming Soon" and list the date of release of the movie, stating "In theaters June 28", so that consumers knew precisely when they could buy tickets to the movie. Similar language is listed on the landing page for *Yesterday's* trailer published on Youtube. Likewise, at least one version of the *Yesterday* trailer includes a weblink at the end, which directs viewers of the trailer to a webpage where they can purchase the movie (e.g., on DVD).

50.   ~~50.~~ Evincing Defendant's intent to deceive consumers (the term "consumers" including Plaintiffs and Class members), interviews show that Defendant knows and has always known that Ms. De Armas is and was not in the publicly released film *Yesterday*.

51.   ~~51.~~ Also evincing Defendant's intent to deceive consumers, interviews show that Defendant knows and has always known that the "something"-song-joke, in which Malik plays The Beatles' song "Something", is and was not in the publicly released film *Yesterday*. Although these interviews reveal Defendant's knowledge of its deception,

28

29

2:22-cv-00459-SVW-AGR

filed by Defendant as Doc. 32-4, PID 303-307. Moreover, the interviews appear to be little known and seen in general. For example, one of the two known interviews – a video - was only viewed approximately 1439 times between 2019 and present (last accessed June 6, 2022), and it is unknown when those views happened. Further, though the video interview reveals that Defendant knew that Ana De Armas was cut, she was not mentioned by name.

52.    52. Despite knowing that Ms. De Armas was not in the released version of the movie *Yesterday*, Defendant has consistently promoted Ms. De Armas as a character starring in the film, by including her scenes in *Yesterday's* movie trailers, listing her as a cast member, and key word linking her name to the movie. Indeed, Defendant continues to promote Ms. De Armas as appearing in the film more than two years after its initial release, in advertisements for movie sales and rentals. More specifically, the film *Yesterday* premiered on or about May 4, 2019, but movie trailers featured in May of 2022 still include the scenes with Ms. De Armas and the "something" song joke. These movie trailers are viewable, prior to purchasing or renting the movie *Yesterday*, from digital movie stores (also known as electronic streaming services), including, but not limited to, Amazon (via Amazon Prime), Google (via Google Play), and VUDU. These same trailers were also used to advertise the movie *Yesterday* prior to its

30

theatrical release, including on Defendant's own website, which also offered movie tickets for sale.

53.   ~~53.~~ Similarly, on or about June 25, 2019 in a post-release national television appearance promoting the film *Yesterday*, director Boyle was interviewed alongside actor Himesh Patel (who plays Jack Malik) on CBS television. Although Ms. De Armas is not in the film, the scene featuring Ms. De Armas was played during Boyle's television appearance to a national television audience, for the specific purpose of enticing viewers to buy tickets to see the motion picture. A true and accurate screen capture from the television appearance is reproduced below:

31

2:22-cv-00459-SVW-AGR

Ms. De Armas is the actress in the white outfit depicted in the above image. Despite using Ms. De Armas to promote the film, interviews reveal that Defendant and director Danny Boyle and screenwriter Richard Curtis knew that Ms. De Armas would not be in the publicly released version of the film at least as early as June 19, 2019.

54.   54. Even though Ms. De Armas would never be in the film to entertain its viewers, Defendant played this scene on national television because Defendant knew it would lure viewers, sales, and movie rentals, because it was a "fantastic" scene in which Ms. De Armas was "radiant" and "brilliant." Moreover, when this scene was featured on national television, the movie *Yesterday* had already been released to the public. Accordingly, Defendant already knew that Ms. De Armas would not and did not appear in the final version of the film.

55.   55. Movie trailers are the *de facto* standard for advertising movies (or films) in the United States.

56.   56. Movie trailers are understood by movie viewers and consumers to convey what actors will appear in the advertised film.

57.   57. Defendant's *Yesterday* movie trailers were used by Defendant as advertisements for the film, for the express commercial purpose of enticing consumers to purchase or rent the movie.

58.   58. Defendant's *Yesterday* movie trailers were used by Defendant as the primary advertisements for the film and were disseminated widely, and viewed by tens of millions of consumers.

59.   59. Defendant knew and indeed intended that consumers would rely on the content of the *Yesterday* movie trailers when making decisions whether to pay for purchasing or viewing the film.

60. Likewise, Defendant believed that Ana De Armas and her scenes were "brilliant" and "radiant" and that consumers would be enticed by her appearance and scenes to pay for the movie.

60.   Defendant creates, distributes, and publishes its movie trailers, including the movie trailer for *Yesterday*, for the purpose of enticing consumers to pay for purchasing or viewing Defendant's films, including the film *Yesterday*.

61.   61. Defendant expected that consumers would rely on the content of the *Yesterday* movie trailers when making decisions whether to pay for purchasing or viewing the film.

62.   62. Defendant's *Yesterday* movie trailers, aired or accessible during 2019, included scenes with Ana De Armas.

63.   63. Defendant's *Yesterday* movie trailers, aired or accessible during 2020, included scenes with Ana De Armas.

64.   64. Defendant's *Yesterday* movie trailers, aired or accessible during 2021, included scenes with Ana De Armas.

65.   65. Defendant's *Yesterday* movie trailers, aired or accessible during 2022, included scenes with Ana De Armas.

33

2:22-cv-00459-SVW-AGR

66.   66. On online movie streaming services such as Amazon.com's Amazon Prime, or NBCUniversal's VUDU, Defendant uses the *Yesterday* movie trailer with Ana De Armas to convince consumers to purchase or rent the movie *Yesterday*.

34

67. 67. After watching the movie trailer for *Yesterday* on Amazon Prime, or on other digital movie stores such as NBCUniversal's VUDU, and other online movie streaming services, consumers are able to purchase or rent the movie *Yesterday* on the same user interface.

68. 68. Defendant's movie trailers for *Yesterday* are accessible on the same display screen, such as a television screen, as the point-of-purchase or rental opportunity for purchasing or renting the movie *Yesterday*.

69. 69. Online streaming services such as Amazon Prime, or other digital movie stores such as NBCUniversal's VUDU, are designed to include movie trailers on the same screen, such as a television screen, as the point-of-purchase or rental opportunity for purchasing or renting the movie featured in the trailer, so that consumers can make instant decisions to purchase or rent a movie, without consulting other sources.

70. 70. Movie consumers typically make decisions to view, purchase, or rent a movie
— or not - based on the content of movie trailers viewed by such consumers.

71. 71. The decision to purchase or rent a movie is binary. A consumer either rents or purchases a movie, or not. A movie trailer is the advertising vehicle which Defendant uses to persuade movie consumers, when such consumers are making such binary movie purchase or rental decisions.

72. 72. Defendant's inclusion of Ana De Armas in *Yesterday* movie trailers leads viewers to believe that Ana De Armas is in the film.

73. 73. Defendant used movie trailers, which included scenes with Ana De Armas, to promote the theatrical release of the film *Yesterday* and to promote DVD sales of *Yesterday*, including direct sales of DVDs by Defendant to consumers. For example, in

35

addition to the conventional use of the trailer as a commercial advertisement, Defendant included a website link at the end of the *Yesterday* trailer so that consumers could buy physical copies of the movie.

74.   ~~74.~~ Defendant used movie trailers, which included scenes with Ana De Armas, to promote online movie sales and rentals of the film *Yesterday*.

 36

75.   ~~75.~~ Ana De Armas does not appear in Defendant's publicly released 2019 movie *Yesterday*.

76.   ~~76.~~ Ana De Armas does not appear in the version of Defendant's publicly released movie *Yesterday* which has been sold and rented to consumers, and exhibited at pay-for- view movie theaters, during the years 2019, 2020, 2021, and 2022.

77.   ~~77.~~ Ana De Armas does not appear in any publicly released version of Defendant's publicly released movie *Yesterday*

78.   ~~78.~~ All of Defendant's theatrical presentations, sales, rentals, and licenses, of the movie *Yesterday* injure consumers in the same way because the film sold, rented, and licensed is the same, regardless of medium, and does not include Ana De Armas and does not include the "something"-song-joke, in which Malik plays The Beatles' song "Something". Moreover, the commercial impression communicated by Defendant's ~~advertising~~ promotion and advertisement of the movie is the same – that Ana De Armas, and the other omitted scenes, will appear in the full length movie.

79.   ~~79.~~ Defendant had sufficient control and authority to determine whether Ana De Armas would appear in the *Yesterday* movie trailer. Defendant also had sufficient control and authority to obtain or create and utilize a new *Yesterday* trailer which was not false and misleading.

80.   ~~80.~~ Defendant chose to continue to utilize *Yesterday* movie trailers featuring Ana De Armas as advertisements, even though Defendant knew that Ana De Armas was not in

the film *Yesterday*.

81.   81. Defendant's trailer for the movie *Yesterday* is used to advertise the movie to solicit purchases and rentals of the movie from online movie services such as Amazon Prime, Google Play, and VUDU. Defendants' *Yesterday* trailer, used on such services to advertise the movie, includes scenes with Ana De Armas.

38

82. 82. The following images are true and accurate screen shots from



Defendant's movie trailer for *Yesterday*:

39



<u>40</u>



41

Actress Ana De Armas is the actress wearing a white outfit in the above images.

83.   ~~83.~~Defendant's official trailer for the movie *Yesterday* was also published by Defendant on YouTube and has been viewed more than 32.6 million times on YouTube since February 12, 2019.  The number 32.6 million meets or exceeds the number of viewers of the movie *Yesterday* that paid to view it or purchased it.

84.   Relying on false, deceptive, and misleading advertisements for its promotion, Defendant's movie *Yesterday* has thus far grossed approximately $150,000,000 (one- hundred fifty million) United States dollars.

85.   The version of the movie trailer offered on the Amazon Prime platform~~, and~~ which was viewed by Plaintiffs Woulfe and ~~Rosoza~~Rosza, has since been replaced with an alternative trailer. The replacement of the trailer on Amazon Prime evinces the ease with which Defendant could have produced and utilized a different trailer, not featuring Ana De Armas.

 42

86.   NBC Universal's VUDU platform, co-owned with Defendant, ~~currently~~ was affirmatively ~~advertises~~ advertising Ana De Armas as appearing in the movie *Yesterday*, which is for sale and rent on the platform, at least as ~~of~~ recently as May 3, 2022. Defendant controls the content of Defendant's movie advertising on the VUDU platform. Defendant's continued advertisement of Ana De Armas as appearing in the movie *Yesterday,* long after being put on notice of its unlawful conduct with the filing and ultimate service of Plaintiffs' original complaint, demonstrates Defendant's intent and willingness to deceive consumers.

87.   The Internet Movie Database ("IMDB") originally listed Ana De Armas as an actress in the movie *Yesterday*. Although the database has recently been changed to remove Ana De Armas' name as an actress in the movie, if consumers were to have consulted the original database beyond viewing Defendant Universal's advertising trailer, such

43

2:22-cv-00459-SVW-AGR

64

consumers would have been falsely informed that Ana De Armas appeared in the movie, even though she does not.

88.    The movie trailers for *Yesterday* which featured Ana De Arma made an affirmative representation to consumers that she would appear in the movie. Indeed, some versions of the trailer display the word "preview" at the beginning which communicates to consumers that the trailer advertisement that they are viewing is an actual true and correct sample (i.e., a true preview) of the advertised movie. However, neither all of the scenes that appear in the trailer, nor Ana De Armas, appear in the actual motion picture.

89.    Evincing that the movie trailers for *Yesterday* which featured Ana De Armas were interpreted as affirmative representations that Ana De Armas appeared in the motion picture, voluminous comments on social media channels discuss consumers' surprise and confusion when she did not appear in the full movie. True and correct copies of these consumer comments are reproduced below:

- Ironically, I went to see the movie because of this scene

<u>44</u>

- This scene was used to promote the movie then was NOT in the movie. I couldn't believe it. Hope they put it back in someday.

- Me too! The movie was not as good as I thought it would be and I was really looking forward to this scene.

- Yeahh, this was one of the scene that i've been waiting for when i watch the movie

- Same. Movie was meh. This scene would have improved it.

- same....i just wait and wait but what...where's the scene????

- So did most people... worst edit ever

- Yes! That cheating coming attraction! I was so damn disappointed 💥

45

2:22-cv-00459-SVW-AGR

- They did me dirty

90.     Defendant's use of trailer advertisements to entice consumers to attend theater presentations or to rent or buy the movie *Yesterday* (in electronic or DVD form) was purely for commercial purposes. Defendant did not write the script for the movie but merely acquired rights to the movie and created trailer advertisements, using omitted scene elements and an actress not in the actual movie *Yesterday*, to pitch the movie to consumers. Specifically, Defendant used Ana De Armas and the omitted scene elements to make the movie *Yesterday* appear more appealing than it actually was. In other words, Defendant used the trailers in a purely commercial marketing campaign to trick viewers into renting or purchasing the motion picture.

91.     In another example evincing Universal's commercial purpose, Defendant's website offered movie tickets for the movie *Yesterday* on the same page that it displayed

 46

the movie trailer advertisement for *Yesterday*. More specifically, tickets could be purchased on Defendant's website using the co-owned Fandango movie ticket sales platform. Defendant and/or its parent entity/entities profited when movie tickets were purchased using the purchase link located alongside the movie trailer advertisement on Defendant's website, providing motivation for Defendant's deceptions.

92.    When not offering movie rentals or sales on its own website, Defendant intends and directs that its movie trailers – including the movie trailer for *Yesterday* - be shown alongside opportunities for movie rentals or purchases so that consumers will make their purchase or rental decisions, in reliance on the content of the movie trailer advertisement. Likewise, at least one version of the *Yesterday* trailer directs consumers to a webpage operated by Defendant, which offers (or offered) DVDs of the *Yesterday* movie for sale.

<u>47</u>

2:22-cv-00459-SVW-AGR

93.     Further demonstrating the movie trailers are advertisements having a commercial purpose, the Motion Picture Association, Inc. (formerly the "MPAA"), of which Defendant Universal is a member, published Advertising Administration Rules which include a definition section. According to the first section, Section 1: Definition of Advertising:

**Section 1. Definition of Advertising**

For purposes of these Rules, "advertising" means any material in any medium that is intended primarily to promote the exhibition, performance or sale of copies of the motion picture to the public and that is directed primarily to or for which a significant number of viewers are consumers in the United States. The senior executive of the Advertising Administration shall have the authority to determine whether specific material constitutes advertising within these Rules.

For reference, the term "advertising" includes, but is not limited to, the following materials: trailers, in-theater extended looks, exclusive content, clips and footage.

Exhibit A is a true and correct copy of page 3 of the Motion Picture Association, Inc.'s Advertising Administration Rules, published on and effective October 8, 2019. Demonstrating that movie trailers are not supposed to be false or misleading, the MPA Administration Rules also state, "Certain content restrictions are applicable to all advertising. In all instances: Advertising may not misrepresent the content of the motion picture[.]" In other words, Defendant's advertisements for *Yesterday* violate even the standards set forth by its own member organization.

48

94.    ~~Additionally,~~ Defendant's commercial advertising expenditures are reported to the Securities and Exchange Commission ("SEC") via its parent entities. These advertising expenditures include trailer production and promotion costs.

95.    Similarly, the Federal Trade Commission ("FTC"), U.S. Congress, and members of representative American movie studios consider trailers to be commercial advertising, such as evidenced by the FTC reports to Congress, and resulting Congressional

<u>49</u>

<u>2:22-cv-00459-SVW-AGR</u>

testimony, pertaining to the movie studios' alleged marketing of adult entertainment to children, using movie trailers. Many if not all of the major movie studios, including Defendant Universal, testified in the Congressional hearings, and consistently acknowledged the commercial purpose of trailers as advertisements.

96.    In all cases known to plaintiffs, the movie theater presentations of the movie *Yesterday*, the DVD copies of the movie *Yesterday*, and the at-home purchases and rentals of the movie *Yesterday* all omitted scenes that appeared in the *Yesterday* movie trailer advertisement, including the scenes that featured the actress Ana De Armas. Accordingly, all consumers were harmed in the same way by the same false, misleading, unfair, fraudulent, and deceptive movie trailer advertisements.

**Goods and Services**

97.    Defendant Universal's movie products are goods and/or are offered to customers utilizing various types of services. The For example, the movie *Yesterday* exists in physical film or digital form which is rented and/or utilized in connection with movie display services which are sold to consumers. Moreover, the physical DVD discs which Universal sells are goods. More specifically, the digital streaming of Defendant's movies is offered as a service, both by Defendant's affiliated entity VUDU, and by third parties acting on behalf of Defendant. Illustratively, VUDU (co-owned with Defendant by NBCUniversal) itself ubiquitously categorizes its offerings as a "service". According to a 2021 VUDU press release as but one example: "Vudu is a leading video-on-demand streaming service from Fandango offering over 150,000 titles to rent or buy, including the newest releases, and thousands of titles for free. Serving millions of entertainment fans daily, Vudu has created compelling video entertainment experiences, including the ability to create custom Lists from their movies & TV library, purchase exclusive Mix & Match bundles, access digital copies of their physical films, and much more. Consumers

50

2:22-cv-00459-SVW-AGR

51

72

TV shows anytime, anywhere, on their favorite smart TV, over-the-top (OTT) streaming player, Android and iOS device, game console, and Blu-ray player. Streaming or downloaded, Vudu delivers a premium experience with the latest digital video technology, including 4K Ultra High Definition, Dolby Vision, HDR, and Dolby Atmos Cinema Sound." Not merely just streaming movies like *Yesterday*, VUDU informs of the purported cast of the movie, and provides a trailer advertisement so a customer can make a purchase decision without leaving the platform. If a movie is purchased, VUDU detects a consumer's internet speeds and adjusts the resolution of the movie delivered to the consumer in real- time to attempt to ensure glitch free movie watching. Vudu also provides a "Movie Recommendation Decision Engine" and supplies third-party movie reviews to aid consumers in selecting movies to purchase. Also, according to VUDU, "One of the features of [VUDU's] Services is that we may customize your user experience based on your Content, webpage and other viewing, purchasing and browsing history. You may notice this when you use the Services." Supporting all of these services, VUDU employs Technical Support and Customer Support teams to aid customers which experience technical issues purchasing or watching a movie (e.g., such as if sound is not playing with the display of a movie). As another facet of its services, VUDU permits movies to be downloaded to various types of physical devices, so that the movies can be viewed at various locations, such as where internet access is not available. According to VUDU's summary of this feature:

"Summary
The Movie Download feature allows you to download a movie to the hard disk drive built into your VUDU device. Once downloaded, you can then watch the movie directly from the hard disk, without having to stream it over the Internet.

Downloading a Movie
You may download a movie immediately after purchasing it or at any time after you have purchased it.

**Purchasing and Downloading**

 52

In order to purchase a movie and begin downloading it immediately, please follow these steps:

1) Select "Buy Movie" from the Movie Details page

2) Select the movie video quality (SD, HD and HDX) that you would like to own. The download feature

is only available for movies that you select to "own" on VUDU.

3) Once you purchase the movie, you will be presented with several options, select "Download and

Watch Later". Your movie will begin downloading."

Amazon's Prime Video service, the service used by Plaintiff's Woulfe and Rosza, is similar to VUDU's service in that it provides many (if not all) of the same or similar features. For example, Prime Video provide descriptions and trailer advertisements for movies, provides movie ratings, actively adjusts movie resolutions during playback, suggests movies to watch, includes parental controls, organizes movie watch parties, provides scene information during movie play with its "X-Ray" service, allows downloads to physical devices so that movies can be moved to watch at different locations, and provides customer service and technical support. Using either service, if a movie is purchased, it can be watched in perpetuity at different physical locations on various physical devices which can be transported geographically, carrying the movie inside. Using Prime Video, if a movie is rented, it is placed into a "My Stuff" folder on a physical device of a consumer where it is accessible for 30 days from the date of payment, with VUDU offering similar 30 day movie rental access.

98.    By way of additional example, Defendant and its affiliated entities have applied for and obtained U.S trademark registrations from the United States Patent and Trademark Office ("USPTO") both for movies themselves and for supplying in-home consumers with movies, such as via in-home movie streaming services (also known as digital movie stores). For example, VUDU was granted a trademark for the mark "VUDU"

53

for its digital movie store services, with the mark itself categorized by the USPTO as a "Service Mark." The services for which the registration was granted are as follows:

> providing consumer information used in the selection and purchase of audio and video content, namely, retail ordering services in the field of motion pictures and multi-media excluding interactive games.

> audio and video broadcasting services, broadcasting audio and video content over global computer networks, video-on-demand transmission services, pay-per-view video and audio transmission services.

> providing information in the area of audio and video programming, namely, electronic distribution of motion pictures and multi-media to retail consumers excluding interactive games.

> providing a website featuring temporary use of non-downloadable software allowing website users to store and playback audio and video content for entertainment purposes in the field of motion pictures and multi-media excluding interactive games.

Amazon.com was granted a similar trademark registration for the mark "Prime Video", for similar services, which is also characterized by the USPTO as a "Service Mark."

99.     The USPTO's authority in issuing trademark registrations is limited to "goods" and "services," and the USPTO has approved of Defendant's and/or its affliated

 54

entities' goods and services for movies and in-home digital movie deliveries, as recited in their U.S. trademark applications.

100.   The state of California has adopted the classification system of the USPTO for goods and services. Consequently, the state of California also recognizes Defendant Universal's movies and in-home movie deliveries as goods and/or services.

**Defendant's False and Deceptive Advertising**

101.   ~~101.~~ Plaintiffs reassert and reallege all of the allegations contained in the foregoing paragraphs as though the same were fully set forth herein.

102.   ~~102.~~ Defendant, through its movie trailers and other false advertising, such as it's fraudulent cast listings on VUDU, *key word linking of Ms. De Armas to Yesterday,* and misleading commercial promotional appearances for *Yesterday*, has consistently conveyed to consumers throughout the United States that the movie *Yesterday* features actress Ana De Armas.

103.   ~~103.~~ Despite Defendant's representations in its advertising, Ana De Armas is not in the film *Yesterday*.

104.   ~~104.~~ Defendant also deceived consumers by including the "something"-song-joke, and the performance of The Beatles' song Something, in movie trailers promoting *Yesterday*.

105.   ~~105.~~ The "something"-song-joke, and the performance of The Beatles' song Something, is not in the publicly released version of the movie *Yesterday*.

106.   ~~106.~~ Defendant's movie trailer advertisements for the movie *Yesterday*, featuring Ana De Armas, are literally false advertisements.

107. ~~107.~~ Defendant's movie trailer advertisement of the movie *Yesterday*, featuring scene elements which were not included in the publicly released film, are collectively a literally false advertisement.

 56

108.   108.   Defendant's movie trailer advertisements for the movie *Yesterday*, featuring Ana De Armas, are false, deceptive, deceitful, fraudulent, unfair, and misleading.

109.   Defendant's movie trailer advertisement of the movie *Yesterday*, featuring scene elements which were not included in the publicly released film, are false, deceptive, deceitful, fraudulent, unfair, and misleading.

110.   Defendant's advertisements on VUDU, which state that Ana De Armas is a cast member, and which list the movie *Yesterday* when searching for Ana De Armas' name, are literally false advertisements.

111.   111.   Defendant's advertisements on VUDU, which state that Ana De Armas is a cast member, and which list the movie *Yesterday* when searching for Ana De Armas' name, are false, deceptive, deceitful, fraudulent, unfair, and misleading.

112.   112.   Consumers, including movie viewers, purchasers, and renters of the movie *Yesterday*, relied on the content of the trailer for the film, or the content of Defendant's advertisements, when deciding whether to spend money to view or purchase the film.

113.   113.   Because consumers were not provided with the movie product that they were promised by Defendant, they were effectively provided with no value at all.

114   Alternatively, at best, Plaintiffs and the class members were provided with a movie product having less value than the product they were advertised and promised.

114.   Because consumers were promised a movie with Ana De Armas by Defendant's advertisements for *Yesterday*, but did not receive a movie with any appearance of Ana De Armas at all, such consumers were not provided with any value for their rental or purchase, or at best were provided with less value than promised.

2:22-cv-00459-SVW-AGR

115.   ~~115~~   Defendant's false, deceptive, fraudulent, unfair, and misleading advertisements have been disseminated to the public continuously since at least 2019, and are still being disseminated

58

in ~~May~~ June of 2022, and Defendant will continue to deceive the

<u>59</u>

<u>2:22-cv-00459-SVW-AGR</u>

public with such advertisements unless it is enjoined from continuing to engage in such unlawful conduct.

## CLASS DEFINITION AND ALLEGATIONS

116.   116.   Plaintiffs reassert and reallege all of the allegations contained in the foregoing paragraphs as though the same were fully set forth herein.

117.   117.   Plaintiffs, pursuant to Fed. R. Civ. Pro. 23(b)(2) and 23(b)(3), bring this action on behalf of themselves and those similarly situated and seek certification of the following classes:

### California Class

All persons who purchased in the state of California any tickets for theater viewership, or who rented or purchased physical or electronic copies of the movie *Yesterday* within California, within the applicable statute of limitations, for personal use until the date notice is disseminated.

### Maryland Class

All persons who purchased in the state of Maryland any tickets for theater viewership, or who rented or purchased physical or electronic copies of the movie *Yesterday* within Maryland, within the applicable statute of limitations, for personal use until the date notice is disseminated.

118.   118. Excluded from each Class is Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who viewed, purchased, or rented the movie

60

2:22-cv-00459-SVW-AGR

*Yesterday,* all



61

persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned and any immediate family members thereof.

119. ~~119.~~ Certification of Plaintiffs' claims for class wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

## Numerosity – Federal Rule of Civil Procedure 23(a)(1)

120. ~~120.~~ The members of the Class are so numerous that individual joinder of all Class members is impracticable. Defendant has sold at least hundreds of thousands of movie tickets, or online or physical movie rentals or purchases, to Class members.

## Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)

121. ~~121.~~ This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    (a)    Whether the representations discussed herein that Defendant made about *Yesterday* were or are true, misleading, or likely to deceive;

    (b)    Whether Defendant's conduct violates public policy;

    (c)    Whether Defendant engaged in false or misleading advertising;

    (d)    Whether Defendant's conduct constitutes violations of the laws asserted herein;

    (e)    Whether Plaintiffs and the other Class members have been injured and the proper measure of their losses as a result of those injuries; and

    (f)    Whether Plaintiffs and the other Class members are entitled to injunctive, declaratory, or other equitable relief.

62

**Typicality – Federal Rule of Civil Procedure 23(a)(3)**

122. ~~122.~~ Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform prohibited conduct described above.

**Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4)**

123. ~~123.~~ Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the other Class members Plaintiffs seek to represent; Plaintiffs have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel.

**Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2)**

124. ~~124.~~ Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to Class as a whole.

**Superiority – Federal Rule of Civil Procedure 23(b)(3)**

125. ~~125.~~ A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to

63

individually seek redress for Defendant's wrongful conduct. Even if Class members

64

could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of the California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.* (Pleading in the Alternative)**
(On behalf of the California Class)

126. ~~126.~~ Plaintiffs reassert and reallege all of the allegations contained in the foregoing paragraphs as though the same were fully set forth herein.

127. ~~127.~~ There is no adequate remedy at law for any unlawful, unfair, or fraudulent advertising, for any *Yesterday* movie sale, movie display, rental, or viewership right sold which the Court determines is not a good or service for which remedies are available under California Consumers Legal Remedies Act. For these acts for which there is no adequate remedy at law, Plaintiff Rosza brings this claim individually and/or on behalf of the California Class.

~~128~~ Accordingly, this claim is pleaded in the alternative to the other claims set forth herein.

128. Plaintiff and Defendant are "persons" within the meaning of the UCL. Cal. Bus. & Prof. Code § 17201.

129. ~~129.~~ The UCL defines unfair competition to include any "unlawful, unfair or fraudulent business act or practice," as well as any "unfair, deceptive, untrue or misleading advertising." Cal. Bus. Prof. Code § 17200.

65

2:22-cv-00459-SVW-AGR

*"Unlawful" Prong*

130.   ~~130.~~   In the course of conducting business, Defendant committed unlawful, unfair and fraudulent business practices by, among other things, making the representations (which also constitutes advertising within the meaning of § 17200) and omissions of material facts, as set forth more fully herein, and violating 15 U.S.C. §1125(a) (as false advertising under the Lanham Act) as well as Civil Code §§ 1572, 1573, 1709, 1711, 1770(a)(5), (7), (9) and (16) (Consumers Legal Remedies Act ("CLRA")) and Business & Professions Code §§ 17200, *et seq.*, 17500, *et seq.* ("False Advertising Law"), and the common law. Additionally, Defendant Universal's false statements, comprising false commercial advertising pertaining to the contents of the

66

movie *Yesterday,* constitute fraud, fraud in contract, common law fraud, and breach of Defendant's covenant of good faith and fair dealing, thus violating California Civil Code §§ 1572, 1573, 1709, and 1711.

131.   ~~131.~~   Plaintiff reserves the right to allege other violations of law, which constitute other unlawful, unfair, and/or fraudulent_ business acts or practices. Such conduct is ongoing and continues to this date.

~~132~~

### ***"Unfair Prong"***

132.   A business act or practice is unfair under the UCL if it offends an established policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims. In the course of conducting business, Defendant committed "unfair" business practices by, among other things, making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts regarding the movie *Yesterday* in its advertising, as set forth more fully herein. There is no societal benefit from false

67

advertising – only harm. Plaintiff and the other Class members paid for a product that did not deliver the content promised by Defendant's advertising. While Plaintiff and the other Class members were harmed, Defendant was unjustly enriched by its false misrepresentations and omissions. As a result, Defendant's conduct is "unfair," as it offended an established public policy. Further, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

133. ~~133.~~ Further, as set forth in this Complaint, Plaintiff alleges _federal and state law_ violations of consumer protection, unfair competition, and truth in advertising laws ~~in California and other states~~, resulting in harm to consumers. Defendant's acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of Business & Professions Code § 17200, _et seq_.

134. ~~134.~~ There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

### _"Fraudulent" Prong_

135. Business & Professions Code § 17200, _et seq_., also prohibits any "fraudulent business act or practice." _A business act or practice is fraudulent under the UCL if it is likely to deceive members of the consuming public, or reasonable consumers._ In the course conducting business, Defendant committed "fraudulent business

68

act or practices" by, among other things, making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts regarding the movie *Yesterday*, as set forth more fully herein. Defendant made the misrepresentations and omissions regarding the content of the film *Yesterday,* among other ways, by misrepresenting that Ana De Armas would appear in the publicly released film when Defendant knew she would not.

<u>69</u>

<u>2:22-cv-00459-SVW-AGR</u>

136.  Defendant's acts and practices alleged herein constitute fraudulent business acts or practices as they have deceived Plaintiffs and are highly likely to deceive reasonable consumers. Plaintiffs relied on Defendant's fraudulent and deceptive representations regarding the movie *Yesterday,* which were but for material with respect to Plaintiffs' decisions to purchase the movie. Plaintiffs would not have purchased the movie *Yesterday* if they had known the truth.

137.  ~~135.~~ Defendant's actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading and/or likely to deceive the consuming public within the meaning of Business &Professions Code § 17200, *et seq*.

138.  ~~136.~~ Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendant's material representations and omissions, which are described above. This reliance has caused harm to Plaintiff and the other members of the Class, each of whom paid to view or purchased Defendant's film *Yesterday*. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of paying to view or purchasing the movie *Yesterday* due to Defendant's unlawful, unfair, and fraudulent practices.

139.  ~~137.~~ Defendant knew and intended, or at least should have known, that its material misrepresentations and omissions would be likely to deceive and harm the consuming public and result in consumers making payments to Defendant for its falsely advertised film.

140.  ~~138.~~ As a result of its deception, Defendant was unjustly enriched by receiving payments from Plaintiff and the Class in return for providing Plaintiff and the Class a movie product and/or service that does not include the actress Ana De Armas as ~~advertised.~~promised by its advertisements. Accordingly, Plaintiff, individually and on behalf of all others similarly situated, and on behalf of the general public, seeks restitution from Defendant

70

71

2:22-cv-00459-SVW-AGR

141. 139.     Unless restrained and enjoined, Defendant will continue to engage in the

72

unlawful, unfair and fraudulent conduct described herein. Defendant Universal is a major motion picture studio with large market share, and Plaintiffs anticipate buying or renting movies advertised with movie trailers by Defendant Universal again. ~~Accordingly~~Moreover, Plaintiffs would be interested in viewing a version of *Yesterday* which did include Ana De Armas. Accordingly, Defendant's advertising on VUDU, including its keyword linking of Ana De Armas to *Yesterday*, and listing of Ana De Armas as a cast member, could deceive Plaintiffs again. For example, given Defendant's persistent false advertising, it is reasonable for Plaintiff's to believe that Defendant switched or will switch the version of the *Yesterday* movie offered for sale and rent on VUDU, just as Amazon.com replaced the *Yesterday* trailer available via Amazon Prime (a.k.a. Prime Video). Accordingly, since money cannot fix future harm, Plaintiff, individually and on behalf of all others similarly situated, and on behalf of the general public, seeks ~~restitution from Defendant of all money obtained from Plaintiff and the other members of the Class collected as a result of Defendant's unfair competition, and for~~ an injunction, including a public injunction for the benefit of the general public, prohibiting Defendant from continuing and further engaging in its unlawful, unfair and fraudulent conduct, requiring corrective advertising, and awarding all other relief this Court deems appropriate.

## COUNT II
### Violation of the California False Advertising Law ("FAL")
### Cal. Bus. & Prof. Code §§ 17500, *et seq*. **(Pleading in the Alternative)**
(On behalf of the California Class)

142. ~~140.~~ Plaintiffs reassert and reallege all of the allegations contained in the foregoing paragraphs as though the same were fully set forth herein.

~~141.~~

143. There is no adequate remedy at law for any unlawful, unfair, or fraudulent advertising, for any *Yesterday* movie sale, movie display, rental, or viewership right sold which the Court determines is not a good or service for which remedies are available under California Consumers Legal Remedies Act. For these acts for which there is no adequate

73

remedy at law, Plaintiff ~~Mike~~ Rosza brings this claim individually and/or on behalf of the California Class.

~~142~~ Accordingly, this claim is pleaded in the alternative to the other claims set forth herein.

144.   The FAL, in relevant part, states that "[i]t is unlawful for any …corporation …with intent … to dispose of … personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated …from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement … which is *untrue* or *misleading*, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading[.]"Cal. Bus. & Prof. Code § 17500 (emphasis added).

<u>74</u>

145.   ~~143.~~   The required intent is the intent to dispose of property, not the intent to mislead the public in the disposition of such property.

146.   ~~144.~~   Defendant violated the FAL by intentionally making literally false and misleading representations in its movie trailer, and in its other advertisements for the movie *Yesterday,* and through its use of key word linking to associate Ana De Armas' name with the movie *Yesterday* in search results. These literally false and misleading representations led consumers to believe that Ana de Armas was in the movie *Yesterday* when, in reality, she did not make an appearance in the movie *Yesterday*.

147.   ~~145.~~   As a direct and proximate result of Defendant's untrue and misleading advertising, and use of key word linking to associate Ana De Armas' name with the movie *Yesterday* in search results, Plaintiff and the Class members have suffered injury in fact and have lost money.

148.   ~~146.~~   Accordingly, Plaintiff ~~requests~~ and the Class Members request that the Court order

Defendant to restore the money Defendant has received from Plaintiff and the members

75

of the Class, and that the Court enjoin Defendant from continuing its unlawful practices, including by issuing a public injunction for the benefit of the general public, and engage in corrective advertising.

## COUNT III
## Unjust Enrichment (Pleading in the Alternative)
(On behalf of the California and Maryland Class)

149. ~~147.~~ Plaintiffs reassert and reallege all of the allegations contained in the foregoing paragraphs as though the same were fully set forth herein.

150. ~~148.~~ There is no adequate remedy at law for any unlawful, unfair, or fraudulent advertising, for any *Yesterday* movie sale, movie display, rental, or viewership right sold which the Court determines is not a good or service for which legal remedies are available under California Consumers Legal Remedies Act or the Maryland Consumer Protection Act. For these acts for which there is no adequate remedy at law, Plaintiffs bring this claim individually and/or on behalf of the California and Maryland Class.

151. ~~149.~~ This claim is pleaded in the alternative to the other claims set forth herein.

76

2:22-cv-00459-SVW-AGR

152.   ~~150.~~   As the intended and expected result of its conscious wrongdoing, Defendant has profited from and benefitted from the sales, rentals, licenses, and public theater presentations of the movie *Yesterday*.

153.   ~~151.~~   Defendant has intentionally sought and voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Defendant's misconduct alleged herein, Plaintiffs and the Class were not receiving a product – the *Yesterday* movie – of the quality, nature, fitness or value that had been represented by Defendant, and that a reasonable consumer would expect. Specifically, Plaintiffs and the Class members expected that when they purchased or rented the movie *Yesterday*, Ana de Armas would have a role in the movie and that other scenes appearing in the *Yesterday* trailer would appear in the film.

2:22-cv-00459-SVW-AGR

154. ~~152.~~ Defendant has been unjustly enriched by its fraudulent, deceptive, unlawful, and unfair conduct, and its withholding of benefits and unearned monies from Plaintiffs and the Class, at the expense of these parties.

155. ~~153.~~ Equity and good conscience militate against permitting Defendant to retain these profits and benefits.

**COUNT IV**
**Breach of Implied Warranty (Pleading in the Alternative)**
**MD Comm. L. Code § 2-314, 2-315, 2-316, California Commercial Code, and Cal. Civ. Code, § 1790 *et seq.* (Song-Beverly Consumer Warranty Act)**
(On behalf of the Maryland ~~Class~~and California Classes)

156. ~~154.~~ Plaintiffs reassert and reallege all of the allegations contained in the foregoing paragraphs as though the same were fully set forth herein.

157. ~~155.~~ Plaintiff Woulfe brings this claim individually and on behalf of the Maryland Class~~.~~

78

156. and Plaintiff Rosz2a brings this claim individually and on behalf of the California Class. This claim is pleaded in the alternative to the other claims set forth herein.

158. The laws governing the sale of goods imply a warranty that the goods conform to the representations and specifications suppliers/merchants supply for the goods and that the goods are fit for the purposes underlying the goods sold.

159. ~~157.~~ The laws governing the sale of goods also imply a warranty that the goods conform to the promises or affirmations of fact made when advertising the product.

160. ~~158.~~ The purpose of these warranties is to protect consumers, as the intended beneficiaries of those warranties.

161. Defendant contracted with ticket sellers, digital movie stores, DVD movies sellers, and movie theaters, and utilized co-owned Fandango and VUDU for movie sales, for the benefit of Plaintiffs and the Class members. Therefore Plaintiff Woulfe and the

79

~~159.   Plaintiff Woulfe and~~ Maryland Class Members <u>and Plaintiff Rosza and the California Class members</u> are the intended beneficiaries of the implied warranty ~~contract~~.

<u>162.</u>   ~~160.~~   Defendant is ~~the~~<u>also a</u> merchant that <u>directly</u> sells the movie *Yesterday* <u>in DVD form</u> to consumers.

~~161~~ <u>Maryland and California Class Members were the intended beneficiaries of the implied warranty for such DVD sales</u>. ~~The movie *Yesterday* is the consumer good.~~
<u>163.</u>   <u>The movie *Yesterday*, at least in some forms, is the consumer good. The trailer for the movie *Yesterday* was a sample of the movie offered to consumers to entice them to buy the movie goods.</u>

<u>164.</u>   ~~162.~~   Defendant breached its implied warranties pertaining to the content of the movie *Yesterday*, because the movie *Yesterday* did not contain Ana de Armas or other omitted content, as Defendant's movie trailer <u>(i.e., the movie sample)</u> and other advertising promised to consumers.

<u>165.</u>   ~~163.~~ Defendant cannot provide a remedy or provide conforming goods because the movie *Yesterday* has already been displayed to Plaintiff Woulfe and Maryland Class Members <u>and Plaintiff Rosza and the California Class Members</u> without Ana de Armas and other scenes.

<u>166.</u>   ~~164.~~   Defendant's breach of the implied warranty of merchantability injured Plaintiff Woulfe and the Maryland Class <u>and Plaintiff Rosza and the California Class Members</u> by inducing Maryland <u>and California</u> movie viewers<u>, respectively,</u> to pay for purchasing or viewing the movie *Yesterday,* using advertising which falsely warranted the movie as including content, including a performance by the actress Ana De Armas, which it did not.

<u>167.</u>   ~~165.~~ Defendant's actions breached implied warranties made to consumers in violation of Maryland law <u>and California law</u>.

<u>80</u>

2:22-cv-00459-SVW-AGR

168.    166.    Plaintiff, via the First Amended Complaint served on Defendant at least as early as March 24, 2022, notified Defendant in writing on February 9, 2022, prior to the service

of the original complaint in this case on March 18, 2022, that *Yesterday* did not conform

81

2:22-cv-00459-SVW-AGR

to the promises and affirmations made ~~when~~by Defendant's advertisements of the movie ~~was advertised to Plaintiff. Namely, the advertisement watched by Plaintiff affirmatively~~*Yesterday* to Plaintiffs. More specifically, Plaintiffs advised Defendant in writing that the movie received was not the movie promised, by specifically explaining that Defendant's advertisments (including the movie sample, in the form of a trailer) misrepresented to ~~Plaintiff~~Plaintiffs that Ana De Armas and other omitted content were present in the movie *Yesterday*, when ~~they were~~she and it was not.

~~167~~ Moreover, Plaintiffs offered Defendant an opportunity to remedy its breaches, which Defendant ignored.

169.   Defendant's unlawful conduct entitles Plaintiffs and the Class to: (a) damages, in an amount to be determined at trial, and (b) an order enjoining Defendant from continuing to offer the movie *Yesterday* for sale or rent or license without Ana De Armas or without other scenes falsely advertised as included within the film.

## COUNT V
**Violation of Maryland's ~~Unfair and Deceptive Trade Practices Action~~ Consumer Protection Act (Pleading in the Alternative)**
**MD Comm. L. Code § 13-301 *et seq*.**
(On behalf of the Maryland Class)

170.   ~~168.~~ Plaintiffs reassert and reallege all of the allegations contained in the foregoing paragraphs as though the same were fully set forth herein.

171.   ~~169.~~ Plaintiff Woulfe brings this claim individually and on behalf of the members of the Maryland Class.

~~170~~ This claim is pleaded in the alternative to the other claims set forth herein.

 82

172.   Plaintiff Woulfe and the Maryland Class members are consumers within the meaning of the Maryland Consumer ~~Unfair and Deceptive Trade Practices~~ Protection Act, §13-201 *et seq*. (the "Maryland Act").

173.   ~~171.~~ The Maryland Act expressly notes that unfair or deceptive trade practices include:

83

2:22-cv-00459-SVW-AGR

a.  False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

b.  Representation that:

84

     i. Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

c. Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

     i. The promotion or sale of any consumer goods, consumer realty, or consumer service.

174. 172. Maryland Code, Commercial Law Article, 13-408, a provision of Maryland's Consumer Protection Act, expressly authorizes civil actions by consumers, like Plaintiff Woulfe.

175. 173. Defendant engages in "trade" and "commerce" generally and as it pertains to the distribution of the movie *Yesterday* for sale or rent to consumers within the state of Maryland.

176. 174. Defendant's movie trailer for the film *Yesterday* represents, and/or other movie advertisements, represent that the actress Ana De Armas, as well as certain omitted scenes, would be featured in the movie *Yesterday*, when she is not and the scenes are not.

177. 175. The Defendant's movie trailer for *Yesterday* is advertisements indivudally and collectively are false, deceptive, and misleading because it represents they represent that actress Ana de Armas, and other omitted scenes, would be featured in the movie *Yesterday*, when she is not and the scenes are not. Defendant's false advertising provided no countervailing benefit to Plaintiffs or the Class Members.

85

178. ~~176.~~ The content of Defendant's movie trailer for the movie *Yesterday,* which was omitted from the publicly released film, is and was collectively material to a reasonable consumer and is and was designed to affect consumer decisions and conduct.

~~177~~ Defendant's non-trailer advertising of *Yesterday* was also collectively material to a reasonable consumer and is and was designed to affect consumer decisions and conduct.

179. Defendant understood and intended that the representations in the movie trailer for *Yesterday, and in other false advertisements,* would influence consumer behavior.

86

180. ~~178.~~ Defendant understood that it has an obligation to ensure the honesty of all promotions and to avoid misleading the public regarding the movie *Yesterday*.

181. ~~179.~~ Defendant's misleading movie trailer, *and other false advertising of Yesterday*, constitutes an unfair method of competition and unfair and/or deceptive acts or practices in the conduct of trade or commerce for movie sales and rentals and licenses to consumers.

182. ~~180.~~ Defendant's acts and practices offend public policy as established by statute.

183. ~~181.~~ Defendant's acts and practices are immoral, unethical, oppressive, and unscrupulous.

184. ~~182.~~ Defendant's conduct substantially injured actual and potential consumers, the public and competition. Defendant knowingly induced viewership, sales, rentals, and licenses of the movie *Yesterday* within the state of Maryland, using a false and deceptive movie trailer *and other false advertisements* for monetary gain from Plaintiff Woulfe, the Maryland Class members, and other consumers who would not have paid to view, rent, buy, or license *Yesterday* but for Defendant's false and misleading conduct.

185. ~~183.~~ Defendant's conduct materially affected available information regarding its

*Yesterday* movie within Maryland.

87

186. ~~184.~~ Defendant's conduct improperly distorted the information available to the public regarding the movie *Yesterday*.

187. ~~185.~~ Defendant's actions caused consumers to pay for the movie *Yesterday*, by deceiving consumers into believing the movie had content that it does not. These injuries are not outweighed by any countervailing benefits to consumers or competition. No legally cognizable benefit to consumers or competition results from Defendant's misconduct.

188. ~~186.~~ Plaintiff Woulfe and the Maryland Class purchased ownership or rental copies of the movie *Yesterday, or movie display services of Yesterday,* for personal, family or household use. Thus, the practices discussed above

88

2:22-cv-00459-SVW-AGR

constitute unfair competition or unfair, unconscionable, deceptive, or unlawful acts or business practices in violation of the Maryland Act.

189. ~~187.~~ The foregoing unfair and deceptive practices directly, foreseeably, and proximately caused Plaintiff Woulfe and the Maryland Class to suffer ascertainable losses when they were deceived into paying to view, buy, rent, or license the movie *Yesterday*, when they would not have but for Defendant's false, deceptive, and misleading advertisements and representations. Consequently, Defendant has been unjustly enriched by gaining revenues for movie sales, rentals, and licenses, which it only gained because of its unlawful conduct.

190. ~~188.~~ Plaintiff Woulfe and the Maryland Class are entitled to recover damages and other appropriate relief, as alleged below.

## COUNT VI
### Breach of Express Warranty in Violation of the Uniform Commercial Code **(Pleading in the Alternative)**
(on behalf of the California and Maryland Class)

191. ~~189.~~ Plaintiffs reassert and reallege all of the allegations contained in the foregoing paragraphs as though the same were fully set forth herein.

89

2:22-cv-00459-SVW-AGR

192. 190.   Plaintiffs bring this claim individually and on behalf of the California and Maryland Class. This claim is pleaded in the alternative to the other claims set forth herein. Defendant sold *Yesterday* DVDs directly to consumers as well as contracted with ticket sellers, digital movie stores, DVD movie sellers and movie theaters, and utilized co-owned Fandango and VUDU for *Yesterday* movie sales, for the benefit of Plaintiffs and the Class. Therefore, Plaintiffs Woulfe and Maryland Class Members, and Plaintiff Rosza and the California Class members, are the intended beneficiaries of the express warranty. The movie *Yesterday*, at least in some forms, is the consumer good.

193. 191. Defendant's *Yesterday* movie trailer expressly warrants that the movie *Yesterday* would feature Ana de Armas and other omitted scenes.

194. 192. Further, Defendant's representations in cast listings and key word linking of Ana De Armas' name to the movie *Yesterday* on VUDU, are express warranties that Ana De Armas is a cast member in the full length movie.

90

2:22-cv-00459-SVW-AGR

195. 193. Defendants breached their express warranties to Plaintiffs and the Maryland and California Class because actress Ana de Armas, and other omitted but promoted scenes, did not appear in the movie *Yesterday*.

196. 194. As a result of Defendant's breach of its express warranties, Plaintiffs and the Maryland and California Class have suffered actual damages because they purchased or rented or licensed products that they would not have, but for Defendant's unlawful conduct.

**COUNT VII**
**Violation of the California Consumers Legal**
**Remedies Act ("CLRA") (Pleading in the Alternative)**
(on behalf of the California Class)

197. 195. Plaintiffs reassert and reallege all of the allegations contained in the foregoing paragraphs as though the same were fully set forth herein.

91

2:22-cv-00459-SVW-AGR

198.  196.  Plaintiff Peter Michael Rosza brings this claim individually and on behalf of the California Class. This claim is pleaded in the alternative to the other claims set forth herein.

199.  197. Plaintiffs are "consumers" and Defendant is a "person" within the meaning of the CLRA Cal. Civ. Code § 1761 (c) and (d).

200.  198. The theatrical presentations, utilizing physical film or digital film sources, physical DVD movie sales, and online movie rentals and sales of the movie *Yesterday* are "goods" or "services" within the meaning of the CLRA. Cal. Civ. Code § 1761(a), (c) and (d).

201.  199. Defendants' DVD versions of the movie *Yesterday,* at the very least, are "goods," as are any other physical film or digital movie versions. Cal. Civ. Code § 1761(a),

(c) and (d).

202.  200. During Plaintiffs' rental of the movie *Yesterday* includes, Defendant's agent monitored the internet speed of Plaintiff's internet connection and adjusted the resolution of Plaintiff's movie play in real-time to optimize playback. Moreover, Defendant's agent provided its X-Ray service (discussed *supra*) during the play of the movie, and maintained the availability of its customer service and technical support personnel. Defendant's agent also stored the movie in Plaintiff's "My Stuff" folder so that Plaintiff had the ongoing ability to access, view, and stream the video content for a period of time, thus constituting up to 30 days. For these and other reasons described herein (or as may be further pleaded or evidenced if needed), the play and active monitoring of the play of the movie on behalf of Plaintiff, utilizing physical equipment and tailored and monitored data streams, constitutes a "service" within the meaning of the CLRA. For similar reasons - also including the delivery of trailers, movie suggestions, and movie

92

reviews – the active monitoring and adjustment of *Yesterday* movie plays on other movie platforms, including the VUDU platform, constitutes a "service" within

93

the meaning of the CLRA. In addition, and similarly, Defendant's theatrical presentations and online movie rentals and sales of the movie *Yesterday* are "services involved the play of physical movie copies and the providing of food and drink, and in

94

some cases the supply of luxury seating, dining, and beverage (wine, beer, cocktails, etc.) experiences, such as at Cinepolis theaters (i.e., where service and support staff assist movie customers during movie showings). Likewise, during *Yesterday* movie play, if any technical difficulties were experienced with the movie, theater staff were present to resolve the movie play issues to maximize movie enjoyment. This plethora of services, all provided collectively to movie consumers to maximize consumers' enjoyment of *Yesterday*, collectively constitute a "service" within the meaning of the CLRA Cal. Civ. Code § 1761(a), (c) and (d).

203.  ~~201.~~  Defendant's theatrical presentations, sale, rental, and advertisement of its movie *Yesterday* constitute "transactions" within the meaning of the CLRA. Cal. Civ. Code

§ 1761(e).

204.  ~~202.~~ The CLRA declares as unlawful the following unfair methods of competition and unfair or deceptive acts or practices when undertaken by any person in a transaction intended to result, or which results in the sale of goods to any consumer:

> (5)  Representing that goods or services … have … characteristics, ingredients, [and] benefits …which [they do] not have …

> (7)  Representing that goods …are of a particular standard, quality or grade … if they are of another.

> (9)  Advertising goods or services …with intent not to sell them as advertised.

> ~~(16)~~ (16) Representing that [goods or services] have been supplied in accordance with a previous representation when [they have] not.  27 Cal. Civ. Code § 1770(a)(5), (7), (9) and (16).

205.  ~~203.~~ Defendant violated the CLRA by representing that its movie *Yesterday*

<u>95</u>

included scene elements and actors when it did not. For example, Defendant's trailers for *Yesterday* falsely represented that the movie featured the actress Ana De Armas, the

2:22-cv-00459-SVW-AGR

"something"-song-joke, a scene from James Corden's talk show, and the performance of The Beatles' song "Something," when, in reality, it did not.

97

204. Defendant's other advertising made similar misrepresentations and false statements.

206. Defendant knew or should have known that its movie trailer representations, and other advertisements, were false and misleading, and that it omitted material facts that would alter any consumer's decision to view, purchase, or rent the film.

207. 205. Defendant knew or should have known that its false and misleading cast listings, and use of key word linking of Ana De Armas' name to the movie *Yesterday*, constituted representations that were false, misleading, deceitful, unfair, deceptive, and fraudulent and that consumers would rely upon Defendant's deception representations. Defendant also knew or should have known that it omitted material facts that would alter any consumer's decision to view, purchase, or rent the film.

208. 206. Defendant's violations of the CLRA proximately caused injury in fact to Plaintiff and the Class.

209. 207. Plaintiff and the Class members attended theatrical presentations, viewed, purchased, or rented Defendant's movie *Yesterday* (or Defendant's *Yesterday* movie play services) based upon the belief that the trailer, and Defendant's other advertisements, accurately represented the content of the movie. For example, Plaintiff and the Class members believed that the actress Ana De Armas, as well as omitted scene elements and songs appearing in the trailer, would appear in the film.

210. 208. Plaintiff and the Class members viewed, purchased, or rented *Yesterday* on the belief that they would receive the advertised film content.

211. 209. Defendant's film *Yesterday* did not and cannot provide the advertised content. Accordingly, Plaintiff and each Class member was injured by the mere fact of their purchase of movie tickets, movie downloads, physical copies, or rentals of the film or purchase of the movie display services.

98

212. 210. Pursuant to Cal. Civ. Code § 1782(d), Plaintiff, individually and on behalf of the other members of the Class, seeks a Court order enjoining the above- described wrongful acts and practices of Defendant and for restitution and disgorgement.

213. 211. Pursuant to Cal. Civ. Code § 1782(a), Defendant was notified in writing by both electronic and certified mail of the particular violations of Section 1770

99

of the CLRA, which notification demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act. A copy of the letter, which was emailed to Defendant on February 11, 2022 and delivered by certified mail, return receipt requested, to Defendant on February 18, 2022, is attached hereto as Exhibit B.

214. ~~212.~~ Defendant has failed to rectify or agree to rectify the problems associated with the actions detailed above and to give notice to all affected consumers within thirty (30) days of the date of written notice pursuant to Cal. Civ. Code §1782, and thus Plaintiff is timely filing this Amended Complaint for damages pursuant to the CLRA. Therefore, Plaintiff further seeks claims for actual, punitive and statutory damages, as appropriate. Such damages include statutory damages awards under Cal. Civ. Code §1780(b)(1) for the members of the California Class.

215. ~~213.~~ Defendant's conduct is fraudulent, wanton, and malicious.

216. ~~214.~~ Pursuant to Cal. Civ. Code §1780(d), attached hereto as Exhibit C is the affidavit showing that this action has been commenced in the proper forum.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the proposed Class, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendant, in combination or in the alternative, as follows:

2:22-cv-00459-SVW-AGR

A.   Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiffs as Class Representatives and, appointing the undersigned counsel as Class Counsel, and ordering Defendant to notify the members of the Classes;

101

2:22-cv-00459-SVW-AGR

B.      Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs and the Class members as a result of Defendant's unlawful, unfair and fraudulent business practices;

C.      Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, including by ordering a public injunction for the benefit of the general public, and ordering Defendant to engage in a corrective advertising campaign;

D.      Ordering damages, including punitive damages, for Plaintiffs and the Classes;

E.      Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiffs and the other members of the Class;

F.      Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

G.      Ordering such other and further relief as may be just and proper.


## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand a trial by jury in this action.

102

2:22-cv-00459-SVW-AGR

Respectfully submitted,

**LEJEUNE LAW, P.C.**

Dated: ~~May 4~~June 6, 2022June 7, 2022          By:

_/s/_ Cody R. LeJeune

Cody R. LeJeune
445 S. Figueroa St.
Suite 3100
Los Angeles, CA 90071
Telephone: (985) 713-4964

**PEQUIGNOT + MYERS**
Matthew A. Pequignot
PEQUIGNOT + MYERS
2585 Ala Namahana Pkwy, #1007
Kilauea, HI 96754
Telephone:  202-328-1200

Attorneys for Plaintiffs
CONOR WOULFE, an individual, and PETER MICHAEL ROSZA, an individual

103

2:22-cv-00459-SVW-AGR

## CERTIFICATE OF SERVICE

I hereby certify that on ~~May  4~~June 6, 2022, I filed the foregoing using the Court's

ECF  system, which served a copy of the foregoing to all counsel of record.

Dated: ~~May  4~~June 6, 2022                         */s/Cody R. LeJeune*_____

104

2:22-cv-00459-SVW-AGR

Cody R. LeJeune

105

2:22-cv-00459-SVW-AGR