1 | KELLY M. KLAUS (State Bar No. 161091)
kelly.klaus@mto.com
2 | VIRGINIA GRACE DAVIS (State Bar No. 336732)
grace.davisfisher@mto.com
3 | **MUNGER, TOLLES & OLSON LLP**
560 Mission Street, 27th Floor
4 | San Francisco, California 94105-2907
Telephone:  (415) 512-4000
5 | Facsimile:   (415) 512-4077

6 | BETHANY W. KRISTOVICH (State Bar No. 241891)
bethany.kristovich@mto.com
7 | BENJAMIN G. BAROKH (State Bar No. 318629)
benjamin.barokh@mto.com
8 | **MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, 50th Floor
9 | Los Angeles, California 90071-3426
Telephone:  (213) 683-9100
10 | Facsimile:   (213) 687-3702

11 | Attorneys for Defendant
UNIVERSAL CITY STUDIOS LLC

12 |

13 | **UNITED STATES DISTRICT COURT**

14 | **CENTRAL DISTRICT OF CALIFORNIA**

15 | CONOR WOULFE and PETER
MICHAEL ROSZA,
16 |
17 |        Plaintiffs,
18 |
   vs.
19 |
20 | UNIVERSAL CITY STUDIOS LLC,
d.b.a., UNIVERSAL PICTURES,
21 |
22 |        Defendant.
23 |
24 |
25 |
26 |
27 |
28 |

Case No. 2:22-cv-00459-SVW-AGR

**DEFENDANT'S NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF [1] SPECIAL MOTION TO STRIKE UNDER CAL. CIV. PROC. CODE § 425.16 AND [2] MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1), (6)**

Judge: Hon. Stephen V. Wilson

Defendant Universal City Studios LLC ("Universal") respectfully submits this Notice of Supplemental Authority in Support of its (1) Special Motion to Strike under Cal. Civ. Proc. Code § 425.16 and (2) Motion to Dismiss under Fed. R. Civ. P. 12(b)(1), (6) (the "Motions") to notify the Court of a recent Ninth Circuit opinion issued after the close of briefing that governs issues relevant to Universal's Motions.

In *Punchbowl, Inc. v. AJ Press, LLC*, No. 21-55881, 2022 WL 16911996 (9th Cir. Nov. 14, 2022), the Ninth Circuit applied *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), to hold that the defendant's use of a word in "the brand name of [a] commercial enterprise" (1) fell within the "wide range of activity [that] qualifies as expressive" under the First Amendment; (2) met the "very low threshold" of being "artistically relevant to the underlying work" under the first prong of *Rogers*; and (3) did not include "an explicit indication, overt claim, or explicit misstatement," so it was not "explicitly misleading" under the second prong of *Rogers*. *Punchbowl*, slip op. at 6–7, 11–12 (quoting *Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 983 F.3d 443, 462 (9th Cir. 2020)).  The Ninth Circuit thus affirmed the district court's grant of summary judgment on the plaintiff's Lanham Act, Cal. Bus. & Prof. Code § 17200, and common law unfair competition claims.  *Id.* at 20 (affirming *Punchbowl, Inc. v. AJ Press LLC*, 549 F. Supp. 3d 1061 (C.D. Cal. 2021) (Wilson, J.)); *see* Compl. (Dkt. 1), *Punchbowl, Inc. v. AJ Press LLC*, Case No. 2:21-cv-03010-SVW-MAR (C.D. Cal. 2021).

A copy of the Ninth Circuit's opinion is attached as Exhibit A.

DATED:  November 16, 2022

Respectfully submitted,

MUNGER, TOLLES & OLSON LLP

By: _____/s/ Kelly M. Klaus_____

KELLY M. KLAUS
Attorneys for Defendant
UNIVERSAL CITY STUDIOS LLC

# EXHIBIT A

FILED

**FOR PUBLICATION**

NOV 14 2022

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| PUNCHBOWL, INC., a Delaware corporation, | No.      21-55881 |
| *Plaintiff-Appellant*, | D.C. No. 2:21-cv-03010-SVW-MAR |
| v. | OPINION |
| AJ PRESS, LLC, a Delaware limited liability company, | |
| *Defendant-Appellee*. | |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted May 17, 2022
Pasadena, California

Before:  John B. Owens and Daniel A. Bress, Circuit
Judges, and Sidney A. Fitzwater,[*] District Judge.

Opinion by Judge Bress

---

[*] The Honorable Sidney A. Fitzwater, United States District Judge for
the Northern District of Texas, sitting by designation.

# SUMMARY[**]

## Lanham Act

The panel affirmed the district court's summary judgment in favor of AJ Press, LLC, in an action brought by Punchbowl, Inc. (Punchbowl), alleging violations of the Lanham Act for trademark infringement and unfair competition and related state law claims.

Punchbowl is an online party and event planning service. AJ Press owns and operates *Punchbowl News*, a subscription-based online news publication that provides articles, podcasts, and videos about American politics, from a Washington, D.C. insider's perspective. Punchbowl claimed that *Punchbowl News* is misusing its "Punchbowl" trademark (the Mark).

Traditionally, courts apply a likelihood-of-confusion test to claims brought under the Lanham Act. When artistic expression is at issue, however, the traditional test fails to account for the full weight of the public's interest in free expression. If the product involved is an expressive work, the court applies a gateway test, grounded in background First Amendment concerns, to determine whether the Lanham Act applies. Under the approach set forth in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), adopted by this court in *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002), the defendant must first make a threshold legal showing that its allegedly infringing use is part of an expressive work protected by the First Amendment. If the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

defendant meets this burden, the Lanham Act does not apply unless the defendant's use of the mark (1) is not artistically relevant to the work or (2) explicitly misleads consumers as to the source or content of the work.

Punchbowl asserted that the *Rogers* test is entirely inapplicable because it does not extend to "the brand name of [a] commercial enterprise." The panel disagreed, holding that AJ Press's use of the Mark in *Punchbowl News* is sufficiently expressive to merit First Amendment protection and application of the *Rogers* test. Applying that test, the panel noted that the first prong sets a very low threshold: the level of artistic relevance merely must be above zero. As to the second prong, the panel concluded that because AJ Press uses the Mark in an entirely different market and as only one component of the larger expressive work, *Punchbowl News* is not explicitly misleading as to its source. The panel wrote that no reasonable buyer would believe that a company that operates a D.C. insider news publication is related to a "technology company" with a "focus on celebrations, holidays, events, and memory-making." The panel wrote that this resolves not only the Lanham Act claims, but the state law claims as well. The panel explained that survey evidence of consumer confusion is not relevant to the question of whether AJ Press's use of the Mark is explicitly misleading, which is a legal test for assessing whether the Lanham Act applies.

The panel held that the district court's denial of Punchbowl's request for a continuance under Fed. R. Civ. P. 56(d) to permit further discovery was not an abuse of discretion.

## COUNSEL

Peter J. Willsey (argued) and Vincent Badolato, Brown Rudnick LLP, Washington, D.C.; Rebecca MacDowell Lecaroz and Melanie Dahl Burke, Brown Rudnick LLP, Boston, Massachusetts; David Stein, Brown Rudnick LLP, Irvine, California; for Plaintiff-Appellant.

Ian C. Ballon (argued), Rebekah S. Guyon (argued), and Nina D. Boyajian, Greenberg Traurig LLP, Los Angeles, California, for Defendant-Appellee.

Cara L. Gagliano and Corynne McSherry, Electronic Frontier Foundation, San Francisco, California, for Amicus Curiae Electronic Frontier Foundation.

Eugene Volokh; Elizabeth Anastasi, Max Hyams, and Sofie Oldroyd, Certified Law Students; UCLA School of Law First Amendment Clinic, for Amici Curiae Professors Ann Bartow, Jim Gibson, James Grimmelmann, Mark Lemley, Phil Malone, Mark McKenna, Lisa Ramsey, Jeremy Sheff, Jessica Silbey, Christopher Sprigman, and Rebecca Tushnet.

## OPINION

BRESS, Circuit Judge:

Punchbowl, Inc., is an online party and event planning service. *Punchbowl News* is a subscription-based online news publication that provides articles, podcasts, and videos about American politics, from a Washington, D.C. insider's perspective. Punchbowl claims that *Punchbowl News* is misusing its "Punchbowl" trademark. Applying our precedents, we hold that *Punchbowl News*'s use of the term "Punchbowl" is expressive in nature and not explicitly misleading as to its source. It thus falls outside the Lanham Act as a matter of law.

I

Punchbowl, Inc. (Punchbowl), is a self-described "technology company that develops online communications solutions for consumers," with a "focus on celebrations, holidays, events and memory-making." Punchbowl provides "online event and celebration invitations and greetings cards" and "custom sponsorships and branded invitations," as part of a subscription-based service. Punchbowl also works with companies such as The Walt Disney Company, Chuck E. Cheese, and Dave & Busters to help them promote their brands through online invitations.

Punchbowl has used the mark Punchbowl® (the Mark) since at least 2006. It registered the Mark with the United States Patent & Trademark Office in 2013. The Mark was registered primarily in connection with the "[t]ransmission of invitations, documents, electronic mail, announcements, photographs and greetings"; "[p]arty planning"; and "[p]reparation of electronic invitations, namely,

2          PUNCHBOWL, INC. V. AJ PRESS, LLC

providing . . . software that enables users to . . . customize electronic invitations."

Punchbowl promotes itself as "The Gold Standard in Online Invitations & Greeting Cards," as reflected in this record excerpt from Punchbowl's website:



A larger example of Punchbowl's Mark and logo (a punch ladle) is shown here:



But this is not the only Punchbowl.  Journalists Jake Sherman and Anna Palmer are the co-founders of AJ Press, LLC, a company that "provides curated, non-partisan commentary, opinions, and critiques."  In 2021, Palmer and Sherman co-founded *Punchbowl News* with reporter John Bresnahan.  *Punchbowl News* is a subscription-based online news publication that covers topics in American government and politics.  AJ Press owns and operates *Punchbowl News*, choosing which topics to cover and how to address them.  AJ Press concentrates its reporting on the "insiders" who make decisions in Washington, D.C., (*i.e.*, politicians, aides, and lobbyists), and on events and news that affect American political dynamics and elections.

Given the publication's focus on Beltway politics, AJ Press wanted a name that evoked its subject matter.  It chose "Punchbowl" because that is the nickname the Secret Service uses to refer to the U.S. Capitol.  The title *Punchbowl News* was thus selected to "elicit the theme and geographic location" of the publication.  AJ Press has filed trademark applications to register the marks "Punchbowl News" and "Punchbowl Press."

*Punchbowl News* often uses a slogan—"Power.  People.  Politics."—in connection with its name and logo.  Like its name, AJ Press chose its slogan to reflect the subject matter and theme of the *Punchbowl News* publication.  Similarly, AJ Press selected a logo to allude to the publication's focus on insider news and political commentary.  The logo depicts an overturned U.S. Capitol filled with bright pink/purple punch—an apparently playful homage to a blend of the traditional red and blue associated with America's leading political parties that emphasizes the publication's nonpartisan stance.  This is an example from the record of *Punchbowl News*'s logo in conjunction with its slogan, as it appears on its website:



*Punchbowl News* frequently promotes its connection to its founders. Its website depicts a large image of Sherman, Palmer, and Bresnahan accompanied by text stating that *Punchbowl News* was "founded by journalists and best-selling authors Jake Sherman and Anna Palmer, and co-founded by veteran Capitol Hill reporter John Bresnahan." *Punchbowl News*'s publications state at the top, near the name "*Punchbowl News*," that they are "by John Bresnahan, Anna Palmer, and Jake Sherman."

The parties' coinciding uses of "Punchbowl" led to this lawsuit. Punchbowl sued AJ Press alleging violations of the Lanham Act for trademark infringement and unfair competition. 15 U.S.C. §§ 1114, 1125(a). Punchbowl also brought related state law claims.

The district court granted summary judgment to AJ Press, concluding that its use of the name "Punchbowl" did not give rise to liability because it constituted protected expression and was not explicitly misleading as to its source. The district court also denied Punchbowl's request for a continuance under Federal Rule of Civil Procedure 56(d) to conduct additional discovery.

Punchbowl timely appeals. We review the district court's grant of summary judgment de novo. *Miranda v. City of Casa Grande*, 15 F.4th 1219, 1224 (9th Cir. 2021).

II

The Lanham Act, 15 U.S.C. § 1051 *et seq.*, "creates a comprehensive framework for regulating the use of trademarks and protecting them against infringement, dilution, and unfair competition." *Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 263 (9th Cir. 2018) (quoting *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010)). Traditionally, courts apply a likelihood-of-confusion test to claims brought under the Lanham Act. *See id.* at 264.

When "artistic expression is at issue," however, we have held that "the traditional test fails to account for the full weight of the public's interest in free expression." *Id.* (quotations omitted). If we were to disregard "the expressive value that some marks assume, trademark rights would grow to encroach upon the zone protected by the First Amendment." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002). A trademark owner "'does not have the right to control public discourse' by enforcing his mark." *Gordon*, 909 F.3d at 264 (quoting *Mattel*, 296 F.3d at 900). Thus, "if the product involved is an expressive work," we apply a gateway test, grounded in background First Amendment concerns, to determine whether the Lanham Act applies. *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1239 (9th Cir. 2013); *see also Gordon*, 909 F.3d at 264 (explaining that when expressive activity is at issue, we "employ[] the First Amendment as a rule of construction to avoid conflict between the Constitution and the Lanham Act").

In *Mattel*, we adopted the approach set forth by the Second Circuit in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), to frame the inquiry into whether the Lanham Act applies. *See Mattel*, 296 F.3d at 902. Under the *Rogers* test,

the defendant must first "make a threshold legal showing that its allegedly infringing use is part of an expressive work protected by the First Amendment." *Gordon*, 909 F.3d at 264. If the defendant meets this burden, the Lanham Act does not apply unless "the defendant's use of the mark (1) is not artistically relevant to the work or (2) explicitly misleads consumers as to the source or the content of the work." *Id.* (citing *Mattel*, 296 F.3d at 902). "Neither of these prongs is easy to meet." *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 462 (9th Cir. 2020). This approach is justified, we have held, because of the First Amendment interests at stake and because consumers are less likely to believe that someone using a mark in an expressive work is seeking to attribute its work to the trademark holder. *See Twentieth Century Fox Television v. Empire Distrib. Inc.*, 875 F.3d 1192, 1196 (9th Cir. 2017).

A

Before we apply the *Rogers* test, however, we must address Punchbowl's objection that this case lies outside of *Rogers*'s domain. Specifically, Punchbowl asserts that the *Rogers* test is entirely inapplicable because it does not extend to "the brand name of [a] commercial enterprise." In Punchbowl's view, that kind of branding is insufficiently expressive to merit *Rogers*'s heightened protections. We disagree.

"[T]he only threshold requirement for the *Rogers* test is an attempt to apply the Lanham Act to First Amendment expression." *Twentieth Century Fox*, 875 F.3d at 1198. To determine whether a work is expressive, we ask "whether the work 'is communicating ideas or expressing points of view.'" *VIP Prods. LLC v. Jack Daniel's Props., Inc.*, 953 F.3d 1170, 1174–75 (9th Cir. 2020) (quoting *Mattel*, 296 F.3d at 900). "A work need not be the expressive equal of

*Anna Karenina* or *Citizen Kane* to satisfy this requirement, and is not rendered non-expressive simply because it is sold commercially." *Id.* at 1175 (citations and quotations omitted).

Our case law demonstrates that a wide range of activity qualifies as expressive under *Rogers* (and thus the First Amendment). For example, in *VIP Products*, we concluded that a rubber dog toy resembling a bottle of Jack Daniel's whiskey was expressive because it conveyed a humorous message. 953 F.3d at 1175. In *Gordon*, we similarly concluded, with "little difficulty," that greeting cards containing the trademarked lines "Honey Badger Don't Care" and "Honey Badger Don't Give a S - - -" were expressive in nature because they juxtaposed "an event of some significance," like a birthday, with the "assertion of apathy" commonly associated with the trademarked phrase. 909 F.3d at 268–69. The expressive aims at issue in these cases were not necessarily lofty, but they were expressive, nonetheless.

Titles, too, can be expressive in nature. Indeed, *Rogers* itself concerned the title of a movie. *See Rogers*, 875 F.2d at 1000. There, the Second Circuit explained that its test "insulates from restriction titles with at least minimal artistic relevance that are ambiguous or only implicitly misleading." *Id*. We have applied *Rogers* to the title of a song ("Barbie Girl"), *see Mattel*, 296 F.3d at 902, and the title of photographic works, *see Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 807 (9th Cir. 2003). In *Twentieth Century Fox*, we held that Fox's use of the mark "Empire" as a title for a television show was expressive because "the show's setting is New York, the Empire State, and its subject matter is a music and entertainment conglomerate, 'Empire Enterprises,' which is itself a figurative empire." 875 F.3d at 1198. In all these cases, the use of the mark was not

merely an "arbitrary" source-identifier. *Id.* at 1198. In fact, so initially focused was the *Rogers* doctrine on titles that it was only later that we "extended [*Rogers*] from titles to allegedly infringing uses within the body of an expressive work." *Id.* at 1196 (citing *E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008)).

In this case, we hold that AJ Press's use of the Punchbowl Mark is sufficiently expressive to merit First Amendment protection, and thus application of the *Rogers* test. Though AJ Press is a commercial enterprise, it is selling core First Amendment-protected information. The content of its publication, and its use of "Punchbowl" in the name of its brand and publications, is expressive. AJ Press specifically chose the name "Punchbowl" to convey the D.C. insider perspective of its news material. The word "Punchbowl" connotes a gossipy setting (*e.g.*, standing around the punchbowl), and, in the context of Washington, D.C. political reporting, talebearer "buzz" about political happenings. The name "Punchbowl" also reflects a more spirited, "punchy" tone consistent with the nature of the fast-moving and tumultuous political topics on which AJ Press is reporting. If a rubber dog toy is expressive under *Rogers*, *see VIP Prods.*, 953 F.3d at 1175, we have little doubt that AJ Press's use of the Punchbowl Mark is as well.

We easily reject Punchbowl's argument that AJ Press's "various publications include 'opinions' and 'journalism' that . . . are a far cry from the types of artistic and creative works that often merit heightened protection." Any attempt to divide up the world between fact and fiction, news and art, fails under the First Amendment concerns that animate *Rogers* and its progeny. "The Free Speech Clause exists principally to protect discourse on public matters." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011); *cf. Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 578 (1977)

("There is no doubt that entertainment, as well as news, enjoys First Amendment protection."). News publications "communicat[e] ideas" and "express[] points of view" on matters of public concern. *VIP Prods.*, 953 F.3d at 1174 (quoting *Mattel*, 296 F.3d at 900). *Punchbowl News* is plainly an expressive work, and its use of "Punchbowl" is likewise expressive in nature. Punchbowl's suggestion that, under *Rogers*, news and opinion should be treated differently from "creative" works, finds no support in our cases.

We also reject Punchbowl's argument that AJ Press's use of "Punchbowl" falls outside *Rogers* because the Mark "is not typically used in the *content* of [AJ Press's] news publications" but rather as part of a "commercial brand." In *Twentieth Century Fox*, we expressly held that whether "a mark ha[s] attained a meaning beyond its source-identifying function" is not a threshold requirement for applying *Rogers*. 875 F.3d at 1197. Rather, this "is merely a consideration under the first prong of the *Rogers* test." *Id.*

Regardless, in this case, attempting to distinguish between a brand and the body and titles of individual articles fails to appreciate the expressive connection between the publication's title and brand and the reporting that appears under that heading. The title of the publication here amplifies the content of the communications and gives context to them. Punchbowl concedes that the use of the word "Punchbowl" in an article or the title of an individual article would be expressive. That AJ Press used "Punchbowl" as the title of a proverbial series does not make it any less expressive.

The logic of *Rogers* is equally applicable to the titles or brands of news publications as it is to the titles or content of individual articles. Our decision in *Twentieth Century Fox* is critical in this respect. There, the record company Empire

Distribution challenged Fox's use of its "Empire" mark as the title of a TV series about a fictional music label named "Empire Enterprises."   875 F.3d at 1195.   Empire Distribution argued that *Rogers* was not implicated because "Fox's use of the mark 'Empire' extend[ed] well beyond the titles and bodies of the[] expressive works."   *Id.* at 1196. Specifically, Fox used the Empire mark as an "umbrella brand to promote and sell music and other commercial products," including in connection with "online advertising" and "the sale or licensing of consumer goods."   *Id.*

We held that use of the "Empire" mark as an umbrella brand did not take the case outside of *Rogers*.   *Id.* at 1196– 97.   We noted that *Rogers* itself "concerned both a movie with an allegedly infringing title and its advertising and promotion."   *Id.* at 1197.   Although Fox's "promotional efforts technically f[e]ll outside the title or body of an expressive work," *Rogers* still applied.   *Id.* at 1996–97.   In so holding, we reasoned that the First Amendment interests underlying *Rogers* "could be destabilized if the titles of expressive works were protected but could not be used to promote those works."   *Id.* at 1997.

The logic of *Twentieth Century Fox* governs here. *Punchbowl News* is within *Rogers*'s bounds even though it consists of underlying expressive works and serves as an "umbrella brand" for them.   *Id.* at 1196.   Indeed, here, unlike in *Twentieth Century Fox*, the Punchbowl Mark is being used to promote articles and other materials that are clearly expressive in nature and core First Amendment material, which arguably makes the *Rogers* test even more relevant. Just because a mark is used as a brand for a media publication does not mean the use of the name is beyond *Rogers*'s coverage.

Punchbowl also maintains that there are other ways AJ Press could have expressed itself without using "Punchbowl" in the name of its publication or branding. But that argument, which poses major First Amendment problems, does not make AJ Press's use of "Punchbowl" non-expressive. *See Rogers*, 875 F.2d. at 998 (rejecting the argument that "First Amendment concerns are implicated only where a title is so intimately related to the subject matter of a work that the author has no alternative means of expressing what the work is about").

Punchbowl's attempt to evade *Rogers* is also undercut by the fact that AJ Press does *not* use the Punchbowl Mark as a bare source-identifier. As will be discussed in more detail below, AJ Press uses the name "Punchbowl," often in conjunction with its slogan and logo, to broadcast a unifying theme that reflects its focus on insider politics in Washington. And it typically uses "Punchbowl" in the title "*Punchbowl News*," or through an otherwise obvious connection to its news reporting. The name *Punchbowl News* itself (in addition to the underlying publications) undoubtedly communicates a perspective on the subjects it covers. *See VIP Prods.*, 953 F.3d at 1174.

In short, Punchbowl has not provided legal support for its assertion that the name of a brand or publication of a news enterprise can never be expressive, or that it is not expressive here. Accordingly, we evaluate the use of the Mark in *Punchbowl News* under the *Rogers* framework.

## B

As we have explained, *Rogers* "requires the plaintiff to show that the defendant's use of the mark is either (1) not artistically relevant to the underlying work or (2) explicitly misleads consumers as to the source or content of the work."

*VIP Prods.*, 953 F.3d at 1174 (quotations omitted).  The first part of this test sets a very low threshold: "the level of [artistic] relevance merely must be above zero."  *E.S.S. Ent.*, 547 F.3d at 1100.  Punchbowl therefore understandably focuses its argument on *Rogers*'s second prong.  That prong of *Rogers* "points directly at the purpose of trademark law, namely to 'avoid confusion in the marketplace by allowing a trademark owner to prevent others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner.'"  *Id.* (quoting *Walking Mt. Prods.*, 353 F.3d at 806).

Accordingly, under our cases the "relevant question . . . is whether [*Punchbowl News*] would confuse its [customers] into thinking that [Punchbowl] is somehow behind [*Punchbowl News*] or that it sponsors [AJ Press's] product[s]."  *Id.*  But it is not enough that AJ Press uses "Punchbowl" in the name of its publication.  We have been careful to note that "the mere use of a trademark alone cannot suffice to make such use explicitly misleading."  *Id.* (citing *Mattel*, 296 F.3d at 902).  Otherwise, "the First Amendment would provide no defense at all," "render[ing] *Rogers* a nullity."  *Id.* at 1099 (quotations omitted).  Instead, the "explicitly misleading" component of *Rogers* sets "a high bar that requires the use to be 'an explicit indication, overt claim, or explicit misstatement' about the source of the work."  *Dr. Seuss*, 983 F.3d at 462 (quoting *Brown*, 724 F.3d at 1245).

Because the use of a trademark alone is not dispositive, we weigh two primary considerations in evaluating whether the junior use is explicitly misleading: "(1) 'the degree to which the junior user uses the mark in the same way as the senior user' and (2) 'the extent to which the junior user has added his or her own expressive content to the work beyond the mark itself.'"  *Id.* (quoting *Gordon*, 909 F.3d at 270–71).

However, "[t]his is not a mechanical test," and "all of the relevant facts and circumstances must be considered." *Gordon*, 909 F.3d at 269 (quotations omitted).

We first consider the degree to which AJ Press uses the Mark in the same way as Punchbowl. *Id.* at 270. Here we ask whether "the junior user has employed the mark in a different context—[such as] in an entirely different market—than the senior user." *Id.* For example, we have approved the use of Mattel's Barbie mark in a pop song, *see Mattel*, 296 F.3d at 902; the mark of a strip club in a video game, *E.S.S. Ent.*, 547 F.3d at 1100; and the mark of a record label in a television series. *Twentieth Century Fox*, 875 F.3d at 1196. In those circumstances, the "disparate use of the mark was at most 'only suggestive' of the product's source and therefore did not outweigh the junior user's First Amendment interests." *Gordon*, 909 F.3d at 270 (quoting *Rogers*, 875 F.3d at 1000).

Punchbowl argues that AJ Press employs the Mark in the same way Punchbowl does because both parties use the Mark "as a brand" for "online communications services" provided to "consumers of online services." But "besides this general similarity, they have nothing in common." *E.S.S. Ent.*, 547 F.3d at 1100. The population consisting of "consumers of online communication services" describes virtually all consumers. If we were to apply *Rogers*'s second prong at that high level of generality, as Punchbowl advocates, we would dilute *Rogers* entirely. Nor do our precedents indicate that is the right approach. Instead, in past cases we have looked far more granularly at the similarity of use. *Gordon* provides a good example. There, we explained that both users employed the mark in the same way because both used it "to identify the source of humorous greeting cards in which the bottom line is 'Honey Badger don't care.'" 909 F.3d at 271.

Here, the parties' uses of the name "Punchbowl" are quite different.  Punchbowl is a self-described "technology company" with a "focus on celebrations, holidays, events and memory-making."  In contrast, *Punchbowl News* is a publication that provides newsletters, podcasts, and videos in the fields of government and politics, with content geared toward Washington insiders.  This is not a case where AJ Press is parodying Punchbowl (and even in the case of parodies, we have held that *Rogers* forecloses liability, *see e.g.*, *Mattel*, 296 F.3d at 901).  Instead, the parties have used a "common English word," *Twentieth Century Fox*, 875 F.3d at 1198, to describe two different enterprises that do very different things.

AJ Press also does not just use the word "Punchbowl," but *Punchbowl News*, and it repeatedly connects its use of "Punchbowl" to its founders.  We reject Punchbowl's assertion that AJ Press's use of the mark with the word "News" "does nothing to distinguish" *Punchbowl News* from Punchbowl's use of the mark.  The companies' ventures operate in different spaces, and *Punchbowl News* is "at most 'only suggestive'" of Punchbowl the greeting card company.  *Gordon*, 909 F.3d at 270 (quotations omitted).

Indeed, it is questionable whether *Punchbowl News* is even suggestive of Punchbowl's online greeting card business at all.  Even if a simple web browser search might initially lead a consumer to the wrong company, there is no indication that AJ Press has sought to tie *Punchbowl News* to Punchbowl's event planning products.  AJ Press has thus not "dup[ed] consumers into buying a product they mistakenly believe is sponsored by the trademark owner." *E.S.S. Ent.*, 547 F.3d at 1100 (quotations omitted).

In addition to the degree to which the junior and senior users employ a mark in the same way, under *Rogers*'s

second prong we look to "the extent to which the junior user has added his or her own expressive content to the work beyond the mark itself." *Gordon*, 909 F.3d at 270. Punchbowl contends that AJ Press's use of (1) descriptive terms such as "press" or "news," (2) a slogan ("Power. People.   Politics."), and (3) the founders' names in association with the Mark, "do not communicate ideas or express points of view; nor do they add any distinctive character to [AJ Press's] use of the mark."  We do not find this persuasive.   These features, both individually and collectively, plainly augment the expressive nature of the use of the word "Punchbowl."  Indeed, as we explained above, AJ Press selected *Punchbowl News*'s name, slogan, and logo to reflect the subject matter and theme of the publication. *See id.* at 269 (explaining that the inquiry focuses "on the nature of the junior user's behavior rather than on the impact of the use" (quotations and alterations omitted)).

Moreover, and as we have explained, the concern that consumers will "be 'misled as to the source of [a] product' is generally allayed when the mark is used as only one component of a junior user's larger expressive creation." *Gordon*, 909 F.3d at 270–71 (quoting *Rogers*, 875 F.2d at 998–99).  Here, this is doubly true.  The Punchbowl Mark is only a part of *Punchbowl News*'s overall branding, which, as noted, includes a slogan and a logo.  In addition, *Punchbowl News*'s "larger expressive creation" consists of its series of newsletters, podcasts, and videos. *Id.* at 271.  In that context, the Mark "obviously serve[s] as only 'one element of the work and the junior user's artistic expressions.'"   *Id.* (quoting *Rogers*, 875 F.2d at 1001) (alterations omitted).

*Punchbowl News*'s public association with its founders further demonstrates that the use of the Mark is not explicitly misleading.   An expressive work is less likely to be misleading when it clearly discloses its origin.  *See Dr.*

*Seuss*, 983 F.3d at 463 (finding a title not explicitly misleading because, in part, "the cover conspicuously lists [the actual creators], not Dr. Seuss, as authors").   Here, *Punchbowl News* promotes its connection to its founders on its website.   For instance, the "About Us" page displays a large image of the co-founders and states that "Punchbowl News is a membership-based news community founded by journalists and best-selling authors Jake Sherman and Anna Palmer, and co-founded by veteran Capitol Hill reporter John Bresnahan."   And *Punchbowl News*'s publications state "by John Bresnahan, Anna Palmer, and Jake Sherman" at the top of the page near *Punchbowl News*'s name.

Punchbowl responds that AJ Press does not always use the founders' names in conjunction with the Mark.   In particular, AJ Press does not mention the founders on *Punchbowl News*'s homepage.   This does not change our analysis.   AJ Press frequently publicizes *Punchbowl News*'s association with its founders and attributes its content to them.   *See Gordon*, 909 F.3d at 269 (explaining that *Rogers* "is not a mechanical test" and "all the relevant facts and circumstances must be considered").   Any reasonable reader of the *Punchbowl News* website would see the connection between the publication and the founders; indeed, the connection to three veteran political reporters is part of *Punchbowl News's* selling point.   Nothing required AJ Press to identify its founders at every possible turn to avoid association with Punchbowl.

Contrary to Punchbowl's argument, this case is very different from *Gordon*, which "demonstrate[d] *Rogers*'s outer limits."   *Id.* at 268.   There, defendants used the plaintiff's trademarked catchphrase "Honey Badger don't care" as the core content of its greeting cards.   *Id.* at 261.   In concluding there was "at least a triable issue of fact," we relied on the fact that the defendants "simply used

[plaintiff's] mark with minimal artistic expression of their own, and used it in the same way that [plaintiff] was using it—to identify the source of humorous greeting cards in which the bottom line is 'Honey Badger don't care.'" *Id.* at 271. In at least some greeting cards, the plaintiff's mark "was used without any other text." *Id.*

No similar facts are at play in this case. AJ Press uses the Punchbowl Mark in conjunction with its own slogan, the names of its founders, and its logo to develop its brand in a distinct media market. *See Dr. Seuss*, 983 F.3d at 462–63 (distinguishing *Gordon* on similar grounds, even when the defendant "used the marks in an illustrated book just as Seuss did"). AJ Press's disparate use of the Punchbowl Mark sharply differentiates this case from *Gordon*. *See Gordon*, 909 F.3d at 261 (noting that "on every prior occasion in which we have applied the [*Rogers*] test, we have found that it barred an infringement claim as a matter of law"). This is not a case in which "the defendant's expressive work consisted of the mark and not much else." *Dr. Seuss*, 983 F.3d at 462 (describing *Gordon*).

In short, no reasonable buyer would believe that a company that operates a D.C. insider news publication is related to a "technology company" with a "focus on celebrations, holidays, events and memory-making." We conclude that, under our precedents, AJ Press's incorporation of the Punchbowl Mark in its news publication's name is not explicitly misleading. This resolves not only the Lanham Act claims, but the state law claims as well. *E.S.S. Ent.*, 547 F.3d at 1101.

## C

Conceding that "evidence of actual confusion may not be a primary consideration" under *Rogers*, Punchbowl

nonetheless argues that this kind of evidence is germane "to whether the parties are using the marks in similar ways." Specifically, Punchbowl contends that the district court erred in determining that survey evidence supposedly demonstrating actual consumer confusion is not relevant. Punchbowl is mistaken.

In *Brown*, we explained that "[t]o be relevant, evidence must relate to the nature of the behavior of the [junior] user, not the impact of the use." 724 F.3d at 1246. Consumer confusion is a potential result—*i.e.*, impact—of an explicitly misleading mark. It does not prove the answer to the legal question whether the use is *explicitly* misleading under *Rogers*. *See id*. Accordingly, given the First Amendment interests at stake, "[t]he *Rogers* test dr[aws] a balance in favor of artistic expression and tolerates 'the slight risk that the use of the trademark might implicitly suggest endorsement or sponsorship to some people.'" *Dr. Seuss*, 983 F.3d at 462 (quoting *Rogers*, 875 F.2d at 1000) (alteration omitted). Our case law is thus clear that we may not "conflate[] the second prong of the *Rogers* test with the general . . . likelihood-of-confusion test, which applies outside the *Rogers* context of expressive works." *Twentieth Century Fox*, 875 F.3d at 1199 (citing *Mattel*, 296 F.3d at 900).

Further, our decision in *Brown* directly rejected the relevance of the type of survey data that Punchbowl seeks to advance. In *Brown*, we explained that "a survey demonstrating that consumers of the *Madden NFL* series believed that [Jim] Brown endorsed the game . . . would not support the claim that the use was explicitly misleading to consumers." 724 F.3d at 1246. *Dr. Seuss* provides another example. *See* 983 F.3d at 462. There, we held that the title of an allegedly infringing work was not explicitly misleading while noting that "evidence of consumer confusion in [an]

expert survey does not change the result." *Id.* Punchbowl argues that *Dr. Seuss* is distinguishable because the cover of the junior users' book in *Dr. Seuss* conspicuously listed the junior users as the authors. But this limitation was not dispositive in *Dr. Seuss*, and AJ Press here has conspicuously associated its publication with its three founders, as we discussed above.

Survey evidence of consumer confusion is thus not relevant to the question of whether AJ Press's use of the Mark is explicitly misleading, which is a legal test for assessing whether the Lanham Act applies. *See Brown*, 724 F.3d at 1246. Because AJ Press uses the Mark "in an entirely different market" and as "only one component of the larger expressive work," *Punchbowl News* is not explicitly misleading as to its source. *Gordon*, 909 F.3d at 270–71.

III

Finally, we address Punchbowl's contention that the district court erred in denying its request for a Rule 56(d) continuance to allow for additional discovery. Punchbowl sought discovery relating to: (1) whether AJ Press was aware of Punchbowl's use of the Mark; (2) the extent to which AJ Press may have caused actual confusion in the market; and (3) the degree to which AJ Press has used the Mark to identify itself as the source for a broad range of products and services. The district court's denial of Punchbowl's motion was not an abuse of discretion.

*Twentieth Century Fox* forecloses any requested continuance for discovery into AJ Press's awareness of Punchbowl's use of the Mark. *See* 875 F.3d at 1199–1200 (explaining that "Fox's reason for selecting the 'Empire' name" and "Fox's prior knowledge of Empire's trademarks" are not "relevant to either prong of the *Rogers* test"). As

discussed above, survey evidence of consumer confusion is also not relevant to the *Rogers* analysis. *See id*. at 1199; *Dr. Seuss*, 983 F.3d at 462; *Brown*, 724 F.3d at 1246.

Further discovery into the degree to which AJ Press uses *Punchbowl News* as a source identifier was also not necessary in these circumstances. As explained above, Punchbowl's source-identifier argument operates at the wrong level of generality for the inquiry into whether the parties' uses are the same. Thus, the information sought was not germane. Additionally, the record is already replete with evidence as to how both companies used the name "Punchbowl" in their operations. Accordingly, the district court's denial of a continuance to permit further discovery was not an abuse of discretion.

\*     \*     \*

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**