CODY R. LEJEUNE (CSB No. 249242)
cody@lejeunelawfirm.com
**LEJEUNE LAW, P.C.**
445 S. Figueroa St.
Suite 3100
Los Angeles, CA 90071
Telephone: (985) 713-4964

MATTHEW A. PEQUIGNOT (admitted *pro hac vice*)
mpequignot@pmiplaw.com
**PEQUIGNOT + MYERS**
2585 Ala Namahana Pkwy, #1007
Kilauea, HI 96754
Telephone: 202-328-1200

Attorneys for Plaintiffs
CONOR WOULFE, an individual, and PETER
MICHAEL ROSZA, an individual

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONOR WOULFE, an individual, and PETER MICHAEL ROSZA, an individual, | CASE NO.:  2:22-cv-00459-SVW-AGR |
| | **THIRD AMENDED CLASS ACTION COMPLAINT** |
| Plaintiff, | |
| v. | |
| | **DEMAND FOR JURY TRIAL** |
| UNIVERSAL CITY STUDIOS LLC, d.b.a., UNIVERSAL PICTURES, a California limited liability company; and DOES 1-20, inclusive, | |
| Defendant, | |

Plaintiffs Conor Woulfe and Peter Michael Rosza ("Plaintiffs") bring this class action complaint against Defendant Universal City Studios LLC, doing-business-as Universal Pictures ("Defendant"), individually and on behalf of all others similarly situated, and allege upon personal knowledge as to Plaintiffs' acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiffs' attorneys.

## NATURE OF THE ACTION

1.      This is a consumer protection class action arising out of Defendant's false, deceptive, and misleading advertising of the 2019 movie *Yesterday*.

2.      Defendant is an American film production and distribution company that advertises, sells, broadcasts, licenses, and distributes feature films, including a movie released in the year 2019 entitled *Yesterday*.

3.      Among other deceptions, Defendant's nationwide advertising and promotion of the movie *Yesterday,* and key word linking of Ana De Armas' name to the movie on digital movie platforms, represented and currently represents to prospective movie viewers that the world famous actress Ana De Armas has a substantial character role in the film.

4.      Defendant's movie *Yesterday*, however, fails to include any appearance of Ana De Armas whatsoever. Accordingly, Defendant's advertising and promotion of the movie *Yesterday* is false, misleading, deceitful, unfair, fraudulent, and deceptive.

5.      Plaintiffs bring this action individually and on behalf of all other similarly situated consumers to halt the dissemination of Defendant's false, misleading, deceitful, unfair, fraudulent, and deceptive representations, to correct the false and misleading perception Defendant's representations have created in the minds of

consumers, and to obtain redress for those who have purchased, rented, licensed, or otherwise paid for attending showings of the movie *Yesterday*.

## **PARTIES**

6.    Plaintiff Peter Michael Rosza ("Plaintiff Rosza") is a forty-four year-old citizen of the State of California, and, at all times relevant to this action, resided in San Diego County, California.

7.    On or about October 31, 2021, Plaintiff Rosza watched Defendant's advertisement of the movie *Yesterday*, in the form of a movie trailer accessed and viewed using Amazon.com's internet movie streaming service. The movie trailer which Plaintiff Rosza viewed was false, misleading, deceitful, unfair, fraudulent, and deceptive. Among other false representations, the trailer promoted Ana De Armas as an actress that would appear in the film. Plaintiff Rosza viewed the movie trailer at his home in San Diego County, California. Persuaded by the movie trailer to view the film *Yesterday* because of its false representations, Plaintiff Rosza rented the movie. Upon watching the rented movie, Plaintiff Rosza discovered that, among other deceptions, Ana De Armas does not appear in the film. Plaintiff Rosza is a frequent movie consumer with experience watching movie trailer advertisements. Prior to his experience with the *Yesterday* trailer and movie, Plaintiff Rosza had never seen a movie trailer that featured an actor or actress that didn't also appear in the film being advertised. For these and other reasons, Plaintiff Rosza interpreted the movie trailer for *Yesterday* as representing that Ana De Armas would appear in the actual movie.

8.    Relying on the Defendant's false, misleading, deceitful, unfair, fraudulent, and deceptive representations, Plaintiff Rosza purchased rights to view the movie *Yesterday* for approximately $3.99. By paying to view the falsely advertised movie, Plaintiff suffered injury-in-fact and lost money.

9.     Plaintiff Conor Woulfe ("Plaintiff Woulfe") is a thirty-eight year-old citizen of the State of Maryland, and, at all times relevant to this action, resided in Howard County, Maryland.

10.     On or about July 12, 2021, Plaintiff Woulfe watched Defendant's advertisement of the movie *Yesterday*, in the form of a movie trailer accessed and viewed using Amazon.com's internet movie streaming service. The movie trailer which Plaintiff Woulfe viewed was false, misleading, deceitful, unfair, fraudulent, and deceptive. Among other false representations, the trailer promoted Ana De Armas as an actress that would appear in the film. Plaintiff Woulfe viewed the movie trailer at his home in Howard County, Maryland. Persuaded by the movie trailer to view the film *Yesterday* because of its false representations, Plaintiff Woulfe rented the movie. Upon watching the rented movie, Plaintiff Woulfe discovered that, among other deceptions, Ana De Armas does not appear in the film. Plaintiff Woulfe is a frequent movie consumer with experience watching movie trailer advertisements. Prior to his experience with the *Yesterday* trailer and movie, Plaintiff Woulfe had never seen a movie trailer that featured an actor or actress that didn't also appear in the film being advertised. For these and other reasons, Plaintiff Woulfe interpreted the movie trailer for *Yesterday* as representing that Ana De Armas would appear in the actual movie.

11.     Relying on the Defendant's false, misleading, deceitful, unfair, fraudulent, and deceptive representations, Plaintiff Woulfe purchased rights to view the movie *Yesterday* for approximately $3.99. By paying to view the falsely advertised movie, Plaintiff suffered injury-in-fact and lost money.

12.     But for Defendant's false and misleading representations and unfair, fraudulent, and/or deceptive conduct promoting the movie, Plaintiffs would not have paid to view the movie *Yesterday*.

13.     Defendant is a limited liability company with a principal place of business at 100 Universal City Plaza, Universal City, California 91608.

14.     Defendant is owned by Comcast Corporation ("Comcast"), by way of Comcast's ownership of NBCUniversal. As a related and jointly controlled entity, which acts in concert with Defendant, digital video store VUDU is also owned by NBCUniversal by way of NBCUniversal's 75% ownership of Fandango Media ("Fandango"). VUDU sells and rents Defendant's movies for play in consumer's homes, and Fandango sells tickets for movie theater showings of Defendant's motion pictures. VUDU and Fandango each promote and sell Defendant's movies in concert with and under the direction and control of Defendant and for Defendant's financial benefit. In some cases, for example, Fandango sold movie tickets for *Yesterday* on Defendant's website www.universalpictures.com. Additonally, Defendant utilizes a website www.uphe.com which it uses to sell DVD copies of movies directly to consumners, including the movie *Yesterday*.

15.     Defendant acquired rights to the movie *Yesterday* from production company, Working Title Films Limited. In other words, the movie *Yesterday* is the creation of a third-party other than Defendant. Defendant thereafter marketed, advertised, screened, promoted, distributed, licensed, rented, and sold the movie to hundreds of thousands, if not millions, of consumers in California and Maryland, knowingly utilizing false advertising to do so.  Likewise, and more specifically, Defendant's false, deceptive, unfair, fraudulent, and misleading advertisements were shown and distributed in California and Maryland.

## JURISDICTION AND VENUE

16.     The Court has original jurisdiction under 28 U.S.C. § 1332(d)(2) ("Class Action Fairness Act" or "CAFA") because the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are

in excess of 100 class members, and some of the members of the class are citizens of states different from Defendant, thus satisfying the minimal diversity requirement.

17.    This Court has personal jurisdiction over Defendant because Defendant conducts business in California. Defendant marketed, advertised, screened, promoted, distributed, licensed, rented, and sold the movie *Yesterday* in and from California, rendering exercise of jurisdiction by California courts permissible.

18.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district. Venue also is proper under 18 U.S.C. § 1965(a) because Defendant  transacts substantial business in this district.

## FACTUAL ALLEGATIONS

### Introductory Background

19.    As the original format for motion pictures (or movies), some movies are filmed using cameras that record movie scenes on physical film reels, typically in 35mm or 70mm formats. After such a movie is completed (e.g., post editing, color correction, etc.), the physical film is duplicated onto additional film reels (often two reels, for longer length movies), and the physical film reels are delivered in protective cannisters to movie theaters around the country for play on film projectors at the respective theaters. Movie consumers (persons that pay to watch or buy movies) which view such a conventional format movie today thereafter buy tickets which are issued in physical form at a theater or digitally online. Moreover, often digital tickets are formatted for physical printing onto paper so that the digital purchase could be proven at the movie theater entrance (by turning in the printed digital ticket). In other words, for movies which are recorded on conventional film, movie consumers purchase tickets for the right to view (and hear) the display of a

movie which is accomplished by operating a physical film projector playing one or more physical film reels. At a modern movie theater, luxury seating and food and beverages are often supplied with the play of the movie, and a technician activiely monitors the play of the movie to adjust the volume or to correct projection (or similar) issues during movie play.

20.    Although conventional film reels are still used today, it is more common now for movies to be recorded with digital cameras. Like film reels, however, a digitally shot film is recorded using a camera that writes the imagery and sound onto a digital file recorded onto a physical digital recording medium. Also like a film-shot movie, once the digital movie is edited and otherwise completed, the movie is copied in physical form, and the physical movie copies are loaded into protective plastic cases (e.g., often with cables and adaptors) – collectively termed Digital Cinema Packages ("DCPs") – which are then shipped to movie theaters around the country for display at movie theaters with digital film projection capabilities. At such theaters, movie consumers are once again paying to view and hear the operation of the physical DCPs which play the movies as tangible sight and sound. When paying to view the movie, like with a film-shot movie, the consumers buy physical or digital tickets. Alternatively, for some movies, the contents of physical digital film packages are transmitted by satellite to movie theaters which then store the movies on physical storage platforms for display to consumers as tangible imagery and sound. Often license keys are required, sold by the movie distributor, which "open" access to the satellite transmitted movie for display to movie patrons.

21.    In addition to shipping physical movie copies (as sales or rentals or leases) to movie theaters, motion pictures are often also reproduced by movie studios (e.g., Defendant Universal) onto Digital Video Discs ("DVDs"), which are typically comprised of layers of aluminum and reflective gold covered in a polycarbonate plastic.

The metal and plastic disc is packaged in a plastic case, often with additional cardboard packaging, and the entire physical DVD package (often shrink-wrapped) is then sold to movie consumers either in brick and mortar stores or through electronic commerce channels, such as directly from Defendant at www.uphe.com. When a movie consumer purchases a DVD, the movie consumer receives ownership rights not only in the DVD itself, but also receives the irrevocable right to re-sell or even rent the movie content (including the imagery and sound) to other consumers, under the First Sale doctrine. In other words, a purchaser of a DVD effectively receives fee simple title to the movie content itself. Defendant Universal has sold at least tens of thousands of DVD copies of the movie *Yesterday* to consumers, with one e-commerce channel alone revealing more than 30,000 sales. These sales are in addition to Defendant Universal's DVD sales and/or sales to view the operation of a physical film or digital motion picture package at a movie theater.

22.    In yet another commercialization channel for movie studios, it is now common for movie studios to sell or rent movies to consumers by transmitting the movies directly to consumer homes. For example, many televisions are now sold with movie play platforms such as Amazon Prime or VUDU preinstalled. Alternatively, as another example, plug-in devices (which include such platforms) are sold to consumers for plugging into physical slots in a television (e.g., into an HDMI port). Using such movie play platforms, a consumer can review trailer advertisements on their own television to find an appealing movie to watch. Once an appealing movie is identified, the consumer typically has the option to rent or purchase the movie. Regardless of which option is selected, once the "offer" of the movie presented by the movie play platform (i.e., on behalf of the movie distributor, in this case Defendant Universal) is accepted, and after the consumer pays for the rental or purchase, the movie data files are transmitted from the physical storage device where the original motion picture (or copy

thereof) is being stored on the consumer's television (or externally connected device ) – at least for a period of time – so that the tangible movie imagery (displayed as visible light) and sound can be played for the consumer in the consumer's home. In the most typical scenario, such as is the case with the trailer for the movie *Yesterday*, the opportunity to purchase or rent the movie is displayed alongside the trailer - on the same screen – so that the consumer can make an immediate decision to purchase or rent the movie (or not), without consulting other sources. In cases in which the movie is sold to a consumer or is purchased by a consumer, the consumer is able to re-watch the movie effectively in perpetuity and is even able to transfer the movie to different physical devices. For example, if a movie is purchased from a digital movie store on a television in a home in California, the movie can nevertheless be transmitted (in other words moved) to a different physical device (e.g., a television, tablet, mobile phone, USB dongle, etc.) so that the movie can be watched at a different location, such as at a second home, or in a hotel, or on an airplane. As an example, digital movie seller VUDU's legacy set-top boxes (so-called VUDU boxes) are physical boxes connectable to a television and onto which purchased movies could be downloaded. The box containing the purchased movies could be moved to other physical locations and attached to different physical viewing devices. Moreover, VUDU provided express written warranties with VUDU boxes which guaranteed that VUDU would replace any purchased movies which were lost. According to one version of such warranty as an example: "If VUDU has to repair or replace your VUDU Equipment, or if content is lost due to a failure of the hard drive in the VUDU Equipment, VUDU will, to the best of its ability and within the rights granted to it by its content licensors, replace all purchased (but not rented) movies or other purchased (but not rented) entertainment content that you acquired from VUDU[.]" Subequent to the legacy set-top boxes, VUDU began including its VUDU digital movie store platforms pre-loaded onto other physical and moveable

devices, such as Blue-ray players, televisions (e.g., Amazon Fire TV Edition smart TVs), and portable movie storage and player devices such as those offered under the brand Roku. Indeed, according to VUDU, "Vudu is also the official movie and TV store on Roku, the world's leading streaming device and Smart TV OS platform." Other digital movies stores, such as Prime Video offered by Amazon.com, offer the same or similar features and options, with many moveable physical movie storage and delivery device offerings, including for example Amazon Fire Tablets. Likewise, a movie can be downloaded from a digital movie store such as Prime Video, onto a tablet for example, and then brought onto an airplane (in other words "moved") to be watched with no access to the internet.

23.    Although movies sold or rented electronically online (including on devices, such as televisions, connected to the internet) are often offered on third-party platforms, such as Amazon or Redbox or Google Play, Defendant either controls or dictates the advertising of its movies which are offered on such platforms. For example, on Amazon.com's Prime Video, Defendant (and not Amazon.com) – utilizing the Prime Video Direct program - uploads the movies, trailers, artwork, and other advertising information using an account called an Aspera account that was set up so that Defendant can maintain control of its own movies and advertising. Accordingly, Defendant can and does upload new trailers or movies and can replace any trailer or movie version at will, independent of any input by Amazon.com. Defendant's control of movie versions and advertising content on platforms such as VUDU is even more direct, since Defendant is co-owned with VUDU by NBCUniversal. Evincing that they are under common control, public records reveal that and all three entities share employees, such as Kevin S. Blum; use the same address for legal correspondence, such as from the United States Trademark Office (100 Universal City Plaza in Universal City, California); and use the same internal email addresses for legal correspondence (e.g., docketing@nbcuni.com and trademarks@nbcuni.com). Indeed, even though Defendant is the distributor for the movie

9

*Yesterday*, Youtube lists NBCUniversal – Defendant and VUDU's parent – as the "provider" of *Yesterday*.

24.     By way of example specific to this case, a screen shot of NBCUniversal's VUDU movie platform offering the *Yesterday* movie for sale and for rent is reproduced below:



25.     The screenshot above is a true and accurate copy of VUDU's offer of sale or rent of the movie *Yesterday* (last accessed May 2, 2022).

26.     As shown in the above screenshot, VUDU offers a selectable "button" for acccessing the *Yesterday* movie trailer advertisement, which falsely advertises the *Yesterday* movie, on the same page and preceding the opportunities to purchase or rent the movie. This is because digital movie stores, such as VUDU, which is co-owned with Defendant by NBCUniversal, intend for the trailer to be relied upon by consumers when

THIRD AMENDED CLASS ACTION COMPLAINT

making movie rental or purchase decisions. Because Defendant is co-owned with VUDU, VUDU acts in concert with and under the direction of Defendant for the promotion of the movie *Yesterday*, and Defendant and/or its parent entities profit(s) from *Yesterday's* movie sales and rentals consummated on the VUDU movie platform.

27.    As shown in the screenshot, the VUDU platform, which is co-owned with Defendant, also affirmatively represents that Ana De Armas is in the movie *Yesterday*, by listing her name and including her photograph as a cast member, even though she is not.

28.    Some movie platforms, such as VUDU's, also allow consumers to conduct key word search for movies. For example, if a consumer likes Ana De Armas as an actress, the consumer can type her name into a search field in the VUDU platform, and the platform will display the movies in which Ana De Armas purportedly appears.

29.    The screenshot below is a true and accurate copy of a screen print from VUDU's movie play platform displaying the results of a search performed using the actress Ana De Armas' name (last accessed May 2, 2022):

30.   As can be seen in the screenshot above (displaying the search results), the VUDU platform lists Ana De Armas as an actress that appears in the movie *Yesterday*, even though she does not. In other words, the search results of a VUDU search for Ana De Armas affirmatively, falsely represent that Ana De Armas is in the movie *Yesterday.*

31.   On a platform such as this, when consumers are induced to pay for *Yesterday* movie rentals or purchases on the VUDU movie platform because they believe Ana De Armas appears in the movie, because she is listed as an actress in the movie, and because the trailer represents that she is in the movie, both Defendant and co-owned VUDU (and therefore Defendant's parent entity or entities) profit from this deception.

32.   Similar to VUDU, the Amazon Prime movie play platform also displays the *Yesterday* movie trailer on the same page as opportunities to purchase or rent the movie. This is so that consumers can be enticed by the trailer to make immediate movie rental and purchase decisions. Also similar to VUDU, Defendant shares in the profits made by

Amazon Prime when the movie *Yesterday* is rented or purchased by a consumer. Additionally, when the movie Yesterday is rented on Amazon Prime, the agreement offered by the platform on behalf of Defendant and accepted by the consumer under false pretenses, makes the movie accessible to the consumer for 30 days.

33.    Other instances of Defendant's false advertisng are, for example, the software encoding of Ana de Armas' name in association with the movie *Yesterday* on websites such as www.bestbuy.com and www.barnesandnoble.com (the latter as "Ana DeArmas") and listing of Ana de Armas as a *Yesterday* cast member (with her photograph) to advertise *Yesterday* Google Play movie sales.

## The Actress Ana De Armas

34.    Ana De Armas (hereinafter Ms. De Armas) is a talented, successful, and famous actress, that has starred in such movies as *Blade Runner 2049*, *War Dogs*, and *Knives Out*.

35.    Demonstrating her demand in the film industry, Ms. De Armas was chosen to be a female lead in the movie *No Time to Die*, co-starring Daniel Craig. *No Time to Die* debuted on or about October 8, 2021 and is the latest film in the James Bond franchise. *No Time to Die* is an important movie for its studio because it is the last James Bond film expected to feature Actor Daniel Craig.

36.    Ms. De Armas was also recently selected to star in the upcoming film *Blonde*, playing the role of deceased movie star Marilyn Monroe. She was also selected to star in the recently released movie *Deep Water*, co-starring her former boyfriend Ben Affleck (hereinafter Mr. Affleck).

37.    Ms. De Armas' 2015 movie *Knock Knock*, co-starring Keanu Reeves, was identified by Netflix as one of its most popular movies. Indeed, *Knock Knock* achieved the status of the "most-watched" movie on Netflix's streaming service during 2020.

38.     Ms. De Armas currently has approximately 6.8 million followers on Instagram.

39.     In 2020, Ms. De Armas was the Golden Globe Nominee for Best Actress in a Comedy or Musical for her performance in the movie *Knives Out*.

40.     Ms. De Armas is famous throughout America and the world because of her successful movie and other media appearances.

### *Yesterday* **and its Trailer**

41.     The movie *Yesterday* started filming in April 2018, premiered at the Tribeca Film Festival on May 4, 2019, and was released in the United States on June 28, 2019 by Universal Pictures. *Yesterday* is a film about a failed musician Jack Malik, who hits his head during a black-out only to wake-up to discover that that the world's knowledge of The Beatles has been erased. Taking advantage of this opportunity, the protagonist Malik adopts The Beatles' songs as his own, quickly becoming world famous.

42.     Ms. De Armas was originally cast to co-star in the film *Yesterday* as a character named Roxanne. Accordingly, scenes featuring Ms. De Armas as the character Roxanne were shot for inclusion in the original version of the movie. In the original version of the movie, the character, Roxanne, was written as a known actress that meets the protagonist Malik during a late night talk show appearance.  During the talk show appearance, the host first suggests that Malik write a song about Roxanne. Immediately revising his song writing request, the talk show host subsequently tells Malik to write a song about "something." Malik – in reply – plays the The Beatles' song *Something* seated next to and gazing at Roxanne. As the scene appears in the movie trailer for *Yesterday*, a romantic attraction is immediately sparked between the two characters.  Roxanne, in the scene, appears charmed by Malik's perceived song writing talent and they ultimately embrace. The film's female lead Ellie, played by the relative unknown actress Lily James,

witnesses the meeting on television from home. In the scene as it appears in the *Yesterday* movie trailer, Ellie is visibly upset that she might lose Malik to Roxanne. Dialogue in the trailer also suggests that Ellie is concerned that Malik is distracted by his newfound fame and glamor of actress Roxanne. Ellie, herself, does not portray a famous or glamorous character in the film, but is simply Malik's longtime, hometown friend.

43.   According to the director Danny Boyle, Ms. De Armas' portrayal of Roxanne in the original film cut was "brilliant" and Ms. De Armas was "radiant" in the role. More specifically, according to the film's director:

> "When you watched [the scene with Ms. De Armas] alone, it was fantastic[.]"

> "[S]he was brilliant in it. I mean really radiant."

> "[I]t's some of our favorite scenes from the film[.]" (sic)

44.   Director Boyle expressed similar flattering views pertaining to character Jack Malik's response to the request to play "something" in the same scene featuring Ms. De Armas. According to Boyle:

> "Actually, we cut one of my favorite jokes from the film, which my son thought of. Because James Corden used to say, 'Why don't you write something right now? I hear you can write things really quickly, write something right now.' And so he wrote 'Something.' [Jack] actually sang the song 'Something,' and I was so delighted by that joke."

45.   The principal actors in the movie Yesterday were largely unknown before the film was released. For example, the actor which played protagonist Malik, Himesh Patel, had never acted or starred in a film prior to *Yesterday*. Similarly, the actress who played Ellie, Lily James, was a relatively unknown name to the casual movie watcher.

46.     Consequently, because none of the *Yesterday* film leads were famous, Defendant could not rely on their fame to promote the movie to entice viewership.

47.     In contrast to the film's lead actors, Ms. De Armas is and was a known movie star. Moreover, according to the director of the film, she was "radiant" and "brilliant" in the movie scenes originally shot for the film.

48.     Unable to rely on fame of the actors playing Jack Malik or Ellie to maximize ticket and movie sales and rentals, Defendant consequently used Ms. De Armas' fame, radiance and brilliance to promote the film by including her scenes in the movie trailers advertising *Yesterday*. Ms. De Armas, in contrast to the actors playing Jack Malik or Ellie, is famous and is a viewership draw by herself.  Moreover, the Ms. De Armas scene which Defendant included in the trailer was described by director Boyle as fantastic. Accordingly, the inclusion of such a fantastic scene would be expected to entice viewership and thereby boost movie sales and rentals.

49.     Although Defendant included the scenes with Ms. De Armas in the movie trailer advertisements, for the purposes of promoting *Yesterday* and enticing film sales and rentals, Ms. De Armas is not and was never in the publicly released version of the movie. Therefore, any consumer that purchased theater tickets or rented or purchased the film *Yesterday* online did not see Ms. De Armas in the film.

50.     Adding to its deceptiveness, the trailer for *Yesterday* also included the "something"-song-joke, which director Boyle described as one of his "favorites" and which he explained "delighted" him. In that scene, the character Malik plays The Beatles' song "Something" as a punchline to the comedic set-up of the scene. Notably the song "Something" is also demonstrably famous. From the Beatles' 1969 album *Abbey Road,* "Something" was written by George Harrison and topped the Billboard Hot 100 in the United States, as well as charts in Australia, Canada, New Zealand and West Germany. Still popular today, one upload of the song alone has achieved over 72 million views on

YouTube. Although in the movie trailer which advertises and promotes *Yesterday*, the scene with the "something"-song-joke, in which Malik plays The Beatles' song "Something", is not in the publicly released version of the film.

51.     Defendants' false representations that an actress, song, and other scene elements would appear in the film *Yesterday*, when they did not, collectively comprise a false, deceptive, deceitful, fraudulent, unfair, and misleading movie trailer advertisement. It is believed to be unprecedented, for example, for a movie trailer to feature an actor or actress which does not actually appear in the movie being advertised. Certain versions of the trailer for *Yesterday* also call the trailer a "preview" thereby expressly representing textually that the trailer is showing scenes that will be in the actual movie. For these and other reasons, by including Ana De Armas and the omitted scenes in the trailer, consumers perceive her and their inclusion as an affirmative representation that Ms. De Armas and the omitted scenes will appear in the full length movie. Demonstrating their commercial purpose, one or more versions of the *Yesterday* trailer also include the words "Coming Soon" and list the date of release of the movie, stating "In theaters June 28", so that consumers knew precisely when they could buy tickets to the movie. Similar language is listed on the landing page for *Yesterday's* trailer published on Youtube. Likewise, at least one version of the *Yesterday* trailer includes a weblink at the end, which directs viewers of the trailer to a webpage where they can purchase the movie (e.g., on DVD).

52.     Evincing Defendant's intent to deceive consumers (the term "consumers" including Plaintiffs and Class members), interviews show that Defendant knows and has always known that Ms. De Armas is and was not in the publicly released film *Yesterday*.

53.     Also evincing Defendant's intent to deceive consumers, interviews show that Defendant knows and has always known that the "something"-song-joke, in which Malik plays The Beatles' song "Something", is and was not in the publicly released film *Yesterday*. Although these interviews reveal Defendant's knowledge of its deception,

neither Plaintiff Rosza or Plaintiff Woulfe viewed these interviews, including the interview filed by Defendant as Doc. 32-4, PID 303-307. Moreover, the interviews appear to be little known and seen in general. For example, one of the two known interviews – a video - was only viewed approximately 1439 times between 2019 and present (last accessed June 6, 2022), and it is unknown when those views happened. Further, though the video interview reveals that Defendant knew that Ana De Armas was cut, she was not mentioned by name.

54.     Despite knowing that Ms. De Armas was not in the released version of the movie *Yesterday*, Defendant has consistently promoted Ms. De Armas as a character starring in the film, by including her scenes in *Yesterday's* movie trailers, listing her as a cast member, and key word linking her name to the movie. Indeed, Defendant continues to promote Ms. De Armas as appearing in the film almost four years after its initial release, in advertisements for movie sales and rentals. More specifically, the film *Yesterday* premiered on or about May 4, 2019, but movie trailers featured in March of 2023 still include the scenes with Ms. De Armas and the "something"-song joke. These movie trailers are viewable (or were viewable), prior to purchasing or renting the movie *Yesterday*, from digital movie stores (also known as electronic streaming services), including, but not limited to, Amazon (via Amazon Prime), Google (via Google Play), and VUDU.  These same trailers were also used to advertise the movie *Yesterday* prior to its theatrical release, including on Defendant's own website, which also offered movie tickets for sale.

55.     Similarly, on or about June 25, 2019 in a post-release national television appearance promoting the film *Yesterday*, director Boyle was interviewed alongside actor Himesh Patel (who plays Jack Malik) on CBS television. Although Ms. De Armas is not in the film, the scene featuring Ms. De Armas was played during Boyle's television appearance to a national television audience, for the specific purpose of enticing viewers to buy tickets to see the motion picture. A true and accurate screen capture from the television appearance is reproduced below:

Ms. De Armas is the actress in the white outfit depicted in the above image. Despite using Ms. De Armas to promote the film, interviews reveal that Defendant and director Danny Boyle and screenwriter Richard Curtis knew that Ms. De Armas would not be in the publicly released version of the film at least as early as June 19, 2019.

56.    Even though Ms. De Armas would never be in the film to entertain its viewers, Defendant played this scene on national television because Defendant knew it would lure viewers, sales, and movie rentals, because it was a "fantastic" scene in which Ms. De Armas was "radiant" and "brilliant." Moreover, when this scene was featured on national television, the movie *Yesterday* had already been released to the public. Accordingly, Defendant already knew that Ms. De Armas would not and did not appear in the final version of the film.

57.    Movie trailers are the *de facto* standard for advertising movies (or films) in the United States.

58.    Movie trailers are understood by movie viewers and consumers to convey what actors will appear in the advertised film.

59.     Defendant's *Yesterday* movie trailers were used by Defendant as advertisements for the film, for the express commercial purpose of enticing consumers to purchase or rent the movie.

60.     Defendant's *Yesterday* movie trailers were used by Defendant as the primary advertisements for the film and were disseminated widely, and viewed by tens of millions of consumers.

61.     Defendant knew and indeed intended that consumers would rely on the content of the *Yesterday* movie trailers when making decisions whether to pay for purchasing or viewing the film. Likewise, Defendant believed that Ana De Armas and her scenes were "brilliant" and "radiant" and that consumers would be enticed by her appearance and scenes to pay for the movie.

62.     Defendant creates, distributes, and publishes its movie trailers, including the movie trailer for *Yesterday*, for the purpose of enticing consumers to pay for purchasing or viewing Defendant's films, including the film *Yesterday*.

63.     Defendant expected that consumers would rely on the content of the *Yesterday* movie trailers when making decisions whether to pay for purchasing or viewing the film.

64.     Defendant's *Yesterday* movie trailers, aired or accessible during 2019, included scenes with Ana De Armas.

65.     Defendant's *Yesterday* movie trailers, aired or accessible during 2020, included scenes with Ana De Armas.

66.     Defendant's *Yesterday* movie trailers, aired or accessible during 2021, included scenes with Ana De Armas.

67.     Defendant's *Yesterday* movie trailers, aired or accessible during 2022, included scenes with Ana De Armas.

68.     Defendant's *Yesterday* movie trailers, aired or accessible during 2023, included scenes with Ana De Armas.

20

69.     On online movie streaming services such as Amazon.com's Amazon Prime, or NBCUniversal's VUDU, Defendant uses (or used) the *Yesterday* movie trailer with Ana De Armas to convince consumers to purchase or rent the movie *Yesterday*.

70.     After watching the movie trailer for *Yesterday* on Amazon Prime, or on other digital movie stores such as NBCUniversal's VUDU, and other online movie streaming services, consumers are able to purchase or rent the movie *Yesterday* on the same user interface.

71.     Defendant's movie trailers for *Yesterday* are accessible on the same display screen, such as a television screen, as the point-of-purchase or rental opportunity for purchasing or renting the movie *Yesterday*.

72.     Online streaming services such as Amazon Prime, or other digital movie stores such as  NBCUniversal's VUDU, are designed to include movie trailers on the same screen, such as a television screen, as the point-of-purchase or rental opportunity for purchasing or renting the movie featured in the trailer, so that consumers can make instant decisions to purchase or rent a movie, without consulting other sources.

73.     Movie consumers typically make decisions to view, purchase, or rent a movie – or not - based on the content of movie trailers viewed by such consumers.

74.     The decision to purchase or rent a movie is binary. A consumer either rents or purchases a movie, or not. A movie trailer is the advertising vehicle which Defendant uses to persuade movie consumers, when such consumers are making such binary movie purchase or rental decisions.

75.     Defendant's inclusion of Ana De Armas in *Yesterday* movie trailers leads viewers to believe that Ana De Armas is in the film.

76.     Defendant used movie trailers, which included scenes with Ana De Armas, to promote the theatrical release of the film *Yesterday* and to promote DVD sales of *Yesterday*, including direct sales of DVDs by Defendant to consumers. For example, in

21

addition to the conventional use of the trailer as a commercial advertisement, Defendant included a website link at the end of the *Yesterday* trailer so that consumers could buy physical copies of the movie.

77.   Defendant used movie trailers, which included scenes with Ana De Armas, as well as cast listings and photographs of Ana de Armas, to promote online movie sales and rentals of the film *Yesterday*.

78.   Ana De Armas does not appear in Defendant's publicly released 2019 movie *Yesterday*.

79.   Ana De Armas does not appear in the version of Defendant's publicly released movie *Yesterday* which has been sold and rented to consumers, and exhibited at pay-for-view movie theaters, during the years 2019, 2020, 2021, 2022, and 2023.

80.   Ana De Armas does not appear in any publicly released version of Defendant's publicly released movie *Yesterday*

81.   All of Defendant's theatrical presentations, sales, rentals, and licenses, of the movie *Yesterday* injure consumers in the same way because the film sold, rented, and licensed is the same, regardless of medium, and does not include Ana De Armas and does not include the "something"-song-joke, in which Malik plays The Beatles' song "Something". Moreover, the commercial impression communicated by Defendant's promotion and advertisement of the movie is the same – that Ana De Armas, and the other omitted scenes, will appear in the full length movie.

82.   Defendant had sufficient control and authority to determine whether Ana De Armas would appear in the *Yesterday* movie trailer. Defendant also had sufficient control and authority to obtain or create and utilize a new *Yesterday* trailer which was not false and misleading.

83.   Defendant chose to continue to utilize *Yesterday* movie trailers featuring Ana De Armas as advertisements, and chose to continue listing her as a cast member in words

alongside her photograph, even though Defendant knew that Ana De Armas was not in the film *Yesterday*.

84.    Defendant's trailer for the movie *Yesterday* is used to advertise the movie to solicit purchases and rentals of the movie from online movie services such as Amazon Prime, Google Play, and VUDU. Defendants' *Yesterday* trailer, used on such services to advertise the movie, includes scenes with Ana De Armas.

85.    The following images are true and accurate screen shots from Defendant's movie trailer for *Yesterday*:







THIRD AMENDED CLASS ACTION COMPLAINT

2:22-cv-00459-SVW-AGR

Actress Ana De Armas is the actress wearing a white outfit in the above images.

86.     Defendant's official trailer for the movie *Yesterday* was also published by Defendant on YouTube and has been viewed more than 32.6 million times on YouTube since February 12, 2019.  The number 32.6 million meets or exceeds the number of viewers of the movie *Yesterday* that paid to view it or purchased it.

87.     Relying on false, deceptive, and misleading advertisements for its promotion, Defendant's movie *Yesterday* has thus far grossed approximately $150,000,000 (one-hundred fifty million) United States dollars.

88.     The version of the movie trailer offered on the Amazon Prime platform which was viewed by Plaintiffs Woulfe and Rosza, has since been replaced by Defendant with an alternative trailer. The replacement of the trailer on Amazon Prime evinces the ease with which Defendant could have produced and utilized a different trailer, not featuring Ana De Armas. The replacement trailer omits any display of Ana de Armas which would reveal the identity of Ana de Armas, and now only includes a momentary shot of the actress with her back turned, but wearing the same white outfit referenced in paragraph 85 *supra*.

89.     NBC Universal's VUDU platform, co-owned with Defendant, was affirmatively advertising Ana De Armas as appearing in the movie *Yesterday*, which is for sale and rent on the platform, at least as recently as May 3, 2022. Defendant controls the content of Defendant's movie advertising on the VUDU platform. Defendant's continued advertisement of Ana De Armas as appearing in the movie *Yesterday,* long after being put on notice of its unlawful conduct with the filing and ultimate service of Plaintiffs' original complaint, demonstrates Defendant's intent and willingness to deceive consumers.

90.     The Internet Movie Database ("IMDB") originally listed Ana De Armas as an actress in the movie *Yesterday*. Although the database has recently been changed to remove

Ana De Armas' name as an actress in the movie, if consumers were to have consulted the original database beyond viewing Defendant Universal's advertising trailer, such consumers would have been falsely informed that Ana De Armas appeared in the movie, even though she does not.

91.    The movie trailers for *Yesterday* which featured Ana De Arma made an affirmative representation to consumers that she would appear in the movie. Indeed, some versions of the trailer display the word "preview" at the beginning which communicates to consumers that the trailer advertisement that they are viewing is an actual true and correct sample (i.e., a true preview) of the advertised movie. However, neither all of the scenes that appear in the trailer, nor Ana De Armas, appear in the actual motion picture.

92.    Evincing that the movie trailers for *Yesterday* which featured Ana De Armas were interpreted as affirmative representations that Ana De Armas appeared in the motion picture, voluminous comments on social media channels discuss consumers' surprise and confusion when she did not appear in the full movie. True and correct copies of these consumer comments are reproduced below:

- Ironically, I went to see the movie because of this scene

- This scene was used to promote the movie then was NOT in the movie. I couldn't believe it. Hope they put it back in someday.

- Me too! The movie was not as good as I thought it would be and I was really looking forward to this scene.

- Yeahh, this was one of the scene that i've been waiting for when i watch the movie

- Same. Movie was meh. This scene would have improved it.

- same....i just wait and wait but what...where's the scene????

27

THIRD AMENDED CLASS ACTION COMPLAINT

2:22-cv-00459-SVW-AGR

- So did most people... worst edit ever

- Yes! That cheating coming attraction! I was so damn disappointed 😿

- They did me dirty

93.    Defendant's use of trailer advertisements to entice consumers to attend theater presentations or to rent or buy the movie *Yesterday* (in electronic or DVD form) was purely for commercial purposes. Defendant did not write the script for the movie but merely acquired rights to the movie and created trailer advertisements, using omitted scene elements and an actress not in the actual movie *Yesterday*, to pitch the movie to consumers. Specifically, Defendant used Ana De Armas and the omitted scene elements to make the movie *Yesterday* appear more appealing than it actually was. In other words, Defendant used the trailers in a purely commercial marketing campaign to trick viewers into renting or purchasing the motion picture.

94.    In another example evincing Universal's commercial purpose, Defendant's website offered movie tickets for the movie *Yesterday* on the same page that it displayed the movie trailer advertisement for *Yesterday*. More specifically, tickets could be purchased on Defendant's website using the co-owned Fandango movie ticket sales platform. Defendant  and/or its parent entity/entities profited when movie tickets were purchased using the purchase link located alongside the movie trailer advertisement on Defendant's website, providing motivation for Defendant's deceptions.

95.    When not offering movie rentals or sales on its own website, Defendant intends and directs that its movie trailers – including the movie trailer for *Yesterday* -  be shown alongside opportunities for movie rentals or purchases so that consumers will make their purchase or rental decisions, in reliance on the content of the movie trailer advertisement. Likewise, at least one version of the *Yesterday* trailer directs consumers to

a webpage operated by Defendant, which offers (or offered) DVDs of the *Yesterday* movie for sale.

96.   Further demonstrating the movie trailers are advertisements having a commercial purpose, the Motion Picture Association, Inc. (formerly the "MPAA"), of which Defendant Universal is a member, published Advertising Administration Rules which include a definition section. According to the first section, Section 1: Definition of Advertising:

**Section 1. Definition of Advertising**

For purposes of these Rules, "advertising" means any material in any medium that is intended primarily to promote the exhibition, performance or sale of copies of the motion picture to the public and that is directed primarily to or for which a significant number of viewers are consumers in the United States. The senior executive of the Advertising Administration shall have the authority to determine whether specific material constitutes advertising within these Rules.

For reference, the term "advertising" includes, but is not limited to, the following materials: trailers, in-theater extended looks, exclusive content, clips and footage,

Exhibit A is a true and correct copy of page 3 of the Motion Picture Association, Inc.'s Advertising Administration Rules, published on and effective October 8, 2019. Demonstrating that movie trailers are not supposed to be false or misleading, the MPA Administration Rules also state, "Certain content restrictions are applicable to all advertising. In all instances:  Advertising may not misrepresent the content of the motion picture[.]" In other words, Defendant's advertisements for *Yesterday* violate even the standards set forth by its own member organization.

97.   Defendant's commercial advertising expenditures are reported to the Securities and Exchange Commission ("SEC") via its parent entities. These advertising expenditures include trailer production and promotion costs.

29
THIRD AMENDED CLASS ACTION COMPLAINT

98.    Similarly, the Federal Trade Commission ("FTC"), U.S. Congress, and members of representative American movie studios consider trailers to be commercial advertising, such as evidenced by the FTC reports to Congress, and resulting Congressional testimony, pertaining to the movie studios' alleged marketing of adult entertainment to children, using movie trailers.  Many if not all of the major movie studios, including Defendant Universal, testified in the Congressional hearings, and consistently acknowledged the commercial purpose of trailers as advertisements.

99.    In all cases known to plaintiffs, the movie theater presentations of the movie *Yesterday*, the DVD copies of the movie *Yesterday*, and the at-home purchases and rentals of the movie *Yesterday* all omitted scenes that appeared in the *Yesterday* movie trailer advertisement, including the scenes that featured the actress Ana De Armas. Accordingly, all consumers were harmed in the same way by the same false, misleading, unfair, fraudulent, and deceptive movie trailer advertisements.

**Goods and Services**

100.   Defendant Universal's movie products are, at least colloquially, goods and/or are offered to customers utilizing various types of services. For example, the movie *Yesterday* exists in physical film or digital form which is utilized in connection with movie display services which are sold to consumers. Moreover, the physical DVD discs which Universal sells are goods. More specifically, the digital streaming of Defendant's movies is offered as a service, both by Defendant's affiliated entity VUDU, and by third parties acting on behalf of Defendant. Illustratively, VUDU (co-owned with Defendant by NBCUniversal) itself ubiquitously categorizes its offerings as a "service". According to a 2021 VUDU press release as but one example: "Vudu is a leading video-on-demand streaming service from Fandango offering over 150,000 titles to rent or buy, including the newest releases, and thousands of titles for free. Serving millions of entertainment fans

daily, Vudu has created compelling video entertainment experiences, including the ability to create custom Lists from their movies & TV library, purchase exclusive Mix & Match bundles, access digital copies of their physical films, and much more. Consumers can watch the latest movies & TV shows anytime, anywhere, on their favorite smart TV, over-the-top (OTT) streaming player, Android and iOS device, game console, and Blu-ray player. Streaming or downloaded, Vudu delivers a premium experience with the latest digital video technology, including 4K Ultra High Definition, Dolby Vision, HDR, and Dolby Atmos Cinema Sound." Not merely just streaming movies like *Yesterday,* VUDU informs of the purported cast of the movie, and provides a trailer advertisement so a customer can make a purchase decision without leaving the platform. If a movie is purchased, VUDU detects a consumer's internet speeds and adjusts the resolution of the movie delivered to the consumer in real-time to attempt to ensure glitch free movie watching.  Vudu also provides a "Movie Recommendation Decision Engine" and supplies third-party movie reviews to aid consumers in selecting movies to purchase. Also, according to VUDU, "One of the features of [VUDU's] Services is that we may customize your user experience based on your Content, webpage and other viewing, purchasing and browsing history. You may notice this when you use the Services." Supporting all of these services, VUDU employs Technical Support and Customer Support teams to aid customers which experience technical issues purchasing or watching a movie (e.g., such as if sound is not playing with the display of a movie). As another facet of its services, VUDU permits movies to be downloaded to various types of physical devices, so that the movies can be viewed at various locations, such as where internet access is not available. According to VUDU's summary of this feature:

"Summary
The Movie Download feature allows you to download a movie to the hard disk drive built into your

VUDU device. Once downloaded, you can then watch the movie directly from the hard disk, without having to stream it over the Internet.

Downloading a Movie
You may download a movie immediately after purchasing it or at any time after you have purchased it.

### Purchasing and Downloading

In order to purchase a movie and begin downloading it immediately, please follow these steps:

1) Select "Buy Movie" from the Movie Details page

2) Select the movie video quality (SD, HD and HDX) that you would like to own. The download feature

is only available for movies that you select to "own" on VUDU.

3) Once you purchase the movie, you will be presented with several options, select "Download and

Watch Later". Your movie will begin downloading."

Amazon's Prime Video service, the service used by Plaintiff's Woulfe and Rosza, is similar to VUDU's service in that it provides many (if not all) of the same or similar features. For example, Prime Video provide descriptions and trailer advertisements for movies, provides movie ratings, actively adjusts movie resolutions during playback, suggests movies to watch, includes parental controls, organizes movie watch parties, provides scene information during movie play with its "X-Ray" service, allows downloads to physical devices so that movies can be moved to watch at different locations, and provides customer service and technical support. Using either service, if a movie is purchased, it can be watched in perpetuity at different physical locations on various physical devices which can be transported geographically, carrying the movie inside. Using Prime Video, if a movie is rented, it is placed into a "My Stuff" folder on a physical device of a consumer where it is accessible for 30 days from the date of payment, with VUDU offering similar 30 day movie rental access.

101.   By way of additional example, Defendant and its affiliated entities have applied for and obtained U.S trademark registrations from the United States Patent and Trademark Office ("USPTO") both for movies themselves and for supplying in-home consumers with movies, such as via in-home movie streaming services (also known as digital movie stores). For example, VUDU was granted a trademark for the mark "VUDU" for its digital movie store services, with the mark itself categorized by the USPTO as a "Service Mark." The services for which the registration was granted are as follows:

providing consumer information used in the selection and purchase of audio and video content, namely, retail ordering services in the field of motion pictures and multi-media excluding interactive games.

audio and video broadcasting services, broadcasting audio and video content over global computer networks, video-on-demand transmission services, pay-per-view video and audio transmission services.

providing information in the area of audio and video programming, namely, electronic distribution of motion pictures and multi-media to retail consumers excluding interactive games.

providing a website featuring temporary use of non-downloadable software allowing website users to store and playback audio and video content for entertainment purposes in the field of motion pictures and multi-media excluding interactive games.

Amazon.com was granted a similar trademark registration for the mark "Prime Video", for similar services, which is also characterized by the USPTO as a "Service Mark."

102.   The USPTO's authority in issuing trademark registrations is limited to "goods" and "services," and the USPTO has approved of Defendant's and/or its affiliated entities' goods and services for movies and in-home digital movie deliveries, as recited in their U.S. trademark applications.

103.   The state of California has adopted the classification system of the USPTO for goods and services. Consequently, the state of California also recognizes Defendant Universal's movies and in-home movie deliveries as goods and/or services.

## Defendant's False and Deceptive Advertising

104.   Plaintiffs reassert and reallege all of the allegations contained in the foregoing paragraphs as though the same were fully set forth herein.

105.   Defendant, through its movie trailers and other false advertising, such as it's fraudulent cast listings on VUDU, Google, and Apple TV; key word linking of Ms. De Armas to *Yesterday* (on numerous platforms); and misleading commercial promotional appearances for *Yesterday*, has consistently conveyed to consumers throughout the United States that the movie *Yesterday* features actress Ana De Armas.

106.   Despite Defendant's  representations in its advertising, Ana De Armas is not in the film *Yesterday*.

107.   Defendant also deceived consumers by including the "something"-song-joke, and the performance of The Beatles' song Something, in movie trailers promoting *Yesterday*.

108.   The "something"-song-joke, and the performance of The Beatles' song Something, is not in the publicly released version of the movie *Yesterday*.

109.   Defendant's movie trailer advertisements for the movie *Yesterday*, featuring Ana De Armas, are literally false advertisements.

110.   Defendant's movie trailer advertisement of the movie *Yesterday*, featuring scene elements which were not included in the publicly released film, are collectively a literally false advertisement.

111.   Defendant's movie trailer advertisements for the movie *Yesterday*, featuring Ana De Armas, are false, deceptive, deceitful, fraudulent, unfair, and misleading.

112.   Defendant's movie trailer advertisement of the movie *Yesterday*, featuring scene elements which were not included in the publicly released film, are false, deceptive, deceitful, fraudulent, unfair, and misleading.

113.   Defendant's advertisements on VUDU, which state that Ana De Armas is a cast member, and which list the movie *Yesterday* when searching for Ana De Armas' name, are literally false advertisements.

114.   Defendant's advertisements on VUDU, which state that Ana De Armas is a cast member, and which list the movie *Yesterday* when searching for Ana De Armas' name, are false, deceptive, deceitful, fraudulent, unfair, and misleading.

115.   Consumers, including movie viewers, purchasers, and renters of the movie *Yesterday*, relied on the content of the trailer for the film, or the content of Defendant's advertisements, when deciding whether to spend money to view or purchase the film.

116.   Because consumers were not provided with the movie product that they were promised by Defendant, they were effectively provided with no value at all. Alternatively, at best, Plaintiffs and the class members were provided with a movie product having less value than the product they were advertised and promised.

117.   Because consumers were promised a movie with Ana De Armas by Defendant's advertisements for *Yesterday*, but did not receive a movie with any appearance

of Ana De Armas at all, such consumers were not provided with any value for their rental or purchase, or at best were provided with less value than promised.

118. Defendant's false, deceptive, fraudulent, unfair, and misleading advertisements have been disseminated to the public continuously since at least 2019, and are still being disseminated in June of 2022, and Defendant will continue to deceive the public with such advertisements unless it is enjoined from continuing to engage in such unlawful conduct.

## CLASS DEFINITION AND ALLEGATIONS

119. Plaintiffs reassert and reallege all of the allegations contained in the foregoing paragraphs as though the same were fully set forth herein.

120. Plaintiffs, pursuant to Fed. R. Civ. Pro. 23(b)(2) and 23(b)(3), bring this action on behalf of themselves and those similarly situated and seek certification of the following classes:

### California Class

All persons in the state of California who rented or purchased electronic copies of the movie *Yesterday* within California, within the applicable statute of limitations, for personal use until the date notice is disseminated.

### Maryland Class

All persons in the state of Maryland who rented or purchased electronic copies of the movie *Yesterday* within Maryland, within the applicable statute of limitations, for personal use until the date notice is disseminated.

## Proposed Alternative Class I

All persons who were exposed to Defendant's advertising representing that the actress Ana de Armas was in the movie *Yesterday*, who rented or purchased electronic copies of the movie *Yesterday* [in the state of California or Maryland, respectively], for personal use, within the applicable statute of limitations, until the date notice is disseminated.

121.   Excluded from each Class is Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who viewed, purchased, or rented the movie *Yesterday*, all persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned and any immediate family members thereof.

122.   Certification of Plaintiffs' claims for class wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

### Numerosity – Federal Rule of Civil Procedure 23(a)(1)

123.   The members of the Class are so numerous that individual joinder of all Class members is impracticable. Defendant has sold at least hundreds of thousands of movie tickets, or online or physical movie rentals or purchases, to Class members.

### Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)

124. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

(a)   Whether the representations discussed herein that Defendant made about *Yesterday* were or are true, misleading, or likely to deceive;

(b)   Whether Defendant's conduct violates public policy;

(c)   Whether Defendant engaged in false or misleading advertising;

(d)   Whether Defendant's conduct constitutes violations of the laws asserted herein;

(e)   Whether Plaintiffs and the other Class members have been injured and the proper measure of their losses as a result of those injuries; and

(f)   Whether Plaintiffs and the other Class members are entitled to injunctive, declaratory, or other equitable relief.

**Typicality – Federal Rule of Civil Procedure 23(a)(3)**

125.   Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through the uniform prohibited conduct described above.

**Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4)**

126.   Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the other Class members Plaintiffs seek to represent; Plaintiffs have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel.

**Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2)**

127.    Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief  and declaratory relief, as described below, with respect to Class as a whole.

## Superiority – Federal Rule of Civil Procedure 23(b)(3)

128.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the California Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code §§ 17200, *et seq*. (Pleading in the Alternative)
(On behalf of the California Class)

129.    Plaintiffs reassert and reallege all of the allegations contained in the foregoing paragraphs as though the same were fully set forth herein.

130.    These claims are asserted pertaining to Defendant's rentals and sales of movies on Amazon Prime only. Claims pertaining to VUDU and other non-Amazon Prime

movie vendors have been dismissed, and factual allegations pertaining to such vendors relate to background facts, materiality, intent, and similar issues only, without forming the basis of any legal claim.

131.   There is no adequate remedy at law for any unlawful,  unfair,  or fraudulent advertising, for any *Yesterday* movie sale, movie display, rental, or viewership right sold which the Court determines is not a good or service for which remedies are available under California Consumers Legal Remedies Act.  For these acts for which there is no adequate remedy at law, Plaintiff Rosza brings this claim individually and/or on behalf of the California Class. Accordingly, this claim is pleaded in the alternative to the other claims set forth herein.

132.   Plaintiff and Defendant are "persons" within the meaning of the UCL. Cal. Bus. & Prof. Code § 17201.

133.   The UCL defines unfair competition to include any "unlawful, unfair or fraudulent business act or practice," as well as any "unfair, deceptive, untrue or misleading advertising." Cal. Bus. Prof. Code § 17200.

*"Unlawful" Prong*

134.   In the course of conducting business, Defendant committed unlawful, unfair and fraudulent business practices by, among other things, making the representations (which  also  constitutes advertising within the meaning of § 17200) and omissions of material facts, as set forth more fully herein, and violating as well as Civil Code §§ 1709, and Business & Professions Code §§ 17200, *et seq.*, 17500, *et seq.* ("False Advertising Law"), and the common law. Additionally, Defendant Universal's false statements, comprising false commercial advertising pertaining to the contents of the movie *Yesterday,* constitute fraud, fraud in contract, common law fraud, and breach of Defendant's covenant of good faith and fair dealing, thus violating California Civil Code §§ 1709.

135.   Plaintiff reserves the right to allege other violations of law, which constitute other unlawful, unfair, and/or fraudulent business acts or practices. Such conduct is ongoing and continues to this date.

***"Unfair Prong"***

136.   A business act or practice is unfair under the UCL if it offends an established policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims. In the course of conducting business, Defendant committed "unfair" business practices by, among other things, making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts regarding the movie *Yesterday* in its advertising, as set forth more fully herein. There is no societal benefit from false advertising – only harm. Plaintiff and the other Class members paid for a product that did not deliver the content promised by Defendant's advertising. While Plaintiff and the other Class members were harmed, Defendant was unjustly enriched by its false misrepresentations and omissions. As a result, Defendant's conduct is "unfair," as it offended an established public policy. Further, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

137.   Further, as set forth in this Complaint, Plaintiff alleges federal and state law violations of consumer protection, unfair competition, and truth in advertising laws, resulting in harm to consumers. Defendant's acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of Business & Professions Code § 17200, *et seq*.

138.   There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

**_"Fraudulent" Prong_**

139.   Business & Professions Code § 17200, *et seq.*, also prohibits any "fraudulent business act or practice." A business act or practice is fraudulent under the UCL if it is likely to deceive members of the consuming public, or reasonable consumers. In the course conducting business, Defendant committed "fraudulent business act or practices" by, among other things, making the representations (which also constitute advertising within the meaning of § 17200) and omissions of material facts regarding the movie *Yesterday*, as set forth more fully herein. Defendant made the misrepresentations and omissions regarding the content of the film *Yesterday,* among other ways, by misrepresenting that Ana De Armas would appear in the publicly released film when Defendant knew she would not.

140.   Defendant's acts and practices alleged herein constitute fraudulent business acts or practices as they have deceived Plaintiffs and are highly likely to deceive reasonable consumers. Plaintiffs relied on Defendant's fraudulent and deceptive representations regarding the movie *Yesterday,* which were but for material with respect to Plaintiffs' decisions to purchase the movie. Plaintiffs would not have purchased the movie *Yesterday* if they had known the truth.

141.   Defendant's actions, claims, omissions, and misleading statements, as more fully set forth above, were also false, misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code § 17200, *et seq*.

142.   Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendant's material representations and omissions, which are described above. This reliance has caused harm to Plaintiff and the other members

of the Class, each of whom paid to view or purchased Defendant's film *Yesterday*. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of paying to view or purchasing the movie *Yesterday* due to Defendant's unlawful, unfair, and fraudulent practices.

143.   Defendant knew and intended, or at least should have known, that its material misrepresentations and omissions would be likely to deceive and harm the consuming public and result in consumers making payments to Defendant for its falsely advertised film.

144.   As a result of its deception, Defendant was unjustly enriched by receiving payments from Plaintiff and the Class in return for providing Plaintiff and the Class a movie product and/or service that does not include the actress Ana De Armas as promised by its advertisements. Accordingly, Plaintiff, individually and on behalf of all others similarly situated, and on behalf of the general public, seeks restitution from Defendant of all money unlawfully obtained from Plaintiffs.

145.   Unless restrained and enjoined, Defendant will continue to engage in theunlawful, unfair and fraudulent conduct described herein. Evincing this danger, Plaintiffs expressly requested during February of 2023 that Defendant agree not to use trailers featuring Ana de Armas in the future, to promote versions of the movie *Yesterday* in which she does not actually appear. Defendant refused this request. The same offer was made to Defendant by Plaintiffs on or around March 16, 2023, in an effort to avoid the need for this Third Amended Complaint addressing injunctive relief, but Defendant ignored the request entirely. Meanwhile, Defendant continues to advertise *Yesterday* using trailers featuring Ana de Armas; Ana de Armas is still listed as a cast member alongside her photograph; and her name is still software encoded to the movie. As an example, below is a true and correct copy of an advertisement for the movie *Yesterday* which appeared on Google at least as of March 17, 2023:



(Copy of Google advertisement, last accessed March 16, 2023)(marked-up)

146.    Defendant Universal is a major motion picture studio with large market share, and Plaintiffs anticipate buying or renting movies advertised with movie trailers by Defendant Universal again. Moreover, because Plaintiff's wanted to see Ana de Armas in the movie *Yesterday*, both Plaintiffs intend to and will pay to view *Yesterday* again, based upon the reasonable presumption that no rational actor would continue to falsely advertise a movie's content, after a Court of law has already determined that the false advertising is unlawful conduct, not protected by the First Amendment. Indeed, Plaintiff Woulfe recently paid to rent *Yesterday* on Google Play, based upon the reasonable presumption that the current cast listing that identifies Ms. de Armas as a cast member would be accurate. Yet, just as Mr. Woulfe was deceived on the Amazon.com platform, Mr. Woulfe was also deceived on the Google Play platform, because Ms. de Armas was not in the version of the film rented thereo.

147.   Plaintiffs' knowledge that the trailer advertisement for *Yesterday* was false in the past does not equate to knowledge that it will remain false in the future. For the reasons stated above, for example, it was reasonable for Mr. Woulfe to rely on cast listings representing that Ana de Armas would be in the version of *Yesterday* that he paid to rent on the second rental occasion. It will also be reasonable for Mr. Rosza to rely on Defendant's existing or future advertisements pertaining to the content of *Yesterday*, for similar reasons. Further, it is commonplace for movie studios to release alternative versions of movies after an initial movie release. Such alternative versions of movies can be called numerous things, depending on their character, such as Director's Cuts, Special Editions, Anniversary Editions, Extended Versions, etc. Any alternative version of *Yesterday* which might be released might - or might not - include Ana de Armas. If the new version is a Director's Cut, the decision to include alternate scenes is within the discretion of the director. Alternatively, the decision to include alternate scenes in an extended cut might be at the discretion of the movie distributor or other creative personnel. Accordingly, for a movie such as *Yesterday*, the director or the studio could (for example) include additional scenes pertaining to the appearance of members of the Beatles, such as a scene where the Beatles members come forth to challenge Jack Malik's authorship of their songs, even though they had not achieved fame themselves for them in the alternate reality portrayed in the movie. Such a story plot is alluded to by certain versions of the movie trailers for *Yesterday*, but that story element never plays out in the publicly released version of the film. In other words, a Director's Cut – or an Extended Cut, Special Edition, or Anniversary Edition (or other release type) - could be released to add scenes which don't include Ana de Armas, but since Defendant refuses to stop advertising that Ana de Armas is in the movie *Yesterday*, Plaintiffs and other members of the movie consuming public are likely to be confused and deceived. Likewise, it is a reasonable presumption that Defendant would change the released version of *Yesterday* which is offered on online rental and

purchase platforms to attempt to mitigate legal liability, without advertising that the movie version is different. Defendant can do this at any time, such as by uploading a new movie version on the Aspera platform to change the *Yesterday* movie version available on Amazon, and could do so without announcement or other advertising changes to avoid further unwanted attention to its false advertising.

148.    Evincing that consumers believe that a movie version with Ana de Armas actually appearing *might* eventually be released, a person identified as KCDC posted the following comment on Bestbuy.com more than three years ago:

> "*Super peaved that they cut the Roxanne character from the movie and left a crucial moment in the trailer. That moment was my entire reason for even seeing the movie to begin with and I feel ripped off for it not being there. Hopefully they will have a director's cut with this corrected at some point.*"

149.    Like Defendant refuses to agree to stop false advertising, Defendant has also obstructed discovery or provided dishonest discovery answers. For example, Defendant has refused to answer discovery about Defendant's advertising practices. An example interrogatory which Defendant refuses to answer substantively is reproduced below:

> Describe and identify all instructions, guidelines, requirements, and/or other information issued (or otherwise communicated) to third-parties pertaining to the advertising or promotion of the movie *Yesterday*, including the content and date of such instructions (or guidelines, requirements, or other information), the person(s) that drafted them, the person(s) that issued them, and the persons(s) that received them. The requirement to identify documents in this interrogatory means to identify them by bates number.

150.   According to Defendant, the above interrogatory is "too vague and ambiguous to respond to… because it does not define the terms and/or phrases 'instructions,' 'guidelines,' 'requirements,' 'other information,' and 'third parties.'" Up until on or around February 28, 2023, Defendant had also not turned over a single internal document, evidently in an effort to obtstruct the progress of this case. Likewise, for discovery requests that Defendant actually did answer, Defendant claims that it has no control over its advertising of *Yesterday* which is not merely implausible but is contradicted the representations of Amazon.com. According to Amazon.com, which researched the specific matter over several weeks, Defendant uploads movie versions and trailer versions using a platform termed "Aspera", on Defendant's own volition. In short, Defendant's lack of candor with some discovery answers and unserious responses to others, paired with its long history of intentionally falsely advertising its movies, shrouds Defendant's future conduct with uncertainty in the context of an already troubling past.

151.   Adding further context to this troubling past, Defendant has falsely advertised numerous other movies, released in each decade since 2005, by including content in trailers that was never included in the released film. Moreover, as can be ascertained by reviewing class action websites discussing this lawsuit, many other movie consumers have already been deceived into paying for the movie *Yesterday*, including consumers that purchased movie theater tickets and DVD copies, as well as online rentals similar to those purchased by Plaintiffs.

152.   Because it is reasonable for Plaintiffs to believe that it would be wise business practice to correct advertising already determined by a Court of law to be false, it is reasonable for Plaintiffs to believe that Defendant's advertising of *Yesterday* will not be false in the future. Yet, because of Defendant's troubling conduct and past, paired with Defendant's express refusal to agree to refrain from false advertising in the future, Plaintiffs – and other movie consumers - will be unable to rely on Defendant's trailer

advertisements for *Yesterday* in the future, unless an injunction is ordered by the Court. Moreover, because Plaintiffs – including Mr. Woulfe – intend to pay to view the movie *Yesterday* again, to continue to attempt to see the scene with Ms. de Armas, Defendant's widespread, current, and consistent advertising that Ana de Armas is in *Yesterday*, could deceive Plaintiffs again. Accordingly, since money cannot fix future harm, Plaintiffs, individually and on behalf of all others similarly situated, and on behalf of the general public, seek an injunction, including a public injunction for the benefit of the general public, prohibiting Defendant from continuing and further engaging in its unlawful, unfair and fraudulent conduct, requiring corrective advertising, and awarding all other relief this Court deems appropriate.

**COUNT II**
**Violation of the California False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500, *et seq*. (Pleading in the Alternative)**
(On behalf of the California Class)

153.   Plaintiffs reassert and reallege all of the allegations contained in the foregoing paragraphs as though the same were fully set forth herein.

154.   These claims are asserted pertaining to Defendant's rentals and sales of movies on Amazon Prime only. Claims pertaining to VUDU and other non-Amazon Prime movie vendors have been dismissed, and factual allegations pertaining to such vendors relate to background facts, materiality, intent, and similar issues only, without forming the basis of any legal claim.

155.   There is no adequate remedy at law for any unlawful, unfair, or fraudulent advertising, for any *Yesterday* movie sale, movie display, rental, or viewership right sold which the Court determines is not a good or service for which remedies are available under California Consumers Legal Remedies Act.  For these acts for which there is no adequate remedy at law, Plaintiff Rosza brings this claim individually and/or on behalf of the

California Class. Accordingly, this claim is pleaded in the alternative to the other claims set forth herein.

156. The FAL, in relevant part, states that "[i]t is unlawful for any … corporation …with intent … to dispose of … personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated …from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement … which is *untrue* or *misleading*, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading[.]" Cal. Bus. & Prof. Code § 17500 (emphasis added).

157. The required intent is the intent to dispose of property, not the intent to mislead the public in the disposition of such property.

158. Defendant violated the FAL by intentionally making literally false and misleading representations in its movie trailer, and in its other advertisements for the movie *Yesterday,* and through its use of key word linking to associate Ana De Armas' name with the movie *Yesterday* in search results. These literally false and misleading representations led consumers to believe that Ana de Armas was in the movie *Yesterday* when, in reality, she did not make an appearance in the movie *Yesterday.*

159. As a direct and proximate result of Defendant's untrue and misleading advertising, and use of key word linking to associate Ana De Armas' name with the movie *Yesterday* in search results, Plaintiff and the Class members have suffered injury in fact and have lost money.

160. Accordingly, Plaintiff and the Class Members request that the Court order Defendant to restore the money Defendant has received from Plaintiff and the members of the Class, and that the Court enjoin Defendant from continuing its unlawful practices,

including by issuing a public injunction for the benefit of the general public, and engage in corrective advertising.

## COUNT III
### Unjust Enrichment (Pleading in the Alternative)
(On behalf of the California and Maryland Class)

161.   Plaintiffs reassert and reallege all of the allegations contained in the foregoing paragraphs as though the same were fully set forth herein.

162.   These claims are asserted pertaining to Defendant's rentals and sales of movies on Amazon Prime and Google Play only. Claims pertaining to VUDU and other non-Amazon Prime movie vendors have been dismissed, and factual allegations pertaining to such vendors relate to background facts, materiality, intent, and similar issues only, without forming the basis of any legal claim.

163.   There is no adequate remedy at law for any unlawful,  unfair,  or fraudulent advertising, for any *Yesterday* movie sale, movie display, rental, or viewership right sold which the Court determines is not a good or service for which legal remedies are available under California Consumers Legal Remedies Act or the Maryland Consumer Protection Act. For these acts for which there is no adequate remedy at law, Plaintiffs bring this claim individually and/or on behalf of the California and Maryland Class.

164.   This claim is pleaded in the alternative to the other claims set forth herein.

165.   As the intended and expected result of its conscious wrongdoing, Defendant has profited from and benefitted from the sales, rentals, licenses, and public theater presentations of the movie *Yesterday*.

166.   Defendant has intentionally sought and voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Defendant's misconduct alleged herein, Plaintiffs and the Class were not receiving a product – the *Yesterday* movie – of the quality, nature, fitness or value that had been

represented by Defendant, and that a reasonable consumer would expect. Specifically, Plaintiffs and the Class members expected that when they purchased or rented the movie *Yesterday*, Ana de Armas would have a role in the movie and that other scenes appearing in the *Yesterday* trailer would appear in the film.

167.   Defendant has been unjustly enriched by its fraudulent, deceptive, unlawful, and unfair conduct, and its withholding of benefits and unearned monies from Plaintiffs and the Class, at the expense of these parties.

168.   Equity and good conscience militate against permitting Defendant to retain these profits and benefits.

**COUNT IV**
**Violation of Maryland's Consumer Protection Act**
**(Pleading in the Alternative)**
**MD Comm. L. Code § 13-301 *et seq*.**
(On behalf of the Maryland Class)

169.   Plaintiffs reassert and reallege all of the allegations contained in the foregoing paragraphs as though the same were fully set forth herein.

170.   These claims are asserted pertaining to Defendant's rentals and sales of movies on Amazon Prime and Google Play only. Claims pertaining to VUDU and other non-Amazon Prime movie vendors have been dismissed, and factual allegations pertaining to such vendors relate to background facts, materiality, intent, and similar issues only, without forming the basis of any legal claim.

171.   Plaintiff Woulfe brings this claim individually and on behalf of the members of the Maryland Class. This claim is pleaded in the alternative to the other claims set forth herein.

172.   Plaintiff Woulfe and the Maryland Class members are consumers within the meaning of the Maryland Consumer Protection Act, §13-201 *et seq*. (the "Maryland Act").

51

173.   The Maryland Act expressly notes that unfair or deceptive trade practices include:

   a.   False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

   b.   Representation that:

      i.   Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

   c.   Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

      i.   The promotion or sale of any consumer goods, consumer realty, or consumer service.

174.   Maryland Code, Commercial Law Article, 13-408, a provision of Maryland's Consumer Protection Act, expressly authorizes civil actions by consumers, like Plaintiff Woulfe.

175.   Defendant engages in "trade" and "commerce" generally and as it pertains to the distribution of the movie *Yesterday* for sale or rent to consumers within the state of Maryland.

176.   Defendant's movie trailer for the film *Yesterday*, and/or other movie advertisements, represent that the actress Ana De Armas, as well as certain omitted scenes, would be featured in the movie *Yesterday*, when she is not and the scenes are not.

177.   Defendant's movie advertisements indivudally and collectively are false, deceptive, and misleading because they represent that actress Ana de Armas, and other omitted scenes, would be featured in the movie *Yesterday*, when she is not and the scenes

are not. Defendant's false advertising provided no countervailing benefit to Plaintiffs or the Class Members.

178.   The content of Defendant's movie trailer for the movie *Yesterday,* which was omitted from the publicly released film, is and was collectively material to a reasonable consumer and is and was designed to affect consumer decisions and conduct. Defendant's non-trailer advertising of *Yesterday* was also collectively material to a reasonable consumer and is and was designed to affect consumer decisions and conduct.

179.   Defendant understood and intended that the representations in the movie trailer for *Yesterday*, and in other false advertisements, would influence consumer behavior.

180.   Defendant understood that it has an obligation to ensure the honesty of all promotions and to avoid misleading the public regarding the movie *Yesterday*.

181.   Defendant's misleading movie trailer, and other false advertising of *Yesterday*, constitutes an unfair method of competition and unfair and/or deceptive acts or practices in the conduct of trade or commerce for movie sales and rentals and licenses to consumers.

182.   Defendant's acts and practices offend public policy as established by statute.

183.   Defendant's acts and practices are immoral, unethical, oppressive, and unscrupulous.

184.   Defendant's conduct substantially injured actual and potential consumers, the public and competition. Defendant knowingly induced viewership, sales, rentals, and licenses of the movie *Yesterday* within the state of Maryland, using a false and deceptive movie trailer and other false advertisements for monetary gain from Plaintiff Woulfe, the Maryland Class members, and other consumers who would not have paid to view, rent, buy, or license *Yesterday* but for Defendant's false and misleading conduct.

185.   Defendant's conduct materially affected available information regarding its *Yesterday* movie within Maryland.

186.   Defendant's conduct improperly distorted the information available to the public regarding the movie *Yesterday*.

187.   Defendant's actions caused consumers to pay for the movie *Yesterday*, by deceiving consumers into believing the movie had content that it does not. These injuries are not outweighed by any countervailing benefits to consumers or competition. No legally cognizable benefit to consumers or competition results from Defendant's misconduct.

188.   Plaintiff Woulfe and the Maryland Class purchased ownership or rental copies of the movie *Yesterday,* or movie display services of *Yesterday*, for personal, family or household use. Thus, the practices discussed above constitute unfair competition or unfair, unconscionable, deceptive, or unlawful acts or business practices in violation of the Maryland Act.

189.   The foregoing unfair and deceptive practices directly, foreseeably, and proximately caused Plaintiff Woulfe and the Maryland Class to suffer ascertainable losses when they were deceived into paying to view, buy, rent, or license the movie *Yesterday*, when they would not have but for Defendant's false, deceptive, and misleading advertisements and representations. Consequently, Defendant has been unjustly enriched by gaining revenues for movie sales, rentals, and licenses, which it only gained because of its unlawful conduct.

190.   Plaintiff Woulfe and the Maryland Class are entitled to recover restitution and other appropriate relief, as alleged below.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the proposed Class, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendant, in combination or in the alternative, as follows:

A.    Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiffs as Class Representatives, appointing the undersigned counsel as Class Counsel, and ordering Defendant to notify the members of the Classes;

B.    Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs and the Class members as a result of Defendant's unlawful, unfair and fraudulent business practices;

C.    Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, including by ordering a public injunction for the benefit of the general public, and ordering Defendant to engage in a corrective advertising campaign;

D.    Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiffs and the other members of the Class;

E.    Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

F.    Ordering such other and further relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs respectfully demand a trial by jury in this action.

Respectfully submitted,

**LEJEUNE LAW, P.C.**

Dated: April 13, 2023

By:    */s/* Cody R. LeJeune

Cody R. LeJeune
445 S. Figueroa St.
Suite 3100
Los Angeles, CA 90071
Telephone: (985) 713-4964

**PEQUIGNOT + MYERS**
Matthew A. Pequignot
PEQUIGNOT + MYERS
2585 Ala Namahana Pkwy, #1007
Kilauea, HI 96754
Telephone: 202-328-1200

Attorneys for Plaintiffs
CONOR WOULFE, an individual, and PETER
MICHAEL ROSZA, an individual

THIRD AMENDED CLASS ACTION COMPLAINT

2:22-cv-00459-SVW-AGR